EXHIBIT A

FILED
2021 NOV 05
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 21-2-14753-1 SEA

| Superior Court of Washington, County of King | |
|---|---|
| ZION GRAE-EL, CAPRICE STRANGE and minors Z█████ A G█████ Z█ W G█ E█ A D█████ E█ M D█ A█ D S█ and A█ M G█   **Plaintiffs**  **V.** CITY OF SEATTLE, a municipal entity and political subdivision of the state of Washington; the SEATTLE POLICE DEPARTMENT, Ryoma Nichols, Daina Boggs; SEATTLE CHILDREN'S HOSPITAL, a non-profit Washington Corporation, Dr. Hannah Deming, Dr. Stanford Ackley, and Brenda Aguilar; STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, Annaliese Ferreria, Greg McCormack, Christine Spencer, Rosalynda Carlton, Derrick Reinhardt, Schawna Jones, Rebecca Webster, Rachel Zakopyko, Corey Grace, Stephanie Allison-noone, and Tabitha Pomeroy; OLIVE CREST, Sienna Bedford, Heather Hadfield, and Scott Hadfield; Seattle Public Schools, and Natalie Long  **Defendants** | No. **21-2-14753-1 SEA**  **SUMMONS (60 DAYS)** |

**TO THE DEFENDANT:** A lawsuit has been started against you in the above entitled court by Zion Grae-El, Caprice Strange, and minors ADS, AMG, ZAG, EMD, and EAD plaintiff(s). Plaintiff's claim is stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against this lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the person signing this Summons within 60 days after the service of this Summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where plaintiff is entitled to what he asks for because you have not responded. If you serve a notice of appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that the plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court, or the service on you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

October, 28, 2021

Signed at Seattle, Washington.

Submitted by:

Zion Grae-El

Address of Plaintiff: 5640 S Cedar St, Tacoma, WA, 98409.

Email of Plaintiff: Zgrae88@gmail.com

Telephone Number of Plaintiff: (206) 326-9160

| Superior Court of Washington, County of King | |
|---|---|
| ZION GRAE-EL, CAPRICE STRANGE and minors Z A G , Z W G  E  A D  E  M D , A D S , and A M G<br><br>**Plaintiffs**<br><br>V.<br>CITY OF SEATTLE, a municipal entity and political subdivision of the state of Washington; the SEATTLE POLICE DEPARTMENT, Ryoma Nichols, Daina Boggs; SEATTLE CHILDREN'S HOSPITAL, a non-profit Washington Corporation, Dr. Hannah Deming, Dr. Stanford Ackley, and Brenda Aguilar; STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, Annaliese Ferreria, Greg McCormack, Christine Spencer, Rosalynda Carlton, Derrick Reinhardt, Schawna Jones, Rebecca Webster, Rachel Zakopyko, Corey Grace, Stephanie Allison-noone, and Tabitha Pomeroy; OLIVE CREST, Sienna Bedford, Heather Hadfield, and Scott Hadfield; Seattle Public Schools, and Natalie Long<br><br>**Defendants** | No. 21-2-14753-1 SEA<br><br>**COMPLAINT FOR DAMAGES** |

**I. Jurisdiction.**   This Court has jurisdiction to hear this matter because:

1. This matter is brought before the Court to be heard under the authority indicated in RCW 2.08.010. This matter is one of the types of matters discussed in that statute.

2. Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."

3. The Superior Court of King County, State of Washington, has subject matter over this action pursuant to RCW 2.08.010.

4. On August 23, 2021, Plaintiffs filed a Standard Tort Claim Form with the State of Washington, Office of Risk Management. More than sixty days have elapsed since their claims were filed.

5. Pursuant to RCW 4.92.110 et seq. Plaintiff has fulfilled all of the administrative requirements for initiating and maintaining this action against the Defendants.


**II. Venue**

1. Plaintiffs Zion Grae-El ( Hereafter ZG ) , Caprice Strange ( Hereafter CS), AG, AS, and ZAG are residents of King County, in the state of Washington. AG, AS, and ZAG are minors and will be using pseudonyms to protect their privacy, due to the sensitive nature of the allegations in this lawsuit. Minors AG, AS, (CS's biological children) and ZAG (CS and ZG's biological son) will be represented by Zion Grae-El and Caprice Strange.

Plaintiffs may collectively be referred to as the Grae-El clan throughout the complaint.

2. Plaintiffs EAD, and EMD were residents of King County, in the state of Washington at the time of this incident. EAD and EMD are minors and will be using pseudonyms to protect their privacy, due to the sensitive nature of the allegations in this lawsuit. EAD and EMD will be represented by Zion Grae-El, their biological father.

3. Defendant State of Washington, Department of Children, Youth and Families (Hereafter DCYF ) in it's official capacity. DCYF is a cabinet level state governmental agency focused on the well being of children and is a government agency within the meaning of 5 U.S.C. § 552(f)(1) and 5 U.S.C. § 701. DCYF is vicariously liable for properly training every DCYF agent that provided professional services to the Grae-El clan.

4. Defendant Annaliese Ferreria ( Hereafter AF ) individually in her capacity as an agent of DCYF . AF at all times relevant hereto was a resident of Washington and acting under color of state law.

5. Rosalynda Carlton ( Hereafter RC ) individually in her capacity as an agent of DCYF (Supervisor) . RC at all times relevant hereto was a resident of Washington and acting under color of state law.

6. Derrick Reinhardt (Hereafter DR) individually in his capacity as an agent of DCYF. DR

at all times relevant hereto was a resident of Washington and acting under color of state law.

7. Defendant Schawna Jones (Hereafter SJ) individually in her capacity as an agent of DCYF. SJ works in a supervisory position. SJ at all times relevant hereto was a resident of Washington and acting under color of state law.

8. Defendant Rebecca Webster ( Hereafter RW) individually in her capacity as an agent of DCYF. RW at all times relevant hereto was a resident of Washington and acting under color of state law.

9. Defendant Rachel C Zakopyko ( Hereafter RZ ) individually in her capacity as an agent of DCYF. RZ  at all times relevant hereto was a resident of Washington and acting under color of state law.

10. Defendant Greg McCormack ( Hereafter GM ) individually in his capacity as an agent of DCYF. GM at all times relevant hereto was a resident of Washingtonand acting under color of state law.

11. Defendant Christine Spencer individually in her capacity as an agent of DCYF. Ms. Spencer worked in a supervisory position. Chrisyine Spencer at all times relevant hereto was a resident of Washington and acting under color of state law.

12. Defendant Stephanie Allison-noone individually and in her official capacity as an agent of DCYF. SAN at all times relevant hereto was a resident of Washington and acting under color of state law. SAN was and is the regional administrator for DCYF region 4.

13. Defendant Tabitha Pomeroy individually  in her capacity as an agent of DCYF. TP at all times relevant hereto was a resident of Washington and acting under color of state law.

14. Defendant Corey Grace individually in his capacity as an agent of DCYF. CG at all times relevant hereto was a resident of Washington and acting under color of state law.

15. Defendant City of Seattle in it's official capacity. The City of Seattle is a municipality organized under the laws of the state of Washington.

16. Defendant Seattle Police Department (Hereafter SPD) in its official capacity. SPD is the principal law enforcement agency of the city of Seattle, Washington. The Seattle Police Department is the largest Municipal law enforcement agency in Washington State.

17. Defendant Seattle Police Officer Ryoma Nichols ( Hereafter RN ) individually in his capacity as an employee of the SPD. RN at all times relevant hereto was a resident of Washington and was a duly appointed Officer of the City of Seattle and acting under color of state law.

18. Defendant Daina Boggs individually in their capacity as an employee of the SPD. Daina Boggs at all times relevant hereto was a resident of Washington and was a duly appointed Officer of the City of Seattle and acting under color of state law.

19. Defendant Seattle public schools ( Hereafter SPS ) in its official capacity, SPS is a government agency organized under the laws of the state of Washington.

20. Defendant Natalie Long ( Hereafter NL) individually in her capacity as an employee of Seattle Public Schools. NL at all times relevant was a resident of Washington and an employee of Seattle Public Schools.

21. Defendant Seattle Children's Hospital ( Hereafter SCH ) in its independent and official capacity. SCH is a nonprofit corporation organized under the laws of the State of Washington authorized to do business in the State of Washington. Defendant is a "healthcare provider" within the meaning of RCW 7.70 and RCW 4.16.350 and was duly

authorized to provide healthcare services to Plaintiffs ZAG, AS, AG, EMD, and EAD. There existed a fiduciary health care provider-patient relationship between the parties. SCH provided to Plaintiff's AS Et al. medical care and treatment. SCH through its agents, employees, and contractors, acted at all relevant times on behalf of SCH and within the scope of their employment or agency (whether actual or ostensible). All of the health care providers who provided professional services to the Grae-El clan were agents of the hospital. SCH is vicariously liable for all of the acts of every health care provider who provided professional services to the Grae-El clan in this matter. RCW 4.16.350

22. If any of the health care providers providing professional services to the Grae-El clan were not employees, then Plaintiffs reserve the right to individually name such non-employees as Defendants by way of an amended complaint.

23. Defendant Dr. Hannah Deming ( Hereafter HD ) individually in her capacity as an agent of SCH. HD was employed by the University of Washington at the time of this complaint. HD graduated from the University of California School of Medicine in San Francisco in May 2018. HD was receiving specialized training at SCH. HD at all times relevant was a resident of Washington, an employee of the University of Washington, and an agent of SCH. SCH authorized HD to provide care and make medical determinations.

24. Defendant Dr. Stanford Ackley ( Hereafter SA ) individually in his capacity as an agent of SCH. SA was a supervising attending physician in the Emergency Department of SCH. SA at all times relevant was a resident of Washington and an agent of SCH.

25. Defendant Brenda Aguilar ( Hereafter BA ) individually in her capacity as an agent of SCH. BA at all times relevant hereto was a resident of Washington, an agent of SCH, and

an employee of DSHS. BA was a part of the Seattle Children's Safe Child and
Adolescent Network (SCAN).

26. Defendant Olive Crest ( Hereafter OC) in its official and individual capacity. OC is a
    non- profit corporation organized under and doing business within the laws of the State of
    Washington.

27. Defendant Heather Hadfield ( Hereafter HH ) and Scott Hadfield individually in their
    capacity as licensed foster parents for OC. HH and SH at all times relevant hereto were
    residents of Bellingham, Washington.

28. Defendant Sienna Bedford ( Hereafter SB ) individually in her capacity as a case manager
    employed with Olivecrest. SB was at all times relevant hereto was a resident of
    Washington.


## III. STATEMENT OF FACTS

### A. CPS HISTORY

1. In case note ID# 45498889, case ID 2247387. A report was made to CPS on November
   28th 2018 by SPS staff regarding AS. Referer NL stated to AF  " that it looked like
   someone grabbed his face really hard. REF states that A███████ reported that his
   stepfather punched him in the stomach, however, they did not see a bruise, his leg hurt
   and hurt on his right shin". When AF asked NL why law enforcement wasn't contacted,
   NL replied that she "didn't think that they needed to".

2. In intake (4029859) it was stated to AF by SPS staff on November 28th that AS "is not
   expressing fear to return home at this time."

3. The initial screening of the report (4029859) by the intake worker GM who took the call screened the intake as a CPS-FAR3 case, only to be upgraded by the supervisor Christine Spencer to a CPS-Investigation when information was inaccurately put together, linking the observed injuries to the action, when that was not actually reported.

4. On 11/28/2018 NL and two other SPS staff collectively and inappropriately questioned AS multiple times regarding allegations. These "interviews" were not recorded.

5. On December 3rd 2018, AF entered case note ID 45499150. This case note was in reference to the "safety assessment" conducted on 11/28/2018. At no point within AF case notes does she state that ZG asserted his right to not allow them into his home. AF states in her report: "SW was informed that stepfather was not compliant with the previous SW because she was a white woman. Current SW was also informed that father has military background". At no point in time did ZG ever state that he was non compliant merely because our previous dcyf worker was a white woman. This was Misleading information, This was an assumption made by DCYF. The sharing of this incorrect information created implicit bias. Additionally, in her deposition AF states that before going to the residence of ZG with SPD RN, they [social workers CG and AF] "we had described, you know, and had informed them of the intake that we'd received and, um, kind of some of the background history as far as the resistance of the family wanting to work with CPS due to, um, racial conflict from the family, um, and their disliking of white social workers". That statement was slander, the family did not say that. That statement was extremely inflammatory, and blatantly bias. ZG feels he was labeled a racist thereafter by Defendants and treated unfairly throughout the removal of his children. To disclose this information would mean that it is relevant information. If the

existence of racial conflict was relevant information, the department would have made race a factor in determining foster homes, case assignments, recommendations, planning, and interactions with the Grae-El clan per DCYF policy 4250.

6. In a deposition of AF on June 27th 2019, AF stated that she briefed SPD on the "resistance of the family wanting to work with CPS due to, um, racial conflict from the family, um, and their disliking of white social workers." Prior to conducting the "safety assessment. AF described the incident as "Extremely hostile". This description isn't entirely true of what was actually said by ZG nor did any other SW describe the encounter on 11/28/2018 as hostile. Parents can be quoted saying they want RZ or a SW of a similar cultural background as themselves, this is an indication that parents aren't opposed to dealing with DCYF. Furthermore, to prefer a similar cultural background doesn't mean ZG and CS disliked white social workers.


7. AF states in a deposition that ZG said to her " he sees too much blue, not enough black". AF states:  "the response to him (ZG) was, you didn't like my blue jeans that I chose to wear today? And then [phone cuts out] irritated and upset that, asked me if I was being funny. And I said, depends. And he stated, um, or are you just trying to, um, how did he word it? Are you just trying to, um, insult my cultural intellect? So, my response, I said, probably the latter of the two. And then he got really quiet."

This is completely unprofessional conduct and is the opposite of de-escalation. Furthermore this does not appear to be the demeanor of someone who was engaged in an emergency situation. AF knew of the families racial concerns and chose that particular

time to make a joke, a moment when ZG voiced his discomfort with the lack of "tact", too many officers, and not enough "black" people.

8. At no point during the "safety assessment " on 11/28/2019 did AF, RN, CG, or JP observe or document any facial marks on any child other than AS. At no point in time did the children say they did not feel safe at home or were scared to return home, despite AS and AG being asked.

9. On November 28th 2018 JP stated that AF, CG, JP, and RN went to the residence of ZG to "assess the safety of the children". She also stated that ZG asserted legal rights of not allowing them entry into his home. JP also stated in case note ID 45481801 that ZG "agreed to send each child out one at a time to speak with daytime investigator". JP did not note any aggression. JP stated " he would not open the door for LE and [stated] that he does not have to by law. Most of what he was yelling was difficult to understand through the door". She also stated LE chose not to remove children and did not articulate the reason being safety.  Clearly there was more being said by ZG than what was documented by AF and CG, and SPD BWC will support this if it was properly used to record the incident.

10. Corey Grace failed to document anything that happened on 11/28/2018. At the time AF was 8 months into phase 2 of her training and was working under him. AF states in a deposition "he [ZG] did arrest [sic], address my coworker, um, Corey Grace. And he said, you my fellow brother, you being black, I'm surprised at, and appalled by your behavior, or something along those lines. And he said, um, what are you, her subordinate? Which at the time Grace had never said anything at all. He, you know, he was just standing there. Um, and, yeah, so he, then he had proceeded to bring, um, agreed to bring the children

down for me to see them." She also states in the same deposition "per policy 6600, if you read it in the DCYS policy handbook that a case worker or children's administrative staff is required to case note any and all interaction with clients". Defendant CG made no case notes during the incident on 11/28/2018. He omitted ZG's assertion of rights, AF inflammatory remarks, ZG's attempts to speak with him and statements made by children. CG's inaction violated DCYF policy 6600.

11. In a previous unfounded CPS investigation (#72714005) written by Heather Blackmore and completed on 03/22/2018,  it was noted that CS did not want the current social worker assigned to her. She [CS] "only wanted to work with Rachel Zakopyko and volunteered to do TripleP services through her home". At no point did ZG request services or state that he "didn't like white people". CS wanted to work with RZ because RZ was of a similar racial  background and CS felt she would have a better likelihood of being culturally understood. It had nothing to do with anyone being white, moreso it was about the family being culturally aligned with their African American culture. Case note:44226284 states "Both parents are concerned that they have a SW who meets their African American cultural needs/values." This is a clear indication that their race and culture should be taken into consideration regarding future interactions.  The next interaction with this family and the department was extremely overcharged and lacked sensitivity in regards to the family's concerns about race and culture.  This is the textbook definition of cultural indifference. CG was in fact a "black" man, yet he made no Documented notes, at all, nor did he respond to ZG, making his presence all but moot.

12. On 11/29/2018 at 10:45 am , AF arrived at Dunlap and called for SPD to place children in PC, further noting that it, "should have been done last night." Statements in the police

report indicate that when staff attempted to remove the children from the home the previous night, the same day as the report, ZG was noted as being "unsafe" and alleged to be aggressive and confrontational. SPD RN arrived at Dunlap at 2pm. Between 10:45 a.m. when AF arrived at the school to respond to the intake, and 2:50 p.m., when the Seattle Police Department (RN) arrived, AF was aware that they were going to request placement of the children, yet no efforts were made in that time to ascertain any more information about the initial incident, or speak with Ms. Marites.

13. In the Deposition of AF, when asked "Did you ask the children any questions about the allegations, about what happened at their home?" AF replied No. Yet in RN's summary report he states " Later, I overheard part of Ferreria's Interview of Ezarieah. I heard Ferreria ask about scratches on both sides of her neck and a small scar by her right collarbone. I heard Ezarieah tell Annaliese that these were caused by Caprice hitting her with a belt and spatula in a separate incident". This is clear evidence of AF providing false information in the deposition and it also means that she was supposed to document the event per DCYF policy. None of the interviews were recorded with video or audio due to SPD and CPS anticipating a "far more thorough interview " by SAU. The children were not separated during questioning.  "A far more thorough interview" is not an appropriate excuse for not conducting and documenting proper interviews at the time. The focus should have been on conducting as thorough of an investigation as possible, however it would appear the opposite took place. AF made no documentation of her "interviews" in her case notes not did she conduct herself according to policy.

14. A second intake was created on 11/30/2018 (4030264) after the children left the hospital. In this second intake RW further bolstered the inflamed bias against ZG by stating

"Description of abuse appears bizarre and severe and causes bodily harm greater than transient pain". RW also refers to the Corporal punishment as "beatings" when the children reffered to the Corporal punishment as "whoopins". This was not a harmless mistake, this was intentional mischaracterization of what children reported. It was also omitted that SCH records state that "Pt and siblings report they love each other and their parents, stating they play video games together, watch movies together, and sometimes go to McDonald's as a treat." This was written into SCH medical files by BA.

15. ZG strongly voiced his desire to have his children placed in a specific environment, where the cultural and spiritual practices of the family would be continued.  ZG voiced his concern with cultural alignment of the foster homes in several emails to DR, SJ, and his Dependency attorney Sacha Marley. Attached as Exhibit J is one of the emails in which ZG is voicing his CULTURAL and religious objections to specific treatment of ZAG by foster mother and SPS employee L█████ M█████ and her husband. These objections were never considered valid by DCYF at any point in time.

16. It is the belief of the Grae-El clan that ZG's child was sent to Bellingham intentionally as an inconvenience for ZG to engage in visiting his son ZAG. Both EAD and EMD were sent home to MN around the time when ZAG was sent to Bellingham. DCYF opposed to ZG  seeing AG and AS because the biological father did not want ZG to have contact. The Department also used a criminal NCO as an additional reason to speak against any reunification between ZG and AS.

17. A third intake was created when two of ZG's children, EAD and EMD, were returned to Minnesota to reside with their mother.  Almost immediately after taking custody of the two children, their mother reported that E.A.D. had disclosed sexual abuse.  E.A.D. was

subjected to a child forensic interview on December 14, 2018, at which time she claimed sexual abuse by Mr. Grae-El. ZG was tried and acquitted on the allegation Sept 2019.

18. In the case note Assessment ID: 72714005 it states that on 01/09/2018 a Triple P referral was made at the request of CS. The correspondence regarding the refusal of services and intake between RZ, CS, and the Triple P counsellor is a clear indication that she was the intended recipient of these services. ZG was not recommended services nor did he refuse services, because no services were offered to ZG. In Dependency proceedings on 12/06/2018 regarding ZAG and ZG, DCYF claimed in a Shelter Care Hearing that: DCYF made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home. The risk of imminent harm to the child as assessed by petitioner (DCYF) establishes reasonable cause for the continued out-of-home placement of the child pending the fact finding hearing; and specific services offered or provided to the parent(s) have been unable to remedy the unsafe conditions in the home and make it possible for the child to return home; and returning the child to the home would seriously endanger the child's health, safety, and welfare. This was a clear case of perjury. No services were offered to ZG regarding ZAG, or AS. DCYF made no effort to prevent or eliminate removing children from the home. Attached as exhibit M is an email regarding CS no longer wanting to engage in services because she was under the understanding that the services were voluntary and that the caseworker CS had refused to work with was no longer involved. There was never any correspondence with ZG regarding services through the department at the time the hearing was conducted. Again, this is a clear case of perjury, because DCYF had no evidence to support the statement. Furthermore it is important that CS requested services regarding an investigation that was deemed

unfounded, but in the case that involved the removal, CS was not recommended any services prior to removing the children.

19. Case: 2247387 Case Note ID:44194098 written by Penny Carr on 12/29/17, stated "Famlink generated law enforcement report, rec'd as returned by law enforcement for having insufficient evidence of a crime." At that time, DCYF and SPD had documented knowledge of Corporal punishment being used in the home and exercises being used as punishments. It was still deemed by the SPD that there was "insufficient evidence of a crime".

20. No services were offered or recommended by DSHS to ZG nor were any evaluations ordered for ZG until after 09/11/2019, 10 months after the removal. ZG was not allowed to see his son ZAG until January the next year. This is a violation of Department policy established to ensure the child's best interests are at hand.

21. ZG and CS were never offered an opportunity to be present during any medical visits. ZG was never given any information regarding ZAG being ▮▮▮▮ and being given ▮▮▮ ▮▮▮▮ medications or aftercare thereof despite his requests. Discovery of diagnosis was made by ZG on 10/28/2018 during a Shared Planning Meeting with DCYF. ZG voiced concerns regarding ZAG's ▮▮▮▮ and ▮▮▮▮ via Email to DR, SJ, TP,SA-N and Diane Craker multiple times, his concerns were disregarded by DR (SW for DCYF) and SJ (Supervisor to DR) via email. DR made no attempt to professionsally validate ZG's claim of his child needing medical attention even though these medical needs were already known. Only after ZG provided a photograph of his son's ZAG's head , did the department seek to get ZAG medical attention. No additional information was provided to ZG regarding the matter. On 1/31/2020 ZG attempted to escalate his concern

to Diane Craker, the program manager of DCYF Constituent Relations. This attempt was made via email with the subject title of 'medical negligence', however ZG was told to speak with his attorney on the matter. Diane Craker only escalated ZG's concern after he pointed out that nobody who disregarded ZG's claims of ZAG's medical needs was a licensed physician. See Exhibit I, which is attached with this complaint for detailed narrative of correspondence on this subject.

22. CS was allowed to see AG within weeks of her removal. ZG wasn't given any visitation regarding ZAG until January of the following year. The Department placed ZAG and AS 2.5 hours north in Bellingham. ZG was given a 3 hour visit, in which he had to travel a total of 5 hours to conduct. ZG was never given a visit with EMD. ZG made several documented email complaints regarding the urgency for which his case was being handled, medical concerns, safety concerns and the subpar levels of professionalism displayed by the department and its associates DR,SJ,TP,AF,RC,RZ, and SA-N. Most of these complaints were not addressed directly, or investigated. Some complaints and demands by ZG were even openly disregarded. ZG escalated his complaint from supervisors RC and SJ to area administrators RZ and TP (RZ resigned 2 days after receiving the formal complaint), and then to the regional administrator SA-N. ZG received no remedy so he filed a complaint with the ombudsman, but found no remedy.

23. On 01/02/2020 DR and the department recommended ZG undergo a polygraph and sexual deviancy evaluation regarding a matter that he was found not guilty of in a criminal trial. ZG passed the polygraph. He was also ordered to undergo a psychological evaluation. ZG did not want to undergo these evaluations due to the Departments insistence that ZG use an expert from their recommendation pool and he didn't want to

provide more information for DCYF to manipulate, but he complied because he didn't want to delay the return of his children.

24. Throughout the entire dependency CS was compliant with the department and their recommendations. CS underwent Triple P parenting, CBT parenting, Therapy, Psychological evaluation, and supervised visitation that lasted from December 2018 through January 2020. At a point during dependency CS was believed to have not made progress in her dependency merely for maintaining an active relationship with ZG. It was this suggestion, inter alia, that coerced CS into discontinuing communication with ZG. CS was focused on getting the children back at all costs. To show her compliance, CS sent an Email to DR stating that " after today 3/19/2019, Zion Grae-El and I will be ceasing contact with one another"

25. After the Emergency Removal of AS and ZAG from the foster home of HH and Scott Hadfield, DCYF and DR placed children with L███ M███. Ms. M███ was not only AS's SPS teacher at the time of removal, she was also the person who initially investigated the allegation as a mandated reporter and state employee. This is in direct violation of RCW 74.13.530 subsection 1.A. , which cannot be waived or deferred per subsection 3 of RCW 74.13.530.

26. Both CS and ZG made complaints and requested to see the intake report, photos and findings from the incident with ZAG's injury he received in fostercare. Case information was never disclosed to parents beyond a brief narrative. The care agency which pertain to the juvenile shall, upon request, give access to all records and information collected or retained to his or her parents per RCW 13.50.100. DR violated policy by not disclosing ALL intake records and information. He was supposed to make the information available

upon request, and it was requested by not only CS but ZG regarding the incidents at the M█████ residence. Attached as Exhibit H is a detailed email correspondence between CS, Royce Roberts, and DR. A complaint was made by CS along with a request for case documentation to Royce Roberts, who forwarded the email to DR by CS's dependency attorney Royce Roberts.

27. DR takes two completely different positions regarding what a serious injury consists of, and Plaintiffs allege that DR acted with malice and ill intent regarding the reunification of the Grae-El clan. DR downplaying injuries in the favor of a state employee is not in the best interest of the child. Attached are the two contradicting positions, one position in which a 6 yr old (AS) received an injury in his home that needed medical attention, and another position in which a 3 year old (ZAG) received an injury in a foster home that did not need medical attention. Photos are included in Exhibit L.

Exhibit K encompasses the first incident. This incident consists of DR identifying what he believed were current safety threats for ZG. DR describes AS's injury as "a serious physical injury that was due to severe discipline" and stated that "Due to the maltreatment of discipline, it resulted in him and the other children needing medical attention at Seattle Children's Hospital. Given their age, they are extremely physically vulnerable". It's important to remember that AS was the age of 6 at the time. Photos were taken at Dunlap Elementary of AS and EAD by SPD. Photos were taken of all the children by DCYF at Seattle children's hospital. It was stated by SCH staff that AS "████████████████████████████████" regarding his ████ symptoms.

Exhibit L consists of email correspondence between DR and ZG regarding injuries ZAG suffered while in L███ M███████ care. In the email thread, DR was explaining to ZG why ZAG was not given in-person medical attention after ZAG received an injury to his ████ on 07/03/2019. CPS investigated the incident 07/05/2019. In this incident, the injury ZAG received was deemed as a "██████████" that "████████████████████████████████ ████████████████████ It was also stated that due to Z██████ not experiencing anything other than pain to the touch no medical attention was sought. It is important to remember that ZAG was the age of 3 at the time.

28. A report written by DR, submitted to superior court on 1/16/2020 gives evidence to his unreasonable motive to further isolate ZG from his family. It was stated by DR that:

28.1. "The Department finds Ms. Strange in compliance with her court ordered services. The Department finds that Ms. Strange still has not made progress. The Department continues to have ongoing concerns about the relationship between Ms. Strange and Mr. Grae-El. It was her relationship with ZG and the severe physical discipline that led to the children coming into care. Though Ms. Strange's providers have reported that they believe Ms. Strange has made progress. The Department cannot support their findings due to the active relationship between Ms. Strange and Mr. Grae-El".

28.2. "the Department cannot support the children returning home because of concerns that Ms. Strange would allow ZG and A███████ to have contact with one another".

28.3. "The Department is hopeful that by engaging in CBT it will help Ms. Strange understand the risk to her children that ZG poses".

29. On February 19th 2019 AF was terminated from her in-training probationary
appointment as a social service specialist 2. Though the department gives general reasons
for separation, AF states in a deposition that:

"Another incident has taken place with the Department. And, um, I was instructed to not
follow policy and procedure. And, um, which is not the right thing to do. So basically I
was instructed to not case note it. And that's not following policy number 6600 per
DCYF. And, um, but I didn't want to be an insubordinate, so I had followed direction and
gave a statement, which is different from a case note. Um, so I gave the area
administrator at the time, Tabitha Pomeroy, my statement. And she didn't, um, which, to
which I was supposed to be, something was supposed to go into my file and take a couple
of trainings and then that was it. But because I turned around and I had followed policy
and procedure and did what I supposed to do, I implemented a case note, which needed to
be done per policy 6600. And, um, Tabitha had looked at the case and noticed that I had,
um, entered the case note. And then she changed her mind and they had probationary
separated me." It can be inferred from this statement that AF believed she was supposed
to receive additional training regarding the handling of DCYF cases, inter alia. In this
deposition, AF accused TP of committing unlawful conduct by instructing others to not
follow DCYF policy.

30. An email correspondence between AB and AF was obtained by JD for the purpose of
Brady material pertaining to the criminal allegations against ZG. These allegations put
into question the credibility of not only AF but also DCYF's chain of command and the
handling of ZG's family. This whistleblowing incident has a similar context to that of
ZG's formal complaint to DCYF about improper information being placed in case files.

In the email AF voices her concerns and frustrations regarding scheduling of her appearance as a witness for ZG's trial and miscommunication on behalf of the prosecutor's office. In the email AF states:

30.1 " I've been trying to bounce back from the bullshit that DCYF did to me cause they are corrupt and I refuse to lie, that's what cost me my job"

30.2 "Rosalynda knows everything.  Why can't you lean heavy on her. She can lie her way through it for you all.  Along with her corrupt bosses her Tabitha Pomeroy and Stephane Allison-noone.

### B. Seattle Children's Hospital History

1. All 5 children were transported to Seattle Children's for ▮▮▮▮▮▮▮▮ at 7:30PM on 11/29/2018. Under the orders of SA (attending physician), all of the children were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮and had ▮▮▮▮▮▮▮▮ including ▮▮▮▮▮▮▮ and ▮▮▮ Children were kept at SCH until 4 am on 11/30/2018.

2. Regarding the youngest ZAG, it was reported th You're a hug you're the 1st person to ask for a hug that aint gonna save you but OKat the SW ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ZAG's parents should have been present to offer the support that only parents can provide. Also in SA's deposition he stated "we get as much info as we can from the kids, but for accuracy we typically rely on adults". No medical background or explanations were given by parents because nobody sought to include

them in the visit to the ER. AG (oldest sibling) spoke to mother during first visit and claimed ██████████████████████ during the ER visit to SCH. AG also stated that some of the children ██████████████████████████

3. Dr. Stanford Ackley was the original supervising physician who saw all five children. SA was assisted during his examinations by several residents who were training to be either pediatricians or emergency physicians. HD was one of the trainees. HD made the determination that all 5 children "████████████████████████████████████ ██████████. This is indicated on all 5 foster care initial health screens.

4. All five children were questioned in a group throughout the several hours that they were at SCH by several physicians. None of the statements were recorded and were in the presence of at least 2 DCYF employees. The physicians generalized much of the statements and did not specify consistently throughout the report who made each statement. These actions resulted in improper interviews, inaccurate statements, subpar treatment, and additional false claims.

5. BA worked as a Family Assessment Response Social Service Specialist III for the Department of Social and Health Services Children's Administration from Mar 2016 - Jan 2018, appropriately 1yr 11 months. It was during this time she provided services to the children at the hospital as an agent of SCH and SCAN. Her employment as a department worker was a conflict of interest regarding the wellbeing of the children. BA omitted statements from children that were favorable to the plaintiff's in her report to CPS. It was stated by Roosevelt Travis, head of Social work at SCH, that BA had recieved proper training prior to employment.

6.  In the Deposition of BA, several issues were observed regarding SCH conduct. It was stated:

    6.1. "They checked in at the emergency room entrance. And we're all in an exam room together, all the siblings".

    Again, this is an improper way to conduct interviews with children regarding allegations of abuse. It was also noted that multiple children were ███████ during the visit at SCH.

    6.2. "I apologize, I can't remember exactly which of the two said what."

    Specific notes were not taken, therefore specific recollection was not retained. In the deposition BA tried to use the notes to determine what was said by who and was unable to due to the generalized notes taken by SCH staff.

    6.3. "I got the information from the siblings, the older siblings,...that the patient [AS] had been ███████████████████"

    Due to the fact that specific notes were not taken and attention to detail was not a focus, Pertinent information became generalized. AS never said that he had been ████████ ████████████ This was the fourth allegation within 48 hours for just AS alone. It is important to note that both older siblings state that they did not witness the incident.

    6.4. "So we have a team of SCAN physicians. They are child abuse and neglect experts. And that was what their recommendation was for me to meet with them and conduct a protection assessment. I don't pick and choose which children I, I meet with."

    BA, SCAN physicians and SA allowed amateur physician HD to make 5 false determinations of abuse. There were "child abuse and neglect experts" available to make the determination properly, along with an attending physician, yet they still chose to have

HD make the determination. To plaintiff's knowledge HD wasn't even training to complete a three-year ACGME-accredited fellowship in child abuse pediatrics.

7. Medical notes indicate AG was diagnosed with a ███████ EMD was diagnosed with ███ ████████ AS was diagnosed with a █████████████████████, EAD was diagnosed with ███████████, and ZAG was diagnosed with ███████ ███████. Medical notes also indicate that children were at hospital from 8pm until 4 am, over 8 hours. It is important to note the children's usual bedtime has been noted to be at 8 or 830 pm.

8. BA was sent to the ED by SCAN for an undisclosed reason. HD was not a part of the SCAN team. Roosevelt Travis (Head of SCAN) stated that the policy governing the action of BA and other members of the SCAN team are internal and not public. The interview techniques and omissions made by BA during the incident, if approved by SCH, go against the standards set by CPS, SPD, and the WA state child interview guide (published by DSHS et al.)

9. The entire visit was an expedition attempt to discover evidence favorable to or manipulable by DCYF. HD did not have the credibility or credentials to make the determination that she made in DCYF documents. SCH policy and training should have prevented this determination from happening in its entirety.

10. AG currently reports that all 5 children were ███████ during the ████████████████ at SCH. This was especially true of EAD and ZAG.   It was also noted in the medical reports that ZAG was ███████████ ZAG was 2 at the time. Parents were not given an opportunity to be present at any point in time.

11. Revered doctor steps down, accusing Seattle Children's Hospital of racism. Here is the original article:

**https://crosscut.com/equity/2020/12/revered-doctor-steps-down-accusing-seattle-childrens-hospital-racism**

 A highly accredited African American doctor of Children's Hospital for over 20 years resigned from his position at children's hospital, stating that he is "examining my own complicity as a representative of a hospital that does not treat people of color as it should. The Grae-El clan did not receive equal treatment. The care that the Grae-El family received was of a low standard. Children's Hospital conspired with state agents to bring forth a false determination of abuse and or neglect. SCH had no regard for the parents and took the narrative brought to them by CPS as their mission.

12. **https://www.king5.com/article/news/investigations/tacoma-doctor-removed-from-expert-role-in-diagnosing-child-abuse-amid-questions-about-her-credibility/281-8db8ef99-3d1c-48b0-a462-367d386c3a12** .

This article encompasses a child abuse specialist that lacked training and appropriate certification to make difficult determinations of abuse or neglect. This article places an emphasis on the importance of receiving the proper training and the ramifications of not being properly trained. HD had only completed 8 months of her 24 month resident training for a pediatrician. The doctor in question in this article had over 10 years of general pediatric experience and was a "go-to" expert witness for the state of Washington.

**C. SPD And Prosecutorial History**

1.  After the initial encounter with ZG. RN states in his supplemental report on 11/29/2018 that "When CPS and SPD tried to remove the children from the custody of the parents, it was unsafe to do so based on the father's aggressive and confrontational demeanor. At this point, I had reason to believe that children were not safe at home". At the time RN's decision was made with the knowledge that AS voiced that he had no fear of returning home, and the knowledge that AG voiced that she felt safe at home. RN continues in the report to say "based on ZION's reported behavior in the original report, I believe that the children could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050'. This is an open admission of conducting a removal without court order under the belief that if first required to obtain a court order, children could not have been taken into custody. RN believed children could not be removed if ZG was given due process. CPS and SPD made no announcement to ZG of their intentions to remove the children from the home, nor was an announcement documented.

2.  No child stated to RN that they saw ZG hit AS. RN claims AS described his ███████ " as ' ███████████████████ ". This is inconsistent with:

    2.1. NL's statement to AF in which NL claimed AS reported he was ███████████
    ███████

    2.2. The misrepresented allegation written by Christine Spencer which stated AS was
    ████████████

3.  RN chose NOT to record the interviews of the children at Dunlap. In RN's report he stated "I screened the incident with A/SGT BOGGS. I did not take audio recorded statements from the children since we are anticipating a far more thorough interview

conducted by SPD SAU". This statement insinuates that RN's actions were approved by SGT Boggs or at very least, Boggs was aware of RN actions.

4. Officer Timothy Jones of the SPD made an initial report on 11/28/2018. In his report there was no mention of ZG being aggressive or confrontational. Officer Jones stated that he " didn't see any signs of distress". Officer Jones stated that he could "see into the apartment a little bit and I didn't see anything that concerned me at the time". He did not indicate dangerous or injurious living conditions. He stated that ZG asserted his rights. This narrative, written by officer Jones, was absent of any description of the children being afraid, ZG being aggressive, or even an observed injury. Lastly it was stated by officer Jones, "I got the impression that CPS wanted me to grab the child when he came out or force my way in to take the kids". This is a clear indication of malicious intent by the department. AF was not properly trained, she did not understand the limitations of her authority. To "grab the child" or "force" their way into the home would've been unconstitutional, yet it was an insinuated request made by DCYF staff.

5. In his summary report RN alleges that "She [EAD] told me that CAPRICE ▆▆▆▆
▆▆▆▆▆▆▆▆▆▆ She had a ▆▆▆▆▆▆▆ which she stated was from the incident. She also told me that she had a ▆▆▆▆▆▆▆ but since she was wearing pants, I did not observe this injury. I photographed the ▆▆▆▆▆ and later uploaded the image to DEMS".

6. On the custody without court order form, RN stated " A▆▆▆ reported being ▆▆ by father on 11/27/18. On 11/28/18 (Redacted text) observed injury to CPS. Interviewed AS, EMD, AG, and EAD who reported a pattern of ▆▆▆▆▆▆▆▆▆. EAD also reported she was ▆▆▆▆▆ and indicated an injury, which I observed. I

believe that all 5 children are in danger of physical harm if returned home". This was the second time RN mentioned that he "observed" a ███████████████ of EAD. No one else mentions observing a '████' on her ███ this includes: EAD's teacher, AF, HD, NL, SA, or any other person.

7. RN did not specify if ██████ were transient at any time. RN did not determine if ███ was transient at any time. Though RN did not determine either of those things, he still made the determination that the alleged discipline was abuse.

8. RN was a Prior Service Army Medic 68-W, which happens to be the same MOS title that was held by ZG. They both received EMT training and certification from FT. Sam Houston , TX. They both possessed medical knowledge sufficient to determine if ██████ were transient. RN chose NOT to use this knowledge to make an appropriate determination. None of the ██████ were more than transient in nature.

9. RN labeled ZG's assertive behavior as confrontational instead of reasonable and protective. There was a significant absence of cultural sensitivity and an abundance of cultural indifference and bias on behalf of RN. RN chose to wait over 14 hours after the "assessment " before addressing the subject of custody. No attempt was made to obtain a court order during the 14 hours that RN claimed children were in imminent danger. This removal was done in response to the assertion of rights by ZG and his protective demeanor, which was all fully lawful. ZG complied and allowed them to see school aged children, which was NOT required by law. ZG attempted to communicate his concerns with CG and was not responded to by CG.

10. ZG was arrested on January 10, 2019, and remained in custody until September 11, 2019. He provided an audio recorded statement denying the allegations. On January 14, 2019,

Information was filed charging ZG with one count of rape of a child in the first degree as to E.A.D., and one count of assault of a child in the third degree as to A.S. He was alleged to have assaulted A.S. ▮▮▮▮▮▮▮▮▮▮ The Information also charged CS, with one count of assault of a child in the third degree as to E.A.D. ZG entered pleas of not guilty and set the case for trial at his arraignment on January 28, 2019. Although ZG consistently demanded a speedy trial, his trial did not commence until late August, 2019. He remained in custody with his case unresolved until September 11, 2019.

11. On March 4, 2019, Judge Galvan ordered a severance after finding that "the emotionally charged nature of the allegations of Rape of a Child in Count 1 would be overly prejudicial to Mr. Grae-El's right to a fair trail with regard to the Assault of a Child charge in Count 2." Following a jury trial, Mr. Grae-El was found not guilty of rape of a child in the first degree as charged in Count 1 on September 4, 2019.

12. Through a combination of coercion, constitutional violations and malicious prosecution, the state was able to extract a guilty plea. The plea agreements of ZG and CS were signed 09/11/2019 and consisted of one count of assault 4 against ZG, one count of assault 3 against ZG, and two counts of assault 4 against CS. Attached as Exhibit E is a motion submitted to the courts by Juanita Holmes, this motion provides details into the conditions ZG endured. This motion explains inter alia how ZG received Ineffective counsel from Jesse Dubow regarding his criminal case, however it is worthy to note that ZG's dependency attorney Sacha Marley failed to provide effective counsel in a similar capacity. Exhibit E also provides evidence of malicious prosecution on behalf of the PA Aubony Burns against ZG. The 4th degree assault against ZG was for ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

13. On 8/10/2021 an appeal brief was filed by Dana Nelson on behalf of ZG, which is attached as Exhibit O.  Much of this appeal brief is linear with that of Juanita Holmes's motion. Though this motion does not argue abuse of discretion on behalf of judge Kristin Richardson, it does infer that the judge did not handle the matter appropriately. It also inferred that Aubony Burns committed malicious prosecution against ZG and CS in order to secure a plea. The judge used her own knowledge and opinion to take a biased position against the expert Witnesses of ZG.


**D. Seattle Public Schools  History**

1.   At the time of removal the reporting teacher L___ M__ had only been a teacher at Dunlap at Dunlap for a few months. No relationship had been established between Ms. M___ and the family, including AS. Very little dialog had taken place between the family and Ms . M___

2.  Parents had given Dunlap staff no concerns in the past with any of their children. SPS staff state there were no red flags.

3.   At the time of removal teacher MARITES PEREZ-ANIAG had the longest and strongest relationship with the family. Ms. Marites had been involved with family for over 18 months, she also was the teacher for 2 of the children. Ms. Marites taught AS the previous school year, and at the time was EAD's teacher. Nobody from the school, SPD, or DCYF spoke with her during their investigation, despite her being available the entire time AF was waiting at the school.

4. 3 SPS staff collectively and improperly interviewed AS on 11/28/2018. NL states that AS was taken to a separate room and asked multiple times about the incident, by each staff member. NL alleges that AS claims he was ███████████████ NL claimed they checked AS's ███████████████ and found none. It was stated by NL that they didn't call SPD because she "didn't think they needed to". AS also stated to SPS staff that he had "no fear of returning home".

5. NL also physically partook in the interviews that took place on 11/29/2018 at Dunlap Elementary with AF and RN.

6. MARITES PEREZ-ANIAG gave a deposition on 3/14/2019. In the deposition she stated:

    6.1. "he's [ZG] a very, um, jolly, and a very happy guy. Um, he's very, like, positive on his words when it comes to talking about his kids' education. He, you know, the first thing he asked me during our meeting was about the curriculum and about teaching kids, um, about social justice, you know. Because E█████ is a, is an African American student, and we really, um, focus on social justice in our school. And she's very, I mean, he's very happy about it. So, yeah, he's always concerned about what we're teaching at school, and what E█████ will be getting in kindergarten when he, you know, school starts".  This narrative is a complete shift from that of DCYF and SPD. Again, this teacher had the longest and strongest relationship with the family.

    6.2 Regarding EAD,  Ms. Marites claimed EAD had received a ███████████████ that was previously believed to have come from a playground incident. She stated that "I do remember seeing that █████ on the week of November, I believe. Um, she showed up during our open house and I saw the █████ And the, because I was not in school that day. And we had an event that night. So I showed up at night. And she came with her

family and siblings And I ask her, oh, you got a ███████ But also that same day, I had a few kids who got some ███████ at the playground. And she wasn't sure how she got it. And she just, like, yeah, someone ███████ me. That's it. But then, you know. Some of the, uh, I think it was A███████, the brother, was saying different things, you know. So, it's just hard to get from kindergarten, like, a whole story how the scratch. And knowing E███████ E███████ is very articulate. She can recall a lot of details in a book. So I'm sure she's, you know, she can remember where she got it. It's not like she's making up, so, okay, I took that. And we talked about playground safety after that". Ms. Marites states that "After the family was, or the students were taken away by CPS...the week after that, E███████ was saying different things how she got the ███████ ...she was saying that it was ███████ afterwards ". Ms. Marites states that EAD told her that "My dad ███████ ███████

7.  EAD has given 3 stories to SPS regarding the ███████ ███████

    7.1) Playground.

    7.2) Stepmother.

    7.3) Father.

    The first story happened before the removal of the children. Story 2 and 3 emerged after the removal. This is an indication of tainted child narrative.

## E.  Olivecrest Foster Agency History

1.  Olivecrest is a Christian based foster agency. In the past Scott Hadfield had worked as a child pastor for a local Christian church in Bellingham and is currently believed to be employed with ███████████████████████

2.  THE Hadfield's were a foster home licensed through Olivecrest. HH was a stay at home mom.

3.  AS, And ZAG were placed in Bellingham, Washington in early December of 2018 after the removal without court order. The foster family consisted of Heather Hadfield, Scott Hadfield, SH, IH, HaH, and NH. This home was deemed appropriate by DCYF and Olivecrest. The foster family was entirely Caucasian. Many of the families customs were unusual for AS and ZAG and difficult to adjust to.

4.  Regarding inappropriate conduct, Lori Menken entered the findings of Abuse and Neglect against HH and Scott Hadfield (Assessment ID: 72923011, Intake ID: 4108388) on the foster parents HH and SH were informed by DCYF that "█████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
█████████████████████████████
██████████████████████████████
██████████████████████████████
███████████████████████
██████████████████████████
██████████████████████████
█████████████████████████████
██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

5. Regarding HH and SH it was also determined by DCYF that ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ This event took place while AS and ZAG were foster children in the home. It was not specified if foster parents made sure AS and ZAG were not a witness or victim to the abuse or neglect, however it can be assumed that AS and ZAG both observed the ███████████████ on SH.

6. Ms. Hadfield reported that A████████ would say things like "I hate Bellingham" or "I don't want to be here". Ms. Hadfield stated that AS was frequently physically aggressive and would hit and kick members of the family including herself. The description given in Bellingham of AS is quite a different description compared to the narrative of NL, former Behavioral Counselor for AS when he was at home with his family. His behavior was in direct relationship to his detachment from home.

7. In an investigation case note written by Kelly Barber on 3/28/2019. In this case note "the investigator asked Ms. Miller about her interactions with Ms. Hadfield regarding A███████ Ms. Miller stated that at Amarieus' IEP meeting, his teacher expressed that he has an attention span of about 30 seconds. Per Ms. Miller, Ms. Hadfield became upset and stated that A███████ sits and reads for 3 hours when he is at home. Ms. Miller stated that Ms. Hadfield reported that A███████ needs to sit for however long it takes him to finish reading a book, sometimes up to 3 hours. Ms. Miller stated that this concerned the teachers because it is not consistent with A███████ developmental skills or ability and it is concerning that he would be made to sit in his room for 3 hours to read.". Ms. Miller was a school staff member at the school AS attended in Bellingham.

8. Ms. Hadfield denied ever ███████████████████████ n case note 45945583 of case 752060 of DCYF investigation. The investigator asked if Amarieus has ever expressed pain when being "helped" or "guided" to time-out. Ms. Hadfield reported that A███████ "███████████████" stating that A███████ is frequently "████████" and "████████" when being taken to time-out. Ms. Hadfield reported that if A███████ was agitated, she would have to take Z██ into another room to make sure Z██ was safe and give A███████ time to calm down.

9. On 2/29/16 the Hadfield's received a provider infraction in which it was said "that Referrer reports ████████████████████████████████████████
████████████████████████████████████████████████

In a second infraction on the same date it was said that "REF stated that foster mother continues to ████████████████████████████████ Foster parent appears to ████████████████████████████████████

████████████████████████████████████████ REF stated that (redacted)

██████████████████████████████████████████████████

10. On 4/29/15 it was reported by HH that "Referrer reports last night about midnight she

███████████████████████████████████████████████████

██████████████████████████████ " This was roughly 3.5 years prior to the

placement of AS and ZAG. To plaintiff's knowledge, no follow-up was done regarding

this forementioned matter, which is of sexual nature.


## IV. Supporting Evidence

### A. Experts Opine Charges Unfounded

1. ZG's dependency attorney put together a team of experts, including a physician, and

   experts on DCYF policy and procedures. Dr. Gabaeff's analysis and opinions make it

   clear the criminal charges are not supported by the evidence. The reports of Sonja D.

   Ulrich, MSW, and Stephen T. Wilson, MSW, LICSW, Ph.D., explain how the DCYF

   investigation took on a life of its own, despite scant evidence of abuse.


### B. Report of Steven Gabaeff, M.D.

1. Attached as Exhibit B are the report and CV of Steven C. Gabaeff, M.D.  Dr. Gabaeff is a

   licensed physician who has been working in the field of clinical forensic medicine since

   1988.  He has extensive experience as an expert in the area of child abuse.  Dr. Gabaeff

   reviewed the medical reports, photos, and statements of all five children.  It is his

   opinion, to a degree of medical certainty, that the injuries documented ████████████

   ████████████████████████████ and were consistent with accident or

reasonable parental discipline as defined by Washington law." Exhibit B, p. 1. Dr.

Gabaeff "found no evidence of substantial bodily injury, as defined by Washington law,

no evidence of a pattern or practice of assault, and no evidence of physical pain or agony

that is equivalent to that produced by torture." Exhibit B, p. 1. He concludes that

"[t]here is no evidence that these markings are related to prior abuse and considerable

evidence they are not." Exhibit B, p. 12. He opines that "[t]he causes of all the findings

are of nonabuse etiology or medically explained." Exhibit B, p. 12.

2.  Dr. Gabaeff concludes his report with his professional opinion: There is no evidence that

    these ▮▮▮▮▮ are related to prior abuse and considerable evidence they are not. I will

    reiterate that I have reviewed the medical reports, photos, and statements of the

    children, and it is my opinion, to that degree of reasonable medical certainty that

    the injuries discussed above, involved, at most, ▮▮▮▮▮▮▮▮▮▮

    ▮▮▮▮▮▮ and were consistent with accident, normal childhood activity among,

    legal disciplinary tactics, and normal marking for children of their ages. There is no

    evidence they are unrelated to or not the direct result of reasonable parental

    discipline, as defined by Washington law. I found no evidence of substantial bodily

    injury, as defined by Washington law, no evidence of a pattern or practice of

    assault, and no evidence of physical pain or agony that is equivalent to that

    produced by torture. The general response by the children was love for their father and

    a balance between the key variables for successful parenting: love and discipline.

    Final thoughts

    2.1. There was no abuse in this case.

    2.2. The causes of all the findings are of nonabuse etiology or medically explained.

2.3. The defendant seems to be caring, and loving, low-risk parents. The probability that they abused with no physical findings diagnostic of abuse, is insufficient to conclude abuse occurred.

2.4. The support for other nonabuse explanations is present, plausible and probable.

2.5. False accusations of child abuse have been and continue to be made by misinformed and/or undertrained professionals who appear to choose to ignore relevant medical history and medical causes, and simply seek to support a pre-conceived suspicions of abuse.

## C. Report of Sonja D. Ulrich, MSW

1. Attached as Exhibit C is a report prepared by Sonja D. Ulrich and her resume. Ms. Ulrich is an independent social worker with more the 28 years of experience in child welfare. She has been qualified as expert in multiple states, including Washington. Her areas of focused include social work practice standards in child protection and child welfare. Ms. Ulrich has a master's degree in social work, and is currently completing her dissertation as a doctoral candidate in social work. She reviewed the DCYF intake record, case notes, investigative assessment, initial CPS discovery, and an interview with A.S. In her report, Ms. Ulrich identifies a number of questionable practices during the DCYF intake, investigation and response. For example, "[A.S.] never stated in the report that the ▮▮▮▮▮▮▮▮▮ were from his stepfather. That was an assumption made by the supervisor in this intake, unnecessarily escalating the intake and the allegations taking a potential disciplinary action and turning it into a 'serious disregard for child's safety' without any additional information." Exhibit C, pp. 6-7. She also expresses concern that

"it appears that the SPD brief interview of all of the children together in a classroom was the primary interview leading to placement, and further feeding the findings at the medical exam."

2. Ms. Ulrich concludes her report with her professional opinion: In my professional opinion, the case involving Mr. Grae-El and Ms. Strange and their children, became rapidly escalated based on bias. As such, information appears to have been unnecessarily exaggerated, and statements made by the children were amplified and taken as more significant than they actually stated. The implication of these actions by the department, SPD, and Seattle Children's led to a belief that Mr. Grae-El had committed a crime and abused his children, rather than implemented discipline.


**D. Report of Stephen T. Wilson, MSW, LICSW, Ph.D.**

1. Attached as Exhibit D is a report from Stephen T. Wilson, MSW, LICSW, Ph.D., along with an appendix of articles and his CV. Dr. Wilson has a master's degree in social work and a doctoral degree in in clinical social work. He has more than forty years of experience as a clinical social worker, specializing in work with children youth and families. He has been an Ethnic Minority Mental Health, Special Populations consultant for person of African descent since 1989. Like Ms. Ulrich, he reviewed case documents in preparing his report and rendering his opinions. Like Ms. Ulrich, Dr. Wilson expresses concern about inconsistencies in the DCYF reports, and the fact that the children were interviewed as a group. Referring to the inconsistencies, he notes, "[t]hese conflicting pieces of information evidence the importance of being clear about causality. Thus, a portion of the case supporting parental abuse has diminishing merit." Exhibit D, p. 4.

Commenting on the group interview, he states, "a good forensic evaluation for child abuse should be done with each child individually, as opposed to in a group." Id.   Dr. Wilson also provides a context for DCYF and SPD reports that Mr. Grae-El was hostile to the investigation.  He notes that "having CPS social workers and police officers come to a person's home, could present as anxiety provoking.  To assert and expect compliance without any reaction seems cognitively dissonant." Exhibit D, p. 3.  He opines that, with three social workers and two police officers coming to the home, "the situation appeared charged from the beginning."  Id.

2.  Dr Wilson concludes his report with his expert opinion: The interactions between Mr. Grae-El, Ms. Strange, and the department have been rife with mistrust.  This is largely due to misinterpreting information.  The record also indicates pieces of misinformation, or missing information which does not support the findings, yet simultaneously deemed as absolute truth, and created a pattern which reflected points of view that these adults were abusing their children.  The record also indicates cross-cultural and sociocultural challenges relating to the parents' worldviews, including language and suppositions about behavior.  This is particularly true of interactions between Mr. Grae-El and adults in the school, and social workers involved in this case between November 27 and 28 of 2018.  That sense of misunderstanding, without verifying information led to a series of suppositions that this family evidenced more aggressive than was present. This pattern appears pervasive throughout the case record and has led to multiple punitive responses to this family unit, up to and including separating children from adult family members.

**E. OTHER EVIDENCE RELIED UPON**

1. ZG's criminal declaration is listed as Exhibit A. This was the declaration submitted to the courts during ZG's criminal proceedings.

2. The 2010 Washington state child interview guide  is attached as Exhibit P. This was a publication developed by UW Medicine - Harborview,  the Washington Criminal Justice Training Commission, and DSHS.

3. Attached as Exhibit Q is an Email conversation between AF and Aubony Burns. Ms. Burns was the prosecutor regarding ZG criminal matters. This Email was sent during ZG's trial.

**V. CAUSE OF ACTION - CLAIMS**

**A. Seattle Children's Hospital - MEDICAL NEGLIGENCE , MEDICAL MALPRACTICE, CONSPIRACY AGAINST RIGHTS**

1. As a healthcare provider, SCH and its staff owed to Plaintiffs a duty to comply with the standard of care of the profession to which it belongs.

2. SA, HD, BA, and SCH owed a duty to Plaintiffs to exercise the degree of skill, care, and learning expected of a reasonably prudent pediatrician, pediatric neurosurgeon, pediatric, radiologist, pediatric nurse, and pediatric hospital in the State of Washington, acting in the same or similar circumstances at the time in question.

3. SA, HD, BA, SCH are medically and professionally negligent for failing to exercise that degree of skill, care and learning expected of a reasonably prudent pediatrician, pediatric nurse, and pediatric hospital. SCH's treatment of care of ZAG Et al. fell below the

standard of care for a pediatrician, pediatric nurse, ED social worker and pediatric hospital.

4. SCH owes an independent, non-delegable duty of care to its patients, as set forth in Pedroza v. Bryant, 101 Wn.2d 226,677 P.2d 166 (1984) and WPI 105.02.02. This includes the duty to exercise reasonable care to monitor and review the competency of all health care providers who practice medicine at SCH this includes non-employees.

5. SCH has a duty to monitor the competence of these physicians. SCH failed to exercise reasonable care in monitoring and reviewing the competency of health care providers who practice medicine at SCH.

6. As a direct and proximate result of SCH, HD, BA, and SA's tortious conduct, the removal of the children was further fortified with additional false information which bolstered the inflamed CPS allegations and the SPD removal. An intentional determination of abuse was made by DCYF using the DCYF's Foster Care Initial Health Screen Forms, in which HD signed all 5 forms. An additional Investigation was opened using the determinations from SCH. SPD's Criminal investigation utilized photos, statements, and findings from SCH in prosecution of ZG and CS. Important exculpatory information regarding the familial bond was omitted and generalized by SCH staff, including BA.

7. SCH and SA failed to take reasonably prudent measures to prevent: mischaracterization of ▮▮▮ by resident trainees, generalizations of statements, and unsupported determinations of abuse or neglect.

8. SA, HD, BA, and SCH's failures constitute a breach of the standard of care and medical negligence. HD's intent to make false determinations and SCH's exaggerations constitute malpractice and negligence.

9. SCH, SA, and HD are independently liable under the doctrine of corporate negligence.

10. SCH has a duty to exercise reasonable care to intervene in the treatment of a patient at the hospital under the care of an independent physician if one of its officers, employees, or agents becomes aware of obvious negligence.

11. Plaintiffs rely on Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000), Greene v. Camreta, 588 F.3d 1011 (9th Cir. 2009), and Parkes v. County of San Diego, 345 F. Supp. 2d 1071 (S.D. Cal. 2004), to argue that the Children's medical examinations are unconstitutional because they are intrusive, done primarily for investigative purposes, done without parental consent, and exclude the non-offending parent from being present.

The Wallis court further observed that "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention," and that "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those that are invasive or upsetting." Id. at 1142. As noted in Greene v. Camreta, however, Wallis "addressed the constitutionality of investigatory physical examinations outside their parents' presence." 588 F.3d at 1036

12. In the act of conspiring with DCYF as agents of SCH, doctors HD, SA and caseworker BA provided and omitted evidence and made determinations that bolstered the false

claim of abuse by DCYF and SPS. BA was the referrer that provided the information to open the intake case 4030264 against the family. At the time of the incident, BA was a DSHS employee and had ties with DCYF.

13. Plaintiff re-alleges and re-pleads all of the allegations in paragraphs III.B 1-12 and all of paragraphs IV of this Complaint and incorporate them by reference.

## B. Seattle Police Department - VIOLATION OF 1ST, 4TH, 5TH, AND 14TH AMENDMENT - CONSPIRACY AGAINST RIGHTS, WITHHOLDING EXCULPATORY EVIDENCE

1. RN entered material information about EAD which he knew was false within his summary report and within the custody without order form as set forth in RCW 9A.84.040. A person commits false reporting if, with knowledge that the information reported, conveyed, or circulated is false, he or she initiates or circulates a false report or warning of an alleged occurrence or impending occurrence knowing that such false report is likely to cause an emergency response. RN's reports were used to justify the removal of the children, to support criminal charges, and to support other inflamed allegations. He claimed he observed ███ on EAD's ███ This was a false statement used to establish an observed pattern of abuse. RN also referred to ZG's parental discipline as abuse multiple times within his reports; this was an intentional mischaracterization of legal parental discipline. In partaking in the actions listed above and throughout this complaint, RN, SGT Boggs, and SPD violated the 4th amendment rights of every member in the Grae-El clan listed as Plaintiffs.

A affidavit is "presumptively valid". Franks v. Delaware, 438 U.S. 154, 171 (1978). To challenge a affidavit, one "must show (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." United States v. Leftkowitz, 618 F.2d 1313, 1317 (9th Cir. 1980) (citing 18 Franks, 438 U.S. 154). This analysis applies to omissions as well as affirmative misstatements. Leftkowitz, 618 *18 F.2d at 1317 n.3.

Without RN's mischaracterizations, false observations, and exculpatory omissions stated within this entire complaint, there would have been no grounds for which to place children in custody without a court order. It would have been a clear case of malicious prosecution had RN not committed perjury to justify his reckless actions.

2.  RN based his decision to conduct an emergency removal without court order pursuant to RCW 13.34.050 on "ZION's reported behavior in the original report". In the original assessment Zion asserted a constitutionally protected right to not allow any of them into his home without a warrant and cooperated by allowing SPD and DCYF employees to view and speak to the children. Exhibit D articulates the actions of ZG as reasonable and protective inter alia. Zion did nothing unlawful and utilized his right to free speech. CS and ZG were deprived of due process by RN. As stated in 15.220-POL of SPD manual: An officer may determine that a child is in dangerous circumstances based on: (1) The child's physical condition. (2) The environment where the child is encountered. (3) The time of day and situation where the child is encountered.

The officer's subjective opinion is the determining factor if the child is in a dangerous circumstance. However RN's opinion was based on actions of ZG that were either constitutionally protected or never happened. No injuries were observed on the ▇ of any child other than AS during the safety assessment. ZG asserted his right to refuse entry, but complied to the extent of allowing the opposing parties to see each child despite the unprofessional conduct of AF. No child stated that they were in fear. The children were in a safe protective environment. The children were well nourished at home, asleep in their beds when police knocked on the door at 830 pm. Nothing that was reported by RN warranted the violation of any constitutional right. The 14th amendment says no person will be deprived of life, liberty or property without due process of law. Due Process was not given to the Grae-El clan. Resulting in damages that are to be determined at the time of trial. The Grae-El clan was deprived of their right to familial association, their right to free speech, their rights to be free from unlawful seizures, and free from the intentional infliction of emotional distress by state officials.

3.  SGT Boggs did not advise RN to record interviews with children. RN referred to SGT Boggs for how to proceed. If SGT Boggs did advise RN on the proper procedure for conducting an Investigatory interview of alleged child abuse, it was not stated. Neither SGT Boggs or RN's actions reflected proper training. It was stated that a more thorough forensic interview was anticipated. That was a contributing factor for why the children were not recorded, but those forensic interviews did not take place until over a week later. The anticipated forensic interview was not a reasonable argument for RN to justify not making reasonable efforts to ensure the most accurate interviews and investigation.

4.  ZG alleges that this violation of his family's constitutional rights was in part, direct retaliation to ZG's assertive demeanor with SPD and DCYF agents the night of 11/28/2018. SPD Policy 5.002-POL section 4 states: Retaliation is prohibited. No employee will retaliate against any person who exercises a constitutional right, publicly criticizes an SPD employee,  or Opposes any practice reasonably believed to be unlawful or in a violation of Department policy, all of which was done by ZG on 11/28/2018.

5.  SPD Policy 15.220-POL provides clarity as to the conditions expected to conduct an emergency removal without court order. CPS may ask law enforcement to take a child into custody without a court order if they believe that a child is at risk for further abuse or that the child's caretaker may hide or flee with the child to avoid investigation of child abuse. ZG was not a flight risk at the time, nor had he avoided investigation. At the time of the determination no valid claim of abuse had been made by any child to SPD, only lawful parental discipline. AG and EMD stated that it was several months when they last got a "███████", which is a clear indication that "████████" didn't happen frequently. The determination that there was imminent danger was made out of malicious subjective opinion and not material facts. Though this particular abuse of discretion may not be deemed unusual, it is nonetheless malicious and not in good faith.

6.  All ████ that were observed clearly did not meet meet the standard of child abuse here in Washington, this is supported by the findings in Exhibit B. The pain was not transient, nor were the marks. RN made no documented inquiry or statement as to if those standards of abuse were met.  RN made no statement as to whether marks met the standard for bodily harm. RN reported AS stated he was '███████████████' but that claim combined with the markings proven, does not constitute abuse. Furthermore in

STATE v. McKAGUE (9th circuit Case No. 85657–5. , Decided: October 06, 2011) it was determined by the courts in subsection 8:

> As noted, in its lead opinion the Court of Appeals applied the dictionary definition of " 'substantial' " as " 'something having substance or actual existence,' 'something having good substance or actual value,' 'something of moment,' and 'an important or material matter, thing, or part.' " McKague, 159 Wn.App. at 503 n. 7 (quoting Webster's Third New International Dictionary 2280 (2002)). But the portion of the definition stating that "substantial" means "something having good substance or actual existence" would make practically any demonstrable impairment or disfigurement a "substantial" injury regardless of how minor. Thus, the definition would apparently render the term "substantial" meaningless, a result a court must avoid. See State v. Hirschfelder, 170 Wn.2d 536, 543, 242 P.3d 876 (2010). We hold instead that the term "substantial," as used in RCW 9A.36 ,021(1)(a), signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence. While we do not limit the meaning of "substantial" to any particular dictionary definition, we approve of the definition cited by the dissent below: "considerable in amount, value, or worth." Webster's, supra, at 2280.

Under this definition of substantial, it would require that the disfigurement be temporary yet "considerable in amount". In this situation there was clear evidence that this element inter alia, was not met. AS's ▮▮▮▮▮▮▮▮ there was ▮▮▮▮▮ there were no ▮▮▮ and his ▮▮▮▮▮▮▮ AS was not abused per RCW policy.

7. As of 08/04/2021 ZG had not been given the initial SPD report (2018-444530) referenced by RN in his 'Child-Other Custody Of Kids Supplemental Report'. This initial report was not included in ZG's Dependency, or criminal discovery provided by Sacha Marley and Jesse Dubow, nor was it included in CS's dependency discovery. In this instance, the narrative regarding the initial encounter with ZG led RN to make the determination that the children could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050. The initial report is of paramount importance in this case, as is the body cam footage. It is also worthy to note that the incident on 11/29/2018 was also recorded via ICV and BWC, and despite the requests of ZG for FULL DISCOVERY in both his criminal and dependency proceedings he had not seen or been given the evidence forementioned. This deprivation of evidence is a violation of ZG's and CS's right to procedural due process ensured by the Constitution.

8. Unlawful policies can result in § 1983 liability if the policies caused a violation of a constitutional right. Monell v. New York City Dept. Soc. Serv., 436 U.S. 658, 694 (1978). To prevail on a Monell claim, a plaintiff must establish that: (1) the plaintiff possessed a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy is the moving force behind the constitutional violation. Van Ort v. Estate of Stanewich, 92 F.3d 831, 836 (9th Cir. 1996). RN based his removal on SPD Policy 15.220-POL and RCW 13.34.050. 15.220-POL is an unconstitutional policy due to its subjective opinion clause. There are no elements to subjective opinions, which is what RN based his determination on, contrary to possessing corroborating evidence of regular parental discipline and

nonabuse. This lack of structure regarding subjective opinions has allowed for abuse of authority and abuse of discretion in this case. This "subjective" clause is the grey area provided by SPD policy in which discretion is abused and bias can thrive. This policy authorized the removal of children without due process. Part of the warrant process includes having a judge review the evidence collected to determine if there is just cause for issuing a warrant. Policy 15.220-POL is unconstitutional and is the leading cause inter alia for the 14th amendment constitutional violations of the GRAE-EL clan.

9.  RN, DAINA Boggs, and SPD breached the aforementioned duties, policy, and laws, proximately causing injuries, harms, losses, and damages to the Grae-El clan, in an amount to be proven at trial.

10. RN failed to investigate DCYF intake so as to observe mischaracterization of allegations and inconsistencies prior to removing children without court order. Doing so would have provided two different narratives at the time of removal. RN also failed to speak with the SPS staff member who had the longest history with the family, Ms. Marites. Attached as Exhibit G is the Deposition of Ms. Marites, which clearly shows a completely different picture of the Grae-El clan than what was painted by AF.

11. An affidavit is "presumptively valid". Franks v. Delaware, 438 U.S. 154, 171 (1978). To challenge a affidavit, one "must show (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." United States v. Leftkowitz, 618 F.2d 1313, 1317 (9th Cir. 1980) (citing 18 Franks, 438 U.S. 154). This analysis applies to omissions as well as affirmative misstatements. Leftkowitz, 618 *18 F.2d at 1317 n.3. The reports from RN contained false

observations, misrepresentations, exaggerations, and omission of exculpatory evidence. Had RN not provided and omitted these statements in his reports, there would not have existed grounds for removal.

12. Plaintiff re-alleges and re-pleads all of the allegations in paragraphs III.A 1-27 , III.C 1-13, and all of paragraphs IV of this Complaint and incorporate them by reference.

## C.  DCYF - VIOLATION OF, 4TH, 5TH, AND 14TH AMENDMENT, CONSPIRACY AGAINST RIGHTS,  WITHHOLDING EXCULPATORY EVIDENCE

1. Neither witness nor prosecutorial immunity apply when there are allegations that a social worker made misrepresentations or was otherwise deceptive in testifying or instituting prosecutorial proceedings. See Cunningham v. Gates, 229 F.3d 1271, 1291 (9th Cir. 2000); Beltran v. Santa Clara County, 514 F.3d 906, 908-09 (9th Cir. 2008). As discussed in this complaint, there are disputed issues as to whether the social workers deliberately or recklessly excluded exculpatory facts from the DCYF and SPD report and, accordingly, Defendants are not entitled to absolute immunity on these grounds.

2. RW intentionally mischaracterized children's descriptions of "⬛⬛⬛" as "⬛⬛⬛" in DCYF Intake (ID: 4030264) to inflame the report. RW also stated and entered her opinion that "Description of abuse appears bizarre and severe and causes bodily harm greater than transient pain" this was not stated by the referent. Exhibit B supports that there was no severe abuse, nor was any bodily harm greater than transient pain noted or observed by any medical professional. This inflammatory unprofessional opinion was added to case files to bolster the false narrative of abuse. This statement was used in both

criminal and dependency proceedings.  This was a violation of DCYF policy 6600 inter

alia and a 14th ammendment violation of due process.

3.  Dcyf policy 2333 subsection 4 states that the caseworker must interview the child outside

the presence of his or her sibling or other children living in the household. This policy

was not followed by AF on 11/29/2018. All school age children were interviewed as a

group. Subsection 5.B.i. and 5.B.ii both state that reasonable efforts are to be made to

audio record child interviews. No efforts were made to record the group interview of

AS,AG. EMD, and EAD. Subsection 5.B.iii of DCYF policy 2333 states that caseworkers

are to use near verbatim documentation if a child physical or sexual abuse interview is

not being audio recorded. Again, this was not done by DCYF, SPD, or SPS staff. AF

claims in a deposition that she never asked the children a single question regarding the

allegations, however RN clearly states in his report that one of his observations derived

from overhearing an interview being conducted by AF. If RN is telling the truth then that

would mean that AF provided false information in her deposition regarding ZG's criminal

matters.  However if RN is not telling the truth then he is openly committing perjury. No

interviews were documented by DCYF on 11/29/2018, which is a clear violation of

policy 6600 inter alia and a violation of the  due process ensured by the Constitution.

State agents acting under Color of Law  only get one shield of immunity; under that one

shield they can not tell 2 statements that are contradicting. AF's actions are considered

perjury and a violation of policy.

4.  DR ,SJ, RC and AF did not take into consideration the family constellation, sibling

relationships, ethnicity, culture, and religion of the Grae-El clan to any distinct degree in

the handling of the Grae-El clan. ZAG and AS were placed 2 hours from their

community, in a white Christian household. Zion Grae-El is Moorish American and practices Afrocentric spirituality, Confucism and Islamism. No effort was made to consider the cultural background of the Grae-El clan, only to note their reluctance to work with "white socialworkers". AS was also forced to switch schools. AS and ZAG were separated from living with AG, EMD and EAD for over 16 months. AS and ZAG were placed in a home that had multiple infractions and a ▮▮▮▮▮▮▮▮▮ this placement already had the potential of committing additional infractions. All of the above named actions are in direct violation of DCYF policy 4250, specifically subsection 4.c. and 4.d. which both state:

4.c. Preferences such as family constellation, sibling relationships, ethnicity, culture, and religion must be considered when matching a child to a foster home.

4.d.  Identify kinship care or licensed placements that are: i.) In the child's best interest and in consideration of their safety, permanency, and well-being needs, including: a.) The least restrictive setting available. b.) In close proximity to the parent. c.) Keeping the child enrolled in the school they were attending when it is practical and in their best interest. d.) With siblings, unless one of the exceptions described in the sibling section of this policy applies. e.) Placement settings that are least likely to result in placement moves.

ZG made multiple attempts to have his children placed in a culturally aligned household that went ignored. Both CS and ZG made multiple attempts to have children moved from culturally detrimental environments, which went unaddressed by DCYF. AS, was placed in over four foster placements in one year.

5. RCW 26.44.030 and DCYF Policy 6600 required DR to report the findings of ▓▓▓▓▓▓ ▓▓▓▓▓▓ disclosed to him by CS and Justin Short. DR did not properly investigate or report the alleged sexualized behavior, he instead investigated AS's claim of being ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ by HH, a report which was later deemed unfounded.

6. AS and ZAG remained in the home after the allegations surfaced on 03/22/2019. They were not removed until 03/25/2019. DCYF has shown its ability to have children removed from homes within 24 hours, however they failed to remove AS and ZAG in a timely manner after allegations arose. DCYF had AS, AG, EMD, EAD, and ZAG removed from the home of their biological parents within 18 hours of initial contact.

7. According to the Washington state Supreme Court the department owes a duty of reasonable care to protect foster children from abuse at the hands of their foster parent. Importantly, as foster children in the state's custody, Plaintiffs are entitled to be free from an unreasonable risk of harm, and they "do not need to wait to suffer an actual harm in order to obtain relief." M.D. ex rel. Stukenberg v. Perry, 294 F.R.D. 7, 34 (S.D. Tex. 2013) (citing Hoptowit v. Spellman, 753 F.2d 779, 784 (9th Cir. 1985) ("Prisoners have the right not to be subjected to the unreasonable threat of injury or death by fire and need not wait until actual casualties occur in order to obtain relief from such conditions.")). Therefore, Plaintiffs were not required to demonstrate past harms in order to meet their burden of proof at trial. Plaintiffs are simply required to prove that Defendants exposed them to a unreasonable risk of harm.

8. Policy 6600 was repeatedly violated by DCYF staff DR, AF, CG, RZ, RW, GM and Christine Spencer by way of intentional omission of exculpatory evidence, misstatement

of evidence, false claims, unprofessional opinion, and recklessly false statements as stated in this complaint. Violating any above mentioned DCYF policy regarding foster children is violation of substantive due process.

9.  TP and SA-N failed to properly investigate the formal complaint of ZG. TP and SA-N were negligent in their investigation of the complaint escalated to them by ZG. After much time to assess the complaint, no action was taken against anyone named in the complaint.  In a response by SA-N ZG was told to discuss with his attorney regarding the matter and that she "cannot discuss this issue with you any further". In a response by TP ZG was told that his "case will not be transferred to another social worker" and suggested that he contact his attorney for further assistance. SA-N could have taken this as an opportunity to improve policy and better protect children and parents, but chose not to investigate thoroughly.

10. DR did not follow RCW 74.13.530 regarding conflicts of interest in child placement. Under the supervision of SJ, DR had AS and ZAG placed with L█ M█. Ms. M█ is the SPS staff member who initiated the action of reporting suspected abuse. SPS staff are state employees. This act was in direct violation of RCW 74.13.530. Ms. M█ conducted a systematic examination of abuse, as a result of her being a mandated reporter and receiving what she believed was an alleged report of abuse from AS.

11. Plaintiffs re-alleges and re-pleads all of the allegations in paragraphs III.A 1-30 and all of paragraphs IV of this Complaint and incorporate them by reference.

**12.** Defendant DCYF, through its agents and employees, breached the aforementioned duties, proximately causing injuries, harms, losses, and damages to the Grae-El clan, in an amount to be proven at trial.

13. At all times relevant the Defendant DCYF agents and employees mentioned herein were agents and/or apparent agents of the State of Washington, pursuant to a state-funded contract with the State of Washington. Therefore, the State of Washington is vicariously liable.

**D. Olivecrest - Negligence**

1.  Exhibit F is a Redacted copy of HH and Scott Hadfield's founded abuse investigation, conducted by DCYF. Per RCW 26.44.160  A child that commits a sex offense as defined in RCW 9.94A.030 shall be investigated. Per RCW 26.44.030 and WAC 110-148-1420 HH reported a concern on 4/29/15 regarding a ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

    ▉▉▉▉▉▉▉▉▉▉▉▉▉ This report was deemed a non CPS intake and documented in DCYF files (Intake ID: 4108388) but was not reported to LE as required by RCW 26.44.030. The department upon receiving a report involving a child who has been subjected to alleged ▉▉▉▉▉▉▉ is required to notify the law enforcement agency within seventy-two hours after a report is received by the department. This notification to LE was not done by Olivecrest employees or DCYF staff, and the oversight prevented SH from being investigated by LE pursuant to RCW 26.44.160. If the report of ▉▉▉▉ by HH was in fact investigated and escalated appropriately, the allegation would have met the elements of ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Due to SH age, she likely would have been deemed a ▉▉▉▉▉▉▉▉▉▉ and the home would not have been suitable in the context that it was during the housing of AS and ZAG. It's

to the plaintiff's knowledge that SH had unsupervised access to children. This raises a
valid concern for child safety, especially since there were two documented complaints of
███████████████ Furthermore, had the investigation taken place long ago, services could
have been provided to the family to prevent the conditions that produced the founded
abuse allegations against HH and Scott Hadfield in 2019. OC was negligent in their
investigation of SH's ████████████████████ Several policies were violated ,not
only by OC but by DCYF.

2. Olivecrest and SB failed to properly document or investigate CS's allegations of observed
    ████████████████████ reported on 03/22/2019. CS reported that AS and ZAG were making
    ████████████████████ and voiced to Justin Short that she wanted it documented
    and looked into. CS also sent an email of a similar nature to DR. CS received no response
    from either DR, SB, Justin Short,  or Olivecrest regarding the matter. In the DCYF
    investigation into AS's claims, no mention was made of CS's complaints to Justin Short
    or DR.

3. Olivecrest and SB also failed to investigate a documented report of ████████████ by
    Justin Short (OC employee) at Olive Crest North Sound location on 03/22/2019.

4. Foster parents HH and Scott Hadfield did not meet the requirements for licensed foster
    parents as set forth by WAC 110-148-1365. Exhibit F proves that the environment for the
    AS and ZAG was not nurturing, supportive, or beneficial for their developmental growth.
    Previous infractions support the allegation that the foster home was not appropriate
    towards foster children prior to the arrival of AS and ZAG. Exhibit F also supports the
    allegation that children were ████████████████████

5. HH used ▮▮▮▮▮▮▮▮▮ against AS which is also against policy WAC 110-148-1615, and WAC 110-148-1620. HH did not get previous written approval to ▮▮▮▮▮▮ AS as frequently as she did. HH, OC, and DCYF also knew that AS reported pain often when HH ▮▮▮▮▮▮▮▮▮ him. This ▮▮▮▮▮▮▮▮▮ was reported by AS and HH herself, yet the allegations AS reported was deemed unfounded.

6. Defendant Olive Crest performs the public functions of recruiting, training, and certifying foster parents and adoptive parents, and providing foster and adoptive placements, care, and services for children who are dependents of the state of Washington.

7. Plaintiffs re-alleges and re-pleads all of the allegations in paragraphs III.E 1-10 of this Complaint and paragraph V.C.7 and incorporate them by reference.

8. OC breached the aforementioned duties and aforementioned policies, proximately causing injuries, harms, losses, and damages to the Grae-El clan, in an amount to be proven at trial.

## E. Seattle Public Schools – 14TH AMENDMENT VIOLATION, 4TH AMENDMENT VIOLATION, AND NEGLIGENCE

1. SPS Policy No. 3421 states that all district employees are to report to the appropriate school administrator. If the school administrator has reasonable cause to believe that the abuse, neglect, or exploitation has occurred, he or she shall report the incident to CPS or law enforcement.

   Based on her own analysis NL made the initial contact with DCYF. In itself, this was not appropriate according to policy. AS did not have valid indicators aligned with requirements to report abuse Per SPS procedure 3421SP.

2. SPS Superintendent Procedure No. 3421SP sets forth indicators of various forms of abuse. AS never said he was ████████████, DCYF staff made that assumption. SPS staff state that AS reported being ████████████ which showed ██████ He also voiced that he was not afraid of returning home. He met one if not none of the indicators of abuse according to SPS policy. SPS made no inquiry into the ████████ AS ████ SPS only noted the ██████

3. NL and 2 other SPS staff also conducted an interview on 11/28/2018 without documented consent of AS and without LE or CPS present, this is against SPS policy No. 3421SP. It is worthy to note that AS is a special needs child, developmentally, and behaviorally.

4. SPS granted SPD access to interview children without parental consent on the grounds of reasonable belief of imminent harm of AS. Nothing in the 18 month history of the family and Dunlap Elementary would indicate any red flag of any kind. Nothing provided by SPS prior to 11/29/2018 would indicate imminent harm. The belief of imminent harm is unsupported by any SPS document or note of incident by SPS staff. In allowing SPD to interview children without parental consent in the absence of imminent harm, SPS and SPD violated their own policy and the Grae-El clan's constitutional right to be free from unlawful seizures. In SPS conducting their own improper interview, without written consent of AS and without notifying parents is a violation of SPS policy. For the record AS is and was ████████████

5. Plaintiffs re-alleges and re-pleads all of the allegations in paragraphs III.D 1–7 of this Complaint and incorporate them by reference.

6. SPS breached the aforementioned duties and aforementioned policies, proximately causing injuries, harms, losses, and damages to the Grae-El clan, in an amount to be proven at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant in their favor, as follows:

## A. GENERAL

1. That proper process issue and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

2. That the Plaintiff be awarded fair and reasonable damages, including compensatory damages up to $2,000,000.00, and punitive damages up to $4,000,000.00;

3. That the plaintiff be awarded the costs of trying this action;

4. That the plaintiff's be awarded treble damages;

5. That costs of this action be taxed to the Defendants;

6. That if Defendants bring any frivolous or unfounded defenses, for costs pursuant to RCW 4.84.185 and/or Rule 11 of the Superior Court Civil Rules;

7. That prejudgment interest be awarded to the Plaintiff;

8. That the Plaintiff be awarded all and any such other and further relief as the Court deems proper; and,

9. That Plaintiff's right to amend this Complaint to conform to the evidence be reserved.

## B. Seattle Police Department

1. Declaring that RN acted recklessly with ill intent or malicious intent in the handling of the Grae-El clan.

2. Declaring and decreeing that defendant SPD's policy 15.220-POL led to multiple violations of the Grae-El clan's constitutional rights.

3. Declaring that RN committed false reporting as set forth in RCW 9A.84.040

4. Declaring that Sgt. Boggs was negligent in advising RN on how to appropriately handle child interviews.

5. For injunctive relief requiring SPD to replace the subjective clause in SPD Policy 15.220-POL with elements.

**C. Seattle Children's Hospital**

1. For injunctive relief preventing SCH from allowing apprentices, trainees, and doctors without specialized training in child abuse from making child abuse determinations in cases when child abuse board-certified physicians are available to provide services.

**D. Seattle Public Schools**

1. For injunctive relief requiring ALL SPS staff to undergo thorough training regarding the handling of child abuse allegations.

2. Declaring that SPS staff NL did not follow SPS Superintendent Procedure.

**E. Olivecrest Foster Agency**

1. Declaring that OC, and SB caused unnecessary and unreasonable risk to AS and ZAG by placing children in an environment that was abusive and not in their best interests or wellbeing.

2. Declaring that SB was negligent in not investigating or escalating allegations of ▆▆▆▆ ▆▆▆▆ by CS, or Justin Short.

3. Declaring that OC was negligent in not reporting suspected ▮▮▮▮▮▮ within the Hadfield's home to law enforcement in 2015

## F.  DCYF

1. Declaring and decreeing that Defendants DR, AF, CG, RZ, RW, GM and Christine Spencer violated DCYF policy 6600.

2. Declaring that GM, Christine Spencer,  and AF committed false reporting as set forth in RCW 9A.84.040.

3. Declaring and decreeing that DR violated RCW 74.13.530.

4. Declaring and decreeing that AF, DR, SJ, and RC acted recklessly with ill intent or malicious intent in the handling of the Grae-El clan.

5. Declaring and decreeing that AF, DR, SJ, RC, CG, GM, RW and Christine Spencer acted with reckless negligence in the handling of the Grae-El clan.

6. Declaring and decreeing that Defendant's DCYF et al's negligence resulted in injury to the Grae-El clan.

7. Declaring and decreeing that TP and SA-N conducted negligent internal investigations in the handling of a formal complaint pertaining to their Department.

8. For injunctive relief preventing Defendant DCYF from allowing employees under probation from making or handling emergency removals, and from using emergency removals to circumvent due process. Plaintiffs also seek injunctive relief requiring ALL child interviews of any kind be verbatim recorded by all state or government entities involved, if not video or audio recorded.

9. Declaring and decreeing that DR was intentionally negligent in not investigating or escalating allegations of █████████ by CS, or the report by Justin Short of ████████ █████

10. Declaring that DCYF was negligent in the placement of AS and ZAG into the homes of HH and L███ M█████

**CERTIFICATION AND CLOSING**

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge, and that this complaint: (1) is not being. presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically, so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Dated: October 23, 2021

Respectfully Submitted

Zion Grae-El,

Pro se Litigant

Address:     5640 S Cedar St,
             Tacoma, WA, 98409

Email:       Zgrae88@gmail.com

Phone:       (206) 326-9160

FILED
2021 NOV 05
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 21-2-14753-1 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING**

| | |
|---|---|
| ZION GRAE-EL | NO. 21-2-14753-1  SEA |
| Plaintiff(s) | ORDER SETTING CIVIL CASE SCHEDULE |
| vs | ASSIGNED JUDGE: PORT, Dept. 51) |
| CITY OF SEATTLE | FILED DATE: 11/05/2021 |
| Defendant(s) | TRIAL DATE:11/07/2022 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

**I.  NOTICES**

**NOTICE TO PLAINTIFF:** The Plaintiff may serve a copy of this **Order Setting Case Schedule (*Schedule*)** on the Defendant(s) along with the ***Summons and Complaint/Petition.***  Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the ***Summons and Complaint/Petition*** or (2) service of the Defendant's first response to the ***Complaint/Petition***, whether that response is a ***Notice of Appearance***, a response, or a Civil Rule 12 (CR 12) motion.  The ***Schedule*** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this ***Schedule***. In order to comply with the ***Schedule***, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].
    **You are required to give a copy of these documents to all parties in this case.**

3

**I. NOTICES (continued)**

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS:**
A filing fee of **$240** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule.  The court will review the confirmation of joinder document to determine if a hearing is required.  If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of <u>all parties and claims</u> is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

 Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of <u>all parties and claims</u> is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

 **ARBITRATION FILING <u>AND</u> TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and cross-claims have been filed.  If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $250 arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a fee of $400 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements <u>and/or</u> Local Civil Rule 41.

**King County Local Rules are available for viewing at <u>www.kingcounty.gov/courts/clerk.</u>**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|---|---|
| | Case Filed and Schedule Issued. | 11/05/2021 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*].<br>**$220 arbitration fee must be paid** | 04/15/2022 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration [*See KCLCR 4.2(a) and Notices on Page 2*]. | 04/15/2022 |
| | **DEADLINE** for Hearing Motions to Change Case Assignment Area [*KCLCR 82(e)*]. | 04/29/2022 |
| | **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(k)*]. | 06/06/2022 |
| | **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(k)*]. | 07/18/2022 |
| | **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | 08/01/2022 |
| | **DEADLINE** for a Change in Trial Date [*See KCLCR 40(e)(2)*]. | 08/01/2022 |
| | **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | 09/19/2022 |
| | **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | 10/10/2022 |
| | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [*KCLCR 4(j)*]. | 10/17/2022 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(1)*] | 10/17/2022 |
| | **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | 10/24/2022 |
| * | Joint Statement of Evidence [*See KCLCR 4 (k)*] | 10/31/2022 |
| | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 10/31/2022 |
| | Trial Date [*See KCLCR 40*]. | 11/07/2022 |

The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above.  Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance.  It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.


DATED:   <u>11/05/2021</u>


_____

PRESIDING JUDGE

3

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE.**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule.  The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:**  If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:**  Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**CASE SCHEDULE AND REQUIREMENTS:**  Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

### A. Joint Confirmation regarding Trial Readiness Report
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g., interpreters, equipment).

The Joint Confirmation Regarding Trial Readiness form is available at www.kingcounty.gov/courts/scforms. If parties wish to request a CR 16 conference, they must contact the assigned court.  Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding the report.

### B. Settlement/Mediation/ADR
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand.  Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held.  FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

### C. Trial
Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court.  The Friday before trial, the parties should access the court's civil standby calendar on the King County Superior Court website www.kingcounty.gov/courts/superiorcourt to confirm the trial judge assignment.

## MOTIONS PROCEDURES

### A. Noting of Motions

**Dispositive Motions:**  All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge.  The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules.  Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Non-dispositive Motions:**  These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered.  All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements. Rather than noting a time of day, the Note for Motion should state "Without Oral Argument."  Local Civil Rule

3

7 governs these motions, which include discovery motions.  The local civil rules can be found at
www.kingcounty.gov/courts/clerk/rules/Civil.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine,
motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the
assigned judge.  All other motions should be noted and heard on the Family Law Motions calendar.  Local
Civil Rule 7 and King County Family Law Local Rules govern these procedures.  The local rules can be
found at www.kingcounty.gov/courts/clerk/rules.

**Emergency Motions:**   Under the court's local civil rules, emergency motions will usually be allowed only
upon entry of an Order Shortening Time.  However, some emergency motions may be brought in the Ex
Parte and Probate Department as expressly authorized by local rule.  In addition,  discovery disputes may be
addressed by telephone call and without written motion, if the judge approves in advance.

**B.  Original Documents/Working Copies/ Filing of Documents:  All original documents must be filed
with the Clerk's Office.**  Please see information on the Clerk's Office website at
www.kingcounty.gov/courts/clerk regarding the requirement outlined in LGR 30 that attorneys must e-file
documents in King County Superior Court.  The exceptions to the e-filing requirement are also available on
the Clerk's Office website. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

The working copies of all documents in support or opposition must be marked on the upper right corner of
the first page with the date of consideration or hearing and the name of the assigned judge.  The assigned
judge's working copies must be delivered to his/her courtroom or the Judges' mailroom.  Working copies of
motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions
Coordinator.  Working copies can be submitted through the Clerk's office E-Filing application at
www.kingcounty.gov/courts/clerk/documents/eWC.

**Service of documents:** Pursuant to Local General Rule 30(b)(4)(B), e-filed documents shall be
electronically served through the e-Service feature within the Clerk's eFiling application.  Pre-registration to
accept e-service is required.  E-Service generates a record of service document that can be e-filed.  Please
see the Clerk's office website at www.kingcounty.gov/courts/clerk/documents/efiling regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested
relief with the working copy materials submitted on any motion.  **Do not file the original of the proposed
order with the Clerk of the Court**.   Should any party desire a copy of the order as signed and filed by the
judge, a pre-addressed, stamped envelope shall accompany the proposed order.  The court may distribute
orders electronically.  Review the judge's website for information:
www.kingcounty.gov/courts/SuperiorCourt/judges.

**Presentation of Orders for Signature:** All orders must be presented to the assigned judge or to the Ex
Parte and Probate Department, in accordance with Local Civil Rules 40 and 40.1. Such orders, if presented
to the Ex Parte and Probate Department, shall be submitted through the E-Filing/Ex Parte via the Clerk
application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). If
the assigned judge is absent, contact the assigned court for further instructions.  If another judge enters an
order on the case, counsel is responsible for providing the assigned judge with a copy.

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented
to the  Ex Parte and Probate Department.**  Such orders shall be submitted through the E-Filing/Ex Parte
via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-
attorneys). Formal proof in Family Law cases must be scheduled before the assigned judge by contacting
the bailiff, or formal proof may be entered in the Ex Parte Department.  **If final order and/or formal proof
are entered in the Ex Parte and Probate Department, counsel is responsible for providing the
assigned judge with a copy.**

**C. Form**
Pursuant to Local Civil Rule 7(b)(5)(B), the initial motion and opposing memorandum shall not exceed 4,200
words and reply memoranda shall not exceed 1,750 words without authorization of the court. The word count

includes all portions of the document, including headings and footnotes, except 1) the caption; 2) table of contents and/or authorities, if any; and 3): the signature block. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED.  FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS.  PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***

_____
                    PRESIDING JUDGE



**Department of Judicial Administration**

Barbara Miner
*Director and Superior Court Clerk*
(206) 296-9300    (206) 296-0100 TTY/TDD

November 8, 2021

ZION GRAE-EL
5640 SOUTH CEDAR ST.
TACOMA, WA. 98409

        RE: GRAE-EL ET AL. V. CITY OF SEATTLE, ET AL.
        King County Superior Court Cause No.:   21-2-14753-1 SEA

    **NOTICE REGARDING AN ORDER SETTING ORIGINAL CASE SCHEDULE / NOTICE  (NT)**

☒    We recently received your new filing .  The enclosed Case Schedule / Notice is pursuant to your filing.  Please read the instructions carefully.

☐    You filed a Request for Trial De Novo. The enclosed Case Schedule is pursuant to your filing. Please read the instructions carefully.

☐    This case is not a managed case.  Please disregard and throw away the Case Schedule you received.

☐    The above captioned case was assigned an incorrect **Order Setting Original Case Schedule** due to the following reason(s):

        ☐    You received a            Case Schedule in error.  Your copies of the correct            Case Schedule is enclosed and has been filed.
        ☐    The file date is incorrect.  A new case schedule is enclosed with the correct file date of        .
        ☐    You received multiple case schedules with different trial dates.  The correct trial date for this case is        .

☐    The enclosed case schedule is issued pursuant to a court  order dated        .

    **YOU MUST SERVE A COPY OF THE ENCLOSED ORDER SETTING CASE SCHEDULE AND THIS NOTICE ON ALL PARTIES**

Sincerely,

Barbara Miner

*Seattle:*              *Regional Justice Center:*             *Juvenile:*
516 Third Avenue Room E609      401 Fourth Avenue North Room 2C      1211 East Alder Room 3015
Seattle, WA  98104-2386           Kent, WA 98032-4429           Seattle, WA  98122-5598



**Department of Judicial Administration**

Barbara Miner
*Director and Superior Court Clerk*
(206) 296-9300   (206) 296-0100 TTY/TDD

Director and Superior Court Clerk

By:  T. BROWN
      Deputy Clerk, Cashiers Section

*Seattle:*
516 Third Avenue Room E609
Seattle, WA  98104-2386

*Regional Justice Center:*
401 Fourth Avenue North Room 2C
Kent, WA 98032-4429

*Juvenile:*
1211 East Alder Room 3015
Seattle, WA  98122-5598