1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   ZION T. GRAE-EL, et al.,                    CASE NO. C21-1678JLR

11                         Plaintiffs,           ORDER

12          v.

13   CITY OF SEATTLE, et al.,

14                         Defendants.

15                          **I.     INTRODUCTION**

16          Before the court is Defendants the City of Seattle, Officer Ryoma Nichols, and

17   Sergeant Daina Boggs's (collectively, the "City Defendants") motion for judgment on the

18   pleadings.  (Mot. (Dkt. # 51); Reply (Dkt. # 67).)  Plaintiffs Zion T. Grae-El and Caprice

19   Strange (collectively, "Plaintiffs") oppose the motion in separate filings.  (Grae-El Resp.

20   (Dkt. # 54); Strange Resp. (Dkt. # 60).[1])  The court has considered the parties'

21

22          [1] Plaintiffs cumulatively submit 27 pages of responsive briefing (*see* Grae-El Resp.;
Strange Resp.), which exceeds their allotment under the local rules, *see* Local Rule W.D. Wash.

1   submissions, the relevant portions of the record, and the applicable law.  Being fully

2   advised,[2] the court GRANTS the City Defendants' motion for judgment on the pleadings.

3               **II.    BACKGROUND**

4           This case arises from a report of suspected child abuse made by Natalie Long, an

5   employee of Seattle Public Schools ("SPS"), to Child Protective Services ("CPS"), a

6   component of the Washington State Department of Children, Youth & Families

7   ("DCYF").  (Compl. (Dkt. # 1-1) at 11.[3])  On November 28, 2018, Leslie Meekins, a

8   teacher at Dunlap Elementary School, became concerned that one of her students—Ms.

9   Strange's minor child, A.S.[4]—had been the victim of abuse.  (*See id.* at 11, 55.)  Ms.

10  Meekins, who is required by state law to report instances of suspected abuse, evidently

11  relayed her concerns to Ms. Long.  (*See id.*)

12          Based on Ms. Meekins' concerns, Ms. Long "and two other SPS staff" each

13  questioned A.S. on November 28, 2018 about the suspected abuse in an allegedly

14  _____

15  LCR 7(e) (providing that "briefs in opposition" to a dispositive motion "shall not exceed twenty-
    four pages").  The City Defendants point out Plaintiffs' technical violation, but do not claim to

16  be prejudiced by it or ask the court to strike the extra pages.  (*See* Reply at 1.)  Thus, the court
    will consider Plaintiffs' full submission but reminds Plaintiffs that, despite their *pro se* status,

17  they must review and comply with the court's Local Rules, which are available on the court's
    website at https://www.wawd.uscourts.gov/local-rules-and-orders.

18          [2] Mr. Grae-El requests oral argument (*see* Grae-El Resp. at 1), but the court concludes
    that argument would not be helpful to its disposition of the motion, *see* Local Rule W.D. Wash.

19  LCR 7(b)(4).

20          [3] When citing to Mr. Grae-El and Ms. Strange's filings, the court refers to the page
    numbers contained in the CM/ECF header.

21          [4] The minor children are referred to using their initials.  Ms. Strange is the biological
    mother of A.G., A.S., and Z.A.G., who is also Plaintiff Zion T. Grae-El's biological son.

22  (Compl. at 6.)  In addition to Z.A.G., Mr. Grae-El is the biological father of E.A.D. and E.M.D.
    (*Id.* at 5-7.)

1   unrecorded interview.  (*Id.* at 11-12, 35.)  During the interview, A.S. allegedly told Ms.

2   Long that he had been hit in the stomach by his stepfather, Mr. Grae-El, and that he was

3   experiencing pain in his leg and shin.  (*Id.* at 11.)  Ms. Long and her colleagues also

4   observed marks on A.S.'s face that they thought "looked like someone grabbed his face

5   really hard," but did not observe any bruising on A.S.'s stomach.  (*Id.*)  They reported

6   these observations to Annaliese Ferreria at DCYF, stated that they did not think the

7   Seattle Police Department ("SPD") needed to be contacted at that time, and relayed that

8   A.S. was not expressing a fear of returning home.  (*Id.*)  Accordingly, the children were

9   sent home after school.  (*See id.* at 11-12.)

10       That evening, Ms. Ferreria, others from DCYF, and SPD Officers Nichols and

11  Timothy Jones went to Plaintiffs' home to conduct a "safety assessment."  (*Id.* at 12,

12  31.[5])  The group apparently spoke only to Mr. Grae-El in a tense exchange in which he

13  shouted through a closed door and asserted his rights to refuse to permit them to enter his

14  home.  (*Id.* at 14.)  Mr. Grae-El did, however, agree to allow each of the children to go

15  outside, one at a time, to speak with Ms. Ferreria and the SPD officers.  (*Id.*)  Plaintiffs

16  allege that, in the course of speaking with Ms. Ferreria, none of the children said "they

17  did not feel safe at home or were scared to return home, despite [A.S.] and [A.G.] being

18  asked."  (*Id.*)

19  //

20  //

21  _____

    [5] The City Defendants dispute that Officer Nichols was present at the Plaintiffs' home on
22  November 28, 2018 (*see* Reply at 3), but the court must accept Plaintiffs' factual allegations as
    true for purposes of this motion.  *See Iqbal*, 556 U.S. at 678.

1    Plaintiffs quote from Officer Jones's "initial report" documenting the November

2    28, 2018 safety assessment and assert that he did not report seeing "any signs of distress"

3    from the children, and though he "could 'see into the [Plaintiffs'] apartment a little bit,'"

4    he "didn't see anything that concerned [him] at the time." (*Id.* at 31 (purporting to quote

5    from Officer Jones' "initial report").)  Plaintiffs further allege that Office Jones did not

6    describe any "dangerous or injurious living conditions," or observe "the children being

7    afraid, [Mr. Grae-El] being aggressive, or even an observed injury." (*Id.*)  Nevertheless,

8    Plaintiffs allege that Officer Jones was under "the impression that CPS wanted [him] to

9    grab" one of the children "when he came out or force [his] way in to take the kids." (*Id.*)

10    None of the children were taken that evening and instead remained in the home

11    and attended school the following morning.  Ms. Ferreria arrived at Dunlap Elementary at

12    10:45 AM on November 29, 2018, and called for SPD officers to place the children in

13    protective custody, which she stated, "should have been done last night." (*Id.* at 15.)  In

14    response, Officer Nichols arrived at Dunlap Elementary sometime between 2 PM and

15    2:50 PM. (*Id.* at 16.)  Plaintiffs allege that Ms. Ferreria had already decided at that point

16    that the children should be placed into protective custody and made no effort over the

17    course of the school day "to ascertain any more information about the initial incident, or

18    speak with" Marites Perez-Aniag, the teacher at Dunlap Elementary who allegedly "had

19    the longest and strongest relationship with the family," having taught A.S. the prior

20    school year. (*Id.* at 30.)

21    After Officer Nichols arrived, Ms. Ferreria apparently did conduct a further group

22    interview of Plaintiffs' children with Officer Nichols. (*Id.* at 16.)  During that interview,

1    Officer Nichols overheard E.A.D. tell Ms. Ferreria that "scratches on both sides of her

2    neck and a small scar by her right collarbone . . . were caused by [Ms. Strange] hitting her

3    with a belt and spatula in a separate incident." (*Id.*)  Neither Ms. Ferreria nor Officer

4    Nichols recorded these interviews "due to SPD and CPS anticipating [that] a far more

5    thorough interview" would be conducted at a later time.  (*Id.* (quotation marks omitted).)

6         Thereafter, Officer Nichols created a "supplemental report" on November 29,

7    2018, in which he indicated that he had "screened the incident" with Sergeant Boggs.

8    (*Id.* at 30 (quoting and paraphrasing from Officer Nichols' November 29, 2018 report).)

9    Officer Nichols noted that CPS and SPD had been unable to remove the children the prior

10   evening because Mr. Grae-El's "aggressive and confrontational demeanor" made it

11   "unsafe to do so," and that E.A.D. had "told" him that Ms. Strange "struck her face and

12   legs with a belt." (*Id.*)  Officer Nichols was able to see a "mark on [E.A.D.'s] left

13   cheek," which she confirmed was from Ms. Strange hitting her. (*Id.* at 31.)  E.A.D. also

14   told Officer Nichols "that she had a bruise on her left thigh," though he was unable to see

15   this mark because E.A.D. "was wearing pants." (*Id.*)

16        Officer Nichols then completed a custody without court order ("CWO") form,

17   which largely incorporated information from his "supplemental report," to certify that he

18   believed probable cause existed to place the children in temporary protective custody

19   without a warrant. (*Id.* at 31.)  On the CWO form, Officer Nichols allegedly stated that

20   A.S. reported "being struck by" Mr. Grae-El on November 27, 2018; the injury had been

21   reported to CPS on November 28, 2018; in a subsequent interview with A.S., E.M.D.,

22   A.G., and E.A.D., the children "reported a pattern of physical discipline often involving a

1   belt"; and E.A.D. had "also reported she was struck by a belt and indicated an injury,"

2   which Officer Nichols had observed.  (*Id.* at 31 (purporting to quote from CWO).)

3   Accordingly, Officer Nichols concluded "that all 5 children are in danger of physical

4   harm if returned home."  (*Id.* at 31-32.)  Without obtaining a warrant, Officer Nichols

5   then placed the children into protective custody.  (*See id.* at 30-32.)

6        Following placement into protective custody, the children were taken to Seattle

7   Children's Hospital ("Children's") where medical examinations were conducted to assess

8   whether the children had any physical signs of abuse.  (*Id.* at 25-28.)  Children's staff

9   identified what they believed to be signs of abuse and neglect and presented these

10   findings to DCYF.  (*Id.* at 46.)  The children were then removed from Plaintiffs' custody

11   and either sent to a foster home in Bellingham, Washington or to live with their non-

12   custodial parent.  (*See id.* at 17.)  A dependency action was also initiated against

13   Plaintiffs.  (*See id.* at 18, 21.)

14        Mr. Grae-El was arrested on January 10, 2019 and subsequently charged with

15   "with one count of rape of a child in the first degree as to E.A.D., and one count of

16   assault of a child in the third degree as to A.S.," for allegedly hitting "A.S. with a belt and

17   spatula."  (*See* Verification of State Records (Dkt. # 20), Ex. 3 at 156 (Mr. Grae-El's

18   motion for relief from his conviction).[6])  Ms. Strange was initially charged with "with

19   one count of assault of a child in the third degree as to E.A.D."  (*Id.*)  Mr. Grae-El was

20

21      [6] The court takes judicial notice of records from Plaintiffs' state court proceeding.  *See*
Fed. R. Evid. 201; *see Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 641 (9th Cir. 2018) (taking

22   judicial notice of documents filed in the § 1983 plaintiff's state court criminal matter to
determine whether *Heck* applied).

1  separately tried on the rape indictment and acquitted on September 4, 2019.  (*Id.* at 156-

2  57.)  Following his acquittal, the State filed an amended information which charged Mr.

3  Grae-El with three counts of second degree assault (A.S. and E.M.D.) and one count of

4  third degree assault (A.S.).  (*Id.* at 157.)  The amended information charged Ms. Strange

5  with two counts of second degree assault (A.S. and E.M.D.) and one count of third degree

6  assault (E.A.D.).  (*Id.*)

7      Mr. Grae-El and Ms. Strange subsequently accepted a plea agreement whereby

8  Mr. Grae-El pled guilty to "one count of assault of a child in the third degree (E.M.D.)

9  and one count of assault in the fourth degree (A.S.)," and Ms. Strange "entered guilty

10  pleas to two counts of assault in the fourth degree (E.A.D. and A.S)."  (*Id.* at 158.)  Mr.

11  Grae-El alleges that his fourth degree assault conviction was "for hitting [A.S.]'s hand

12  with his own hand using 'moderate force.'"  (Compl. at 33.)  In September 2020, Mr.

13  Grae-El moved to vacate his convictions on the grounds that he was provided with

14  ineffective assistance of counsel during the plea process.  *See State v. Grae-El*, No.

15  82306-0-I, 2022 WL 670953, at *3 (Wash. Ct. App. Mar. 7, 2022).  After holding an

16  evidentiary hearing, the trial court denied Mr. Grae-El's motion in a ruling that was

17  recently affirmed on appeal.  *Id.* at *3, 9.

18      Plaintiffs initiated this action in King County Superior Court on or about

19  November 19, 2021.  (*See* NOR (Dkt. # 1) ¶ 1; Compl. at 1.)  The City Defendants

20  removed this matter from King County Superior Court on December 16, 2021.  (*See*

21  NOR at 1.)

22  *//*

1

### III.   ANALYSIS

2   The City Defendants construe Plaintiffs' claims against them as including:

3   (1) First Amendment claims against Officer Nichols for retaliating against Mr. Grae-El

4   for refusing to permit an inspection of his home on November 28, 2018 (Compl. at 49);

5   (2) Fourth Amendment claims against Officer Nichols for judicial deception (*id.* at

6   48-49); (3) Fourteenth Amendment claims against Officer Nichols for violating their

7   right to familial association without due process (*id.* at 49); (4) claims under *Brady v.*

8   *Maryland*, 373 U.S. 83 (1963), alleging that the City Defendants suppressed Officer

9   Jones' police report and Officer Nichols' body worn video ("BWV") footage from

10  November 28 and 29, 2018 (*id.* at 53); (5) Fourteenth Amendment claims under *Monell v.*

11  *Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), alleging that the City of Seattle

12  violated Plaintiffs' right to familial association by promulgating SPD Policy Manual

13  15.220-POL-7 (*id.* at 54); and (6) claims for intentional infliction of emotional distress

14  ("IIED") under Washington law (*id.* at 50).  (Mot. at 5; 21-23.)  Plaintiffs do not dispute

15  this formulation, which the court also finds to be a reasonable summation of Plaintiffs'

16  claims.  (*See generally* Grae-El Resp.; Strange Resp.; Compl. at 48-54.)

17  The City Defendants argue that judgment on the pleadings is appropriate because:

18  (1) Plaintiffs' judicial deception and familial relations claims are barred under *Heck v.*

19  *Humphrey*, 512 U.S. 477 (1994) (Mot. at 7-10), or (2) unsupported by allegations

20  showing that Officer Nichols—or any other SPD officer—lacked probable cause or a

21  reasonable basis to place Plaintiffs' children in protective custody (*id.* at 10-14);

22  (3) Plaintiffs' *Brady* claims fail "[b]ecause they do not identify anything material in these

1   documents and cannot identify how the lack of disclosure harmed them (*id.* at 14-16);

2   (4) Officer Nichols and Sergeant Boggs are entitled to qualified immunity (*id.* at 16-18);

3   (5) Plaintiffs' *Monell* claims rest on a misstatement of SPD Policy and are unsupported

4   by any underlying constitutional violation (*id.* at 18-21); (6) Plaintiffs' claims against

5   Sergeant Boggs rest on a theory of supervisory liability, which cannot support a claim

6   under 42 U.S.C. § 1983 (*id.* at 21-22); (7) Plaintiffs' First Amendment claims for

7   retaliation fail because the actions taken against Plaintiffs were reasonable and supported

8   by probable cause (*id.* at 22); and (8) Plaintiffs fail to plead the required elements of an

9   IIED claim under Washington law (*id.* at 22-23).

10      The court begins by describing the legal standard that applies to a motion for

11  judgment on the pleading before turning to consider Plaintiffs' claims, beginning with

12  their First Amendment retaliation claims.

13  **A.      Federal Rule of Civil Procedure 12(c)**

14      Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are

15  closed but within such time as not to delay the trial, any party may move for judgment on

16  the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when the

17  moving party clearly establishes on the face of the pleadings that no material issue of fact

18  remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach*

19  *Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990). In ruling on

20  motions brought under Rule 12(c), the court considers the complaint, documents over

21  which the court may take judicial notice, and exhibits attached to the complaint. *See*

22  *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021); Fed. R. Civ. P. 10(c) ("A

1    copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all

2    purposes.").

3         The standard for dismissing claims under Rule 12(c) is "substantially identical" to

4    the Rule 12(b)(6) standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5    *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).  To survive a motion to

6    dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter,

7    accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S.

8    at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has

9    facial plausibility when the plaintiff pleads factual content that allows the court to draw

10   the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

11   Although not a "probability requirement," this standard asks for "more than a sheer

12   possibility that a defendant has acted unlawfully."  *Id.*  "Determining whether a

13   complaint states a plausible claim for relief will . . . be a context-specific task that

14   requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at

15   679.

16        When considering a motion for judgment on the pleadings, a court may consider

17   material which is properly submitted as part of the complaint without converting the

18   motion into a motion for summary judgment.  *See Lee v. City of Los Angeles*, 250 F.3d

19   668, 688 (9th Cir. 2001).

20   **B.    First Amendment Retaliation**

21        Plaintiffs allege that Officer Nichols' placement of their children in protective

22   custody "was in part, direct retaliation" for Mr. Grae-El's "assertive demeanor" during

1   the November 28, 2018 safety assessment and his decision to decline the DCYF and SPD

2   officials to enter his home without a warrant.  (*See* Compl. at 51.)  The City Defendants

3   argue that Plaintiffs' First Amendment claims must be dismissed because they "have

4   failed to plead that probable cause was lacking" for Officer Nichols' seizure of the

5   children and their subsequent arrest.  (*See* Mot. at 22.)  They further assert that "the fact

6   of their prosecution, which has not been called into doubt, shows that prior courts have

7   found probable cause existed."  (*Id.* (citing *Nieves v. Bartlett*, ___ U.S. ___, 139 S. Ct.

8   1715, 1724 (2019)).)

9        "To plead a First Amendment claim for retaliation, a plaintiff must allege

10  (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of

11  ordinary firmness from exercising his constitutional rights, and (3) a causal link between

12  the protected conduct and the retaliatory action."  *Pallas v. Accornero*, No.

13  19-CV-01171-LB, 2019 WL 3975137, at *5 (N.D. Cal. Aug. 22, 2019) (first citing *Mt.*

14  *Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); and then citing

15  *Ford v. Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013)).  "To prevail on such a clam, a

16  plaintiff must establish a 'causal connection' between the government defendant's

17  'retaliatory animus' and the plaintiff's 'subsequent injury.'"  *Nieves*, 139 S. Ct. at 1722

18  (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006)).  Generally, this causal showing

19  requires that plaintiffs plead and prove an absence of probable cause for the arrest.  *See*

20  *id.* (requiring that the official's retaliatory motive be a "but-for" cause of the adverse

21  action).

22  //

ORDER - 11

As alleged in the complaint, Officer Nichols based his conclusion that the children were "in danger of physical harm if returned home" on the following:  Mr. Grae-El's "aggressive and confrontational demeanor" during the safety assessment; reports that A.S. said Mr. Grae-El hit him on November 27, 2018; his own interviews with the children on November 29, 2018, during which A.S. "described several open slaps across the face," and E.A.D.'s report that Ms. Strange "struck her face and legs with a belt" causing a "mark on [E.A.D.'s] left cheek," which Officer Nichols was able to observe, and "a bruise on her left thigh," which Officer Nichols did not observe because E.A.D. "was wearing pants"; and reports from A.S., E.M.D., A.G., and E.A.D.—Plaintiffs' school-age children—that their parents engaged in "a pattern of physical discipline often involving a belt."  (*See* Compl. at 30-32.)

Plaintiffs allege facts that conflict with some, but not all, of the grounds on which Officer Nichols justified removing the children without a court order.  For instance, they dispute Officer Nichols' characterization of Mr. Grae-El's demeanor during the safety assessment on November 28, 2018 as "aggressive and confrontational," and characterize it instead as "protective" and "assertive."  (*See* Compl. at 15-16; *see also id.* at 32 (alleging that Officer Jones did not record Mr. Grae-El's conduct as aggressive or dangerous); Grae-El Resp. at 12.)  Further, Plaintiffs note that A.S.'s injury was inconsistently described by SPS, DCYF, and SPD officials as arising from either a punch to the stomach, punch to the eye, or an open slap to the face, and also allege that Officer Nichols' falsely asserted in his report and CWO form that "he observed bruising on EAD's left cheek."  (*See* Compl. at 30, 48; Grae-El Resp. at 8.)  Plaintiffs also fault

Officer Nichols for failing to note that E.A.D. initially told Ms. Perez-Aniag that she was not sure how she got a scratch on her neck but later stated that she received it when either Mr. Grae-El or Ms. Strange hit her with a belt.  (*See* Compl. at 35-36; Grae-El Resp. at 17-18.)

Plaintiffs "do not dispute that 'whoopins' took place," however, only that they caused "markings that meet the definition of abuse."  (*See* Grae-El Resp. at 3.)  And they do not allege any facts that call into doubt that A.S. told numerous adults from SPS, CPS, and SPD that he was hit by Mr. Grae-El on November 27, 2018.  (*See* Compl. at 30.) Indeed, Plaintiffs allege that an injury was visible on A.S.'s face during the safety assessment on November 28, 2017.  (*See* Compl. at 50 (denying that "injuries were observed on the face of any child other than [A.S.] during the safety assessment").[7]) Plaintiffs also seemingly accept that Officer Nichols at least "overheard" E.A.D. tell Ms. Ferreria that "scratches on both sides of her neck and a small scar by her right collarbone . . . were caused by Caprice hitting her with a belt and spatula in a separate incident" (*see id.* at 16), and acknowledge that E.A.D. told Ms. Perez-Aniag that the visible scratch on her neck was from being hit with a belt (*id.* at 35-36).  (*See also* Strange Resp. at 3 (conceding that E.A.D. told Ms. Ferreria "that one scratch on her neck came from" Ms. Strange, but asserting that E.A.D. "[l]ater recanted the collarbone

---

[7] In his response, Mr. Grae-El contends that he told either Officer Nichols or Officer Jones during the safety assessment that the marks on A.S.'s face were caused by a dog.  (*See* Grae-El Resp. at 12, 17.)  However, Plaintiffs do not allege any facts in support of this alternate dog theory in their complaint and they may not add new facts through a response brief.  (*See generally* Compl.); *see also* Webb, 999 F.3d at 1201 (describing materials the court may consider when evaluating a motion under Rule 12(c)).

scratch allegation according to [Ms. Perez-Aniag"].)  Finally, Plaintiffs do not dispute that the children collectively "reported a pattern of physical discipline often involving a belt" to Officer Nichols (*id.* at 31), even though they would characterize this conduct as lawful parental discipline (*see id.* at 48; *see also* Grae-Resp. at 3 (admitting practice of "whooping" children)).

The court need not accept as true Plaintiffs' conclusions that their methods of physically disciplining their children stopped short of abuse, but otherwise accepts as true their allegations about what Officer Nichols' investigation revealed.  *See Iqbal*, 556 U.S. at 678.  Omitting the information Plaintiffs allege Officer Nichols misrepresented, the court nevertheless concludes that Officer Nichols had "investigated and corroborated" sufficiently "[s]erious allegations of abuse" to "give rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody," if the children might have suffered further harm before a warrant could have been obtained. *See Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294-95 (9th Cir. 2007).

Plaintiffs contend that, even if the allegations relayed to Officer Nichols constituted serious allegations of abuse, Officer Nichols had time to obtain a warrant before placing the children into protective custody.  (*See* Grae-El Resp. at 18.)  They allege in their complaint that Officer Nichols "chose to wait over 14 hours after the '[safety] assessment' before" removing the children.  (Compl. at 32.)  That could suggest a lack of true exigence except that counting the passage of time from the safety assessment starts the proverbial clock too soon.  *See Rogers*, 487 F.3d at 1294-95 (requiring an investigation to corroborate "serious allegations of abuse" before assessing

1   whether, if the abuse is confirmed, there is sufficient time to obtain a warrant).

2   Notwithstanding Ms. Ferreria's assertion that placement of the children into protective

3   custody "should have been done [the prior] night" (Compl. at 15), it appears from the

4   complaint that Officer Nichols was not able to establish probable cause until after he

5   interviewed the children at their school and learned about the pattern of physical

6   discipline they reported, which did not happen until sometime after 2 PM on the

7   afternoon of November 29, 2018 (*see id.* at 16, 31-32).  Only at that point—when there

8   would have been little time to obtain a warrant before the children were to be released to

9   their parents at the end of the school day—does the exigency question become relevant.

10  *See Rogers*, 487 F.3d at 1294-95; *Barnes v. Cty. of Placer*, 654 F. Supp. 2d 1066, 1071

11  (E.D. Cal. 2009) (analyzing exigency based on the time between confirmation of

12  suspected abuse and the close of the school day), *aff'd*, 386 F. App'x 633 (9th Cir. 2010).

13  Given the time of day at which Officer Nichols was able to confirm the serious

14  allegations of a pattern of abuse, including a recent incident of that abuse against at least

15  A.S., Plaintiffs fail to allege facts showing that Officer Nichols acted unreasonably by

16  inferring that the children would be in danger if returned home at the end of the school

17  day.  *See Rogers*, 487 F.3d at 1294-95.

18      Because Plaintiffs have not alleged that Officer Nichols lacked probable or

19  reasonable cause to place the children into protective custody without a warrant on

20  November 29, 2018, they fail to state a First Amendment claim for retaliation.  *See*

21  //

22  //

1    *Nieves*, 139 S. Ct. at 1722.[8]  The City Defendants' motion as to these claims is therefore

2    GRANTED and Plaintiffs' First Amendment claims for retaliation are DISMISSED

3    without prejudice.

4    **C.    Plaintiffs' Fourth Amendment Claim for Judicial Deception and Fourteenth**
     **Amendment Claim for Deprivation of Familial Association**

5

6          Plaintiffs allege that Officer Nichols violated their Fourth Amendment rights

7    through the preparation of a police report and CWO form that contained material and

8    deceptive statements and which served as the basis for removing Plaintiffs' children from

9    their custody without a warrant, thereby depriving them of their Fourteenth Amendment

10   right to familial association without due process.  (*See* Compl. at 48-49.[9])  The City

11   Defendants assert that these claims must be dismissed because they are barred under

12   *Heck v. Humphrey*, 512 U.S. 477 (1994).  (*See* Mot. at 7-10.)

13         In *Heck v. Humphrey*, the Supreme Court held that a § 1983 damages action "must

14   be dismissed" where it will "necessarily imply the invalidity of" an existing conviction or

15   sentence, "unless the plaintiff can demonstrate that the conviction or sentence has already

16   //

17   [8] Plaintiffs also allege Officer Nichols' retaliation violated SPD Policy Manual
     5.002-POL-4, which prohibits retaliation against those exercising their constitutional rights.  (*See*
     Compl. at 51.)  Because Plaintiffs have failed to establish that Officer Nichols retaliated against
18   them under the First Amendment, and do not separately develop this alleged violation of SPD's
     anti-retaliation policy, any such claim is also DISMISSED without prejudice.

19

20   [9] Plaintiffs seemingly allege the City Defendants violated RCW 9A.84.040, which makes
     it a gross misdemeanor to knowingly make a false report that is likely to cause an emergency
     response.  To the extent Plaintiffs intended to state a claim under this state criminal statute, that
21   claims is DISMISSED with prejudice because RCW 9A.84.040 provides no enforceable right of
     action to a private citizen.  *See also Keyter v. 230 Gov't Officers*, 372 F. Supp. 2d 604, 611
     (W.D. Wash. 2005) ("[T]here no private right of action in the criminal law."), *aff'd sub nom.*
22   *Keyter v. Locke*, 182 F. App'x 684 (9th Cir. 2006).

1    been invalidated." *Heck*, 512 U.S. at 487; *see also Muhammad v. Close*, 540 U.S. 749,

2    751 (2004) ("[W]here success in a . . . § 1983 damages action would implicitly question

3    the validity of conviction or duration of sentence, the litigant must first achieve favorable

4    termination of his available state, or federal habeas, opportunities to challenge the

5    underlying conviction or sentence."). Thus, where a conviction stands, a claim that is

6    "fundamentally inconsistent with the unlawful behavior for which section 1983 damages

7    are sought," will be barred by *Heck*. *See Beets v. Cnty. of Los Angeles*, 669 F.3d 1038,

8    1042 (9th Cir. 2012) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005)

9    (en banc)). When the underlying conviction is the result of a guilty plea, and not a

10   verdict following trial, the court must similarly determine whether success in the § 1983

11   action would undermine the validity of the plea agreement. *See City of Hemet*, 394 F.3d

12   at 699; *see also Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1133 (9th Cir. 2011). It is

13   the defendants' burden to establish that *Heck* applies by showing that "success in the

14   action would necessarily imply the invalidity of a criminal conviction." *Washington v.*

15   *Los Angeles Cnty. Sheriff's Dep't*, 833 F.3d 1048, 1056 n.5 (9th Cir. 2016).

16         The parties do not dispute that, at present, Mr. Grae-El's convictions for third and

17   fourth degree assault and Ms. Strange's convictions for fourth degree assault remain in

18   effect. Thus, the question before the court is whether Plaintiffs would impugn those

19   convictions by prevailing in this action on their Fourth or Fourteenth Amendment claims.

20   *See Beets*, 669 F.3d at 1042. The City Defendants argue that success in this matter would

21   do precisely that because Plaintiffs (1) "were charged with assault for the 'whoopins'

22   which A.S. and E.A.D., and E.M.D. (as well as A.G.) reported to Officer Nichols";

1  (2) subsequently pled guilty to assaulting their children; and, thus, (3) "[a] finding in

2  Plaintiffs' favor . . . would require" a declaration from the court "that the factual

3  predicate for Plaintiffs' guilty pleas (that they abused A.S., E.A.D., and E.M.D.) was

4  false." (Mot. at 9.)  The court agrees.

5          As a legal matter, it seems inescapable that, in order to have success on their

6  judicial deception claims, Plaintiffs must demonstrate that Officer Nichols lacked

7  probable cause because establishing that fact is an essential element of their claims.  *See*

8  *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (establishing that judicial

9  deception claim cannot prevail where the challenged affidavit "on its face establishes

10  probable cause").  Likewise, Plaintiffs will only prevail on their familial association

11  claims if they can establish that Officer Nichols lacked "reasonable cause to believe that"

12  Plaintiffs' children were "likely to experience serious bodily harm *in the time that would*

13  *be required to obtain a warrant*."  *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 790 (9th

14  Cir. 2016) (emphasis in original) (quoting *Rogers*, 487 F.3d at 1295).[10]  Accordingly,

15  Plaintiffs broadly allege that Officer Nichols lacked any reasonable basis to act because

16  he intentionally mischaracterized "parental discipline as abuse" in his reports, which he

17  then "used to justify the removal of the children" and "to support criminal charges"

18  against Plaintiffs.  (*See* Compl. at 48; *see also id.* at 51 (alleging that when Officer

19  Nichols decided to take the children into protective custody without a court order, "no

20  //

21

22          [10] "[T]he tests under the Fourth and Fourteenth Amendment for when an official may
remove a child from parental custody without a warrant are equivalent."  *Id.* at 789.

valid claim of abuse had been made by any child to SPD, only lawful parental discipline").)

If proven, these allegations would "implicitly question the validity" of Plaintiffs' existing guilty pleas for assaulting their children because they would directly challenge whether probable cause existed for their underlying arrest. *See Muhammad*, 540 U.S. at 751. "There is no question that *Heck* bars" challenges that would call into question whether defendants had probable cause to either effectuate the § 1983 plaintiff's arrest or to bring criminal charges against him. *See Smithart*, 79 F.3d at 952. Accordingly, under *Heck*, Plaintiffs' Fourth and Fourteenth Amendment claims cannot proceed. *See id.* (affirming dismissal on *Heck* grounds where plaintiff sought to invalidate his conviction "expressly or by implication").

Mr. Grae-El attempts to argue that his Fourth and Fourteenth Amendment claims are sufficiently factually distinct and should not be barred by *Heck* because neither the facts of his third degree assault charge (for hitting A.S.'s hand) nor his fourth degree assault charge (for assaulting E.M.D.) played any role in Officer Nichols' November 29, 2018 abuse findings or Mr. Grae-El's subsequent arrest. (*See* Grae-El Resp. at 14-15.) Thus, he argues that success on his Fourth and Fourteenth Amendment claims would not call into doubt the validity of his guilty pleas, as his convictions pertain to separate instances of child abuse not considered by Officer Nichols in making his determination to place the children in protective custody. (*See id.*) Mr. Grae-El correctly notes that, as alleged, Officer Nichols did not base his abuse determination on a specific allegation that Mr. Grae-El hit A.S. on the hand, though he did rely on reports that Mr. Grae-El hit A.S.

1    and that Plaintiffs generally engaged in "a pattern of physical discipline" amounting to

2    physical abuse.  (*See* Compl. at 30-32 (describing the allegations Officer Nichols

3    included in his November 29, 2018 report and on the CWO form).)  Officer Nichols'

4    finding that Plaintiffs engaged in a pattern of abusive physical discipline was both central

5    to his probable cause finding and is at the heart of Plaintiffs' Fourth and Fourteenth

6    Amendment claims.  (*See id.* at 48, 51.)

7         Moreover, records from the state court criminal proceedings, which Mr. Grae-El

8    submits as exhibits to his response brief and over which the court takes judicial notice,

9    further illustrate that Mr. Grae-El's criminal proceedings pertained to allegations of child

10   abuse during the summer and fall of 2018.  (*See* Grae-El Plea Statement (Dkt. # 54-7

11   (sealed)) at 8 (explaining that Mr. Grae-El is guilty of assault in the third degree because

12   "on or between 6/1/18 and 11/30/18," he "committed the crime of Assault 4 DV against

13   my stepson A.S." by "intentionally commit[ing] an offensive or unwanted touching when

14   [he] was physically disciplining him when I hit his hand"); Information (Dkt. # 54-6

15   (sealed)) at 2-3 (charging Mr. Grae-El with third degree assault for hitting A.S. with a

16   "belt and spatula" "between November 15, 2018 and November 30, 2018").[11])  Those

17   criminal proceedings—and Mr. Grae-El's ultimate guilty plea—thus arose from the same

18   conduct during the same time frame that Officer Nichols considered when he concluded

19   he had reasonable cause to believe Plaintiffs' children needed to be placed into protective

20   //

21   _____

22   [11] The court takes judicial notice of these court filings pursuant to Federal Rule of Evidence 201.  Fed. R. Evid. 201; *Byrd*, 885 F.3d at 641 (taking judicial notice of documents filed in the § 1983 plaintiff's state court criminal matter to determine whether *Heck* applied).

1    custody to shield them from further abuse.  (*See id.*)  Thus, Mr. Grae-El challenges

2    conduct that is not "distinct temporally or spatially from the factual basis for [his]

3    conviction."  *Beets*, 669 F.3d at 1042.  And he does so in a manner that would, if

4    successful, "implicitly question the validity" of his convictions.  *See Muhammad*, 540

5    U.S. at 751.  Accordingly, his Fourth and Fourteenth Amendment claims are not timely

6    and may not proceed.  *See Heck*, 512 U.S. at 486-87.

7        Ms. Strange also tries in vain to draw a factual distinction between the conduct to

8    which she pled guilty and that which she challenges through this action.  She asserts that

9    *Heck* does not bar her claims because the factual predicate for the offense to which she

10   pled guilty could not, as a matter of Washington law, arise out of the same child abuse

11   fact pattern as her Fourth and Fourteenth Amendment claims.  (*See* Strange Resp. at 5

12   ("[T]here is no assault 4 of a child charge that exists in Washington.").)  That argument is

13   unavailing.  Washington law certainly permits a parent to be convicted for fourth degree

14   assault if their physical discipline exceeds the limits of allowable corporal punishment.

15   *See State v. Redmond*, ___ P.3d ___, 2009 WL 3723831, at *1-3 (Wash. Ct. App. 2009)

16   (affirming fourth degree assault conviction of father who hit his daughter and then

17   defended his conduct as lawful parental discipline).  Indeed, that is precisely the offense

18   to which Ms. Strange pled guilty.  (*See* Verification of State Court Records, Ex. 3 at 158

19   (describing Ms. Strange's guilty plea).)

20       Thus, Ms. Strange's Fourth and Fourteenth Amendment claims are *Heck* barred

21   for the same reason as Mr. Grae-El's claims:  they arise out of conduct that is closely

22   related to the conduct for which she pled guilty and would, if successful, call into

1    question the validity of her convictions for assaulting her children.  *See Muhammad*, 540

2    U.S. at 751; *Beets*, 669 F.3d at 1042.  Indeed, the application of *Heck* is even more

3    straightforward in Ms. Strange's case.  She pled guilty "to two counts of assault in the

4    fourth degree (E.A.D. and A.S.)" (Verification of State Court Records, Ex. 3 at 158

5    (describing Ms. Strange's guilty plea)) and now challenges Officer Nichols' probable

6    cause finding, which was partly based on E.A.D.'s assertion that Ms. Strange hit her with

7    a belt (*see* Compl. at 33).  That sort of direct attack on the probable cause finding

8    underlying her criminal proceedings is prohibited by *Heck*.  *See Smithart*, 79 F.3d at 952.

9          For the reasons given above, Plaintiffs Fourth and Fourteenth Amendment claims

10   have not yet accrued and are thus barred under *Heck*, 512 U.S. at 486-87.[12]  Plaintiffs

11   may be able to assert these claims if they successfully invalidate their convictions.  *See*

12   *Trimble v. City of Santa Rosa*, 49 F.3d 583, 585 (9th Cir. 1995).  Accordingly, the City

13   Defendants' motion as to Plaintiffs' Fourth and Fourteenth Amendment claims is

14   therefore GRANTED, and those claims are DISMSSED without prejudice.

15   **D.    Evidentiary Suppression Under *Brady v. Maryland***

16         Plaintiffs additionally allege that they were not given two pieces of exculpatory or

17   impeachment evidence in the discovery produced as part of their criminal proceeding or

18   in the course of their dependency proceeding.  (*See* Compl. at 53.)  Specifically, Plaintiffs

19

20   _____

21   [12] Because the court finds that these claims are barred under *Heck*, it does not consider
     whether these claims have been adequately pled or, if they are, whether Officer Nichols or
     Sergeant Boggs enjoy qualified immunity.  Likewise, the court does not consider whether
22   Plaintiffs have stated a claim for conspiracy to violate these rights, which they mentioned only in
     passing in their complaint.  (*See* Compl. at 48.)

1   take issue with the City Defendants' alleged failure to provide them with Officer Jones'

2   November 28, 2018 report and Officer Nichols' BWV footage from November 29, 2018.

3   (*See id.*)  Plaintiffs mention the attorneys who were allegedly responsible for producing

4   discovery in those matters only in passing, and neither name them as defendants in this

5   action nor allege that they possessed the missing information during those proceedings

6   but failed to provide it to Plaintiffs.  (*See id.*)  Rather, the gist of Plaintiffs' grievance

7   regarding this missing evidence seems to be that Officer Nichols failed to consider

8   mitigating or exculpatory facts when he prepared his November 29, 2018 police report

9   then used that to draft the CWO form which Plaintiffs believe to be contained in Officer

10   Jones' report and Officer Nichols' BWV footage.  (*See* Grae-El Resp. at 11 (arguing that

11   "[t]he omission of this exculpatory evidence from [Officer Nichols'] report was

12   detrimental to the defense of" Plaintiffs).)  Thus, it appears that Plaintiffs' allegations

13   regarding missing evidence principally serves to buttress their Fourth and Fourteenth

14   Amendment claims, which challenge Officer Nichols' probable cause determination.

15   (*See* Compl. at 53.)  Those claims are barred under *Heck*.  *See supra* at 12-15.

16        To the extent Plaintiffs intended to state independent claims for withheld evidence,

17   those are properly construed as claims for the unlawful suppression of exculpatory or

18   impeachment evidence by Officer Nichols or Sergeant Boggs, in violation of Plaintiffs'

19   due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  (*See* Compl. at 53; *see*

20   *also* Mot. at 14-16.)  "*Brady* suppression occurs when the government fails to turn over

21   even evidence that is 'known only to police investigators and not to the prosecutor.'"

22   *Youngblood v. W. Virginia*, 547 U.S. 867, 869-70 (2006).  To establish a *Brady* violation

1  for suppression by an investigating officer, plaintiffs must allege that "(1) the officer

2  suppressed evidence that was favorable to the accused from the prosecutor and the

3  defense, (2) the suppression harmed the accused, and (3) the officer 'acted with deliberate

4  indifference to or reckless disregard for an accused's rights or for the truth in withholding

5  evidence from prosecutors.'" *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018)

6  (quoting *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1087, 1089 (9th Cir.

7  2009)).  Only suppressed evidence that "could reasonably be taken to put the whole case

8  in such a different light as to undermine confidence in the verdict" will suffice to

9  establish such a due process violation. *See id.* (quoting *Kyles v. Whitley*, 514 U.S. 419,

10  435 (1995)).

11      The City Defendants argue that Plaintiffs have failed to state suppression claims

12  under *Brady* "[b]ecause they do not identify anything material in these documents and

13  cannot identify how the lack of disclosure harmed them." (*See id.* at 14.)  Plaintiffs do

14  allege, however, that Officer Jones' report "is of paramount importance in this case, as is

15  the body cam footage." (Compl. at 53.)  They further explain that they would have used

16  this evidence to rebut Officer Nichols' assessment that Mr. Grae-El had an aggressive

17  demeanor during the safety assessment on November 28, 2018 and that the children were

18  in distress in Plaintiffs' care. (*See id.* at 31 (noting that Officer Jones' report "was absent

19  of any description of the children being afraid, [Mr. Grae-El] being aggressive, or even

20  an observed injury" on the children).

21      Even if Plaintiffs had been able to make use of Officer Jones' report and Officer

22  Nichols' BWV footage in that manner, the court is not convinced that such evidence

1    would have "put the whole case in such a different light as to undermine confidence in

2    the verdict." *Mellen*, 900 F.3d at 1096 (quotation marks omitted).  As noted above, even

3    accounting for what this countervailing evidence allegedly shows, Officer Nichols had

4    sufficiently corroborated allegations of abuse to warrant a finding of probable or

5    reasonable cause.  *See supra* at 12-15.  Accordingly, the City Defendants' motion as to

6    these claims is GRANTED and Plaintiffs' *Brady* claims are DISMISSED without

7    prejudice.

8    **E.      SPD's Liability Under *Monell v. New York City Department of Social Services***

9            Plaintiffs also seek to impose municipal liability against SPD based on its failure

10   to act to preserve Plaintiffs' constitutional rights.  (*See* Compl. at 53 (first citing *Monell*,

11   436 U.S. at 694; and then citing *Van Ort v. Est. of Stanewich*, 92 F.3d 831 (9th Cir.

12   1996).)  Plaintiffs allege that SPD Policy Manual 15.220-POL-2 "is unconstitutional" and

13   permitted Plaintiffs' children to be placed into protective custody in violation of their

14   Fourteenth Amendment rights to familial association.  (*See* Compl. at 54.)  Specifically,

15   Plaintiffs take issue with the "subjective opinion clause" in SPD Policy Manual 15.220-

16   POL-2, which they allege created a "grey area . . . in which discretion is abused and bias

17   can thrive," as it did here by allowing Officer Nichols and Sergeant Boggs to "authorize[]

18   the removal of children without due process."  (*Id.* at 53-54.)

19           SPD Policy Manual 15.220-POL-2 contains definitions for terms used in section

20   220 of title 15 of the SPD Policy Manual, which pertains to SPD policies relating to child

21   welfare.  *See SPD Policy Manual 15.220-POL-2*, Seattle Police Dep't (May 7, 2019),

22   https://www.seattle.gov/police-manual/title-15---primary-investigation/15220---child-

welfare.[13]  Included in that section is a definition for when a "child is in dangerous

circumstances."  *See id.*  The SPD Policy Manual instructs officers to "determine that a

child is in dangerous circumstances based on" three objective factors:  (1) "The child's

physical condition"; (2) "The environment where the child is encountered"; and (3) "The

time of day and situation where the child is encountered."  *Id.*  However, SPD policy

provides that the "officer's subjective opinion is the determining factor if the child is in a

dangerous circumstance."  *Id.*  Where the officer has "reason to believe, or the child

reports, either child abuse or neglect during the investigation of . . . children in dangerous

circumstances," SPD policy requires the officer to then "follow the procedures for

investigating child abuse."  SPD Policy Manual 15.220-POL-6.  The procedures for

investigating child abuse provide that, before an SPD officer may "take custody of

abused or neglected children" without a court order, they must satisfy SPD Policy

Manual 15.220-POL-7 and RCW 26.44.050, both of which require that the officer find

that "there is probable cause to believe that the child is abused or neglected and that the

child would be injured or could not be taken into custody if it were necessary to first

obtain a court order pursuant to RCW 13.34.050."  *See* SPD Manual 15.220-POL-7; *see*

*also* RCW 26.44.050.

   To establish a municipal liability claim based on the municipalities' failure "to act

to preserve constitutional rights," a plaintiff must show:  (1) that it "possessed a

---

[13] The court finds that the contents of Title 15 of the SPD Policy Manual are "not subject to reasonable dispute" and, accordingly, takes judicial notice of the language contained therein. *See* Fed. R. Evid. 201.

constitutional right of which he was deprived; (2) that the municipality had a policy;
(3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional
right; and (4) that the policy is the 'moving force behind the constitutional violation.'"
*Van Ort*, 92 F.3d at 835 (quoting *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir. 1992)).
To the extent Plaintiffs' municipal liability claims are based on their Fourth and
Fourteenth Amendment claims, they fail to meet the fourth prong of that test because
*Heck* bars those claims, *supra* at 17-22, and prevents them from "show[ing] an
underlying constitutional violation."  *See Lockett v. Cnty. of Los Angeles*, 977 F.3d 737,
741 (9th Cir. 2020); *see also Foley v. Kaldenbach*, No. 15-CV-1627-CAB-AGS, 2018
WL 325027, at *3 (S.D. Cal. Jan. 8, 2018) (dismissing municipal liability claims where
plaintiff's underlying constitutional claims were barred under *Heck*).

Even if *Heck* did not apply to bar Plaintiffs from establishing an underlying
constitutional violation, their municipal liability claims would nevertheless fail because
Plaintiffs misunderstand what SPD policy requires.  As summarized above, even where
an SPD officer's *subjective* opinion is the determinative factor in concluding that a child
is in a dangerous circumstance, SPD policy nevertheless requires the officer to
*objectively* determine whether the child has been abused and whether it is feasible to
obtain a warrant before placing the child in protective custody.  *See* SPD Policy Manual
15.220-POL-6; *id.* at 15.220-POL-7; *see also Nieves*,139 S. Ct. at 1724 ("[P]robable
cause speaks to the objective reasonableness of an arrest."); *State v. Graham*, 927 P.2d
227, 233 (Wash. 1996) ("Under both the federal and state constitutions, probable cause is
the objective standard by which the reasonableness of an arrest is measured.").  Where

1    that standard is met, parents whose children are removed will have received all of the

2    process that is constitutionally due. *See Rogers*, 487 F.3d at 1294 (permitting extra-

3    judicial removal of a child on a finding of "reasonable cause"); *see also Draper v. United*

4    *States*, 358 U.S. 307, 311 n.3 (1959) (concluding that "probable cause" and "reasonable

5    grounds" are "substantial equivalents of the same meaning").

6        Because SPD Policy does not permit the warrantless removal of children based

7    purely on an officer's subjective opinion but, rather obligates SPD officers to make a

8    constitutionally compliant finding before children can be removed without a court order,

9    Plaintiffs have failed to allege that SPD policy could be "the moving force" behind their

10    alleged constitutional violation. *See Van Ort*, 92 F.3d at 835. Accordingly, Plaintiffs fail

11    in their attempt to establish municipal liability for SPD based on its promulgation of a

12    policy that failed to prevent Plaintiffs' alleged constitutional harms. Moreover, because

13    dismissal of Plaintiffs' municipal liability claims is based on the court's determination

14    that SPD policy requires compliance with the constitution, the court further concludes

15    that Plaintiffs will be unable to cure the deficiencies in this claim through amendment.

16    Accordingly, the City Defendants' motion as to this claim is GRANTED and Plaintiffs'

17    municipal liability claims are DISMISSED with prejudice. *Eminence Cap., LLC v.*

18    *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (permitting dismissal with prejudice

19    where amendment would be futile).

20    **F.**     **Sergeant Boggs' Supervisory Liability**

21        Plaintiffs mention Sergeant Boggs sparingly few times in their lengthy complaint,

22    but seem to allege that she is liable for unspecified constitutional violations based on:

1    (1) her role as Officer Nichols' supervisor (*see* Compl. at 31); and (2) her failure to

2    "advise" Officer Nichols "to record interviews with [Plaintiffs'] children" (*see id.* at 50).

3    Although section 1983 permits a cause of action against a supervising official in their

4    individual capacity, based on their "own culpable action or inaction in the training,

5    supervision, or control of [their] subordinates," or for their acquiescence in the

6    constitutional violations of their subordinates, *see Larez v. City of Los Angeles*, 946 F.2d

7    630, 646 (9th Cir. 1991), Plaintiffs fail to state such a claim here.

8          As with their municipal liability claims, Plaintiffs' supervisory liability claims

9    against Sergeant Boggs fails because they have not established an underlying

10   constitutional deprivation.  *See Lockett*, 977 F.3d at 741.  Even if Plaintiffs had

11   established a predicate constitutional violation, however, they fail to allege that Sergeant

12   Boggs did anything wrong.  For instance, although they allege that "[Sergeant] Boggs did

13   not advise [Officer Nichols] to record interviews with children" (Compl. at 50), they also

14   make the conflicting allegation that Officer Nichols' BWV footage captured the

15   November 29, 2018 "incident" (*see, e.g.*, *id.* at 53).  More generally, Plaintiffs' passing

16   references to Sergeant Boggs' involvement fails to allege sufficient facts to "raise [their]

17   right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555.  Accordingly,

18   the City Defendants' motion as to these claims is GRANTED and Plaintiffs' claims

19   against Sergeant Boggs are DISMISSED without prejudice.

20   **G.   IIED Claim**

21         Finally, Plaintiffs allege that the City Defendants intentionally caused them

22   emotional distress.  (*See* Compl. at 50.)  An IIED claim—also known as the tort of

1  "outrage"—has three elements:  "(1) extreme and outrageous conduct, (2) intentional or

2  reckless infliction of emotional distress, and (3) actual result to plaintiff of severe

3  emotional distress."  *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003).  Liability under

4  this tort is reserved for "conduct 'which the recitation of the facts to an average member

5  of the community would arouse his resentment against the actor and lead him to exclaim

6  "Outrageous!"'"  *Id.* (quoting *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1998)).

7  Plaintiffs here allege no facts that would provoke such community outrage; indeed, the

8  court has concluded that Plaintiffs fail to allege that Officer Nichols lacked probable or

9  reasonable cause to place the children into protective custody without a warrant.  *See*

10  *supra* at 12-15.  Accordingly, the City Defendants' motion as to this claim is GRANTED

11  and Plaintiffs' IIED claim is DISMISSED without prejudice.

12                     **IV.    CONCLUSION**

13          For the foregoing reasons, the City Defendants' motion for judgment on the

14  pleadings (Dkt. # 51) is GRANTED.  Plaintiffs' claims against the City Defendants are

15  DISMISSED.  The court DISMISSES all of Plaintiffs' claims without prejudice and with

16  leave to amend, except for their municipal liability claim against SPD and any claims

17  under RCW 9A.84.040, which the court DISMISSES with prejudice.  The court will

18  provide further guidance to Plaintiffs regarding seeking leave to amend these claims in a

19  forthcoming order.  (*See* 3/8/33 Order (Dkt. # 61) at 2.)

20  //

21  //

22  //

ORDER - 30

1    Dated this 18th day of April, 2022.

2

3

4    JAMES L. ROBART
     United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22