UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ZION T. GRAE-EL, et al.,

                    Plaintiffs,

            v.

CITY OF SEATTLE, et al.,

                    Defendants.

CASE NO. C21-1678JLR

ORDER

## I.      INTRODUCTION

Before the court is Defendants Seattle Children's Hospital, Dr. Hannah Deming, Dr. Stanford Ackley, and Brenda Aguilar's (collectively, the "Children's Defendants") motion to dismiss the amended complaint.  (Mot. (Dkt. # 78); Reply (Dkt. # 79); Am. Compl. (Dkt. # 77).[1])  *Pro se* Plaintiffs Zion T. Grae-El and Caprice Strange oppose the motion.  (Resp. (Dkt. # 79).)  The court has considered the submissions of the parties, the

---

[1] The court uses the page numbers contained in the CM/ECF header when citing to the Plaintiffs' response brief and amended complaint.

relevant portions of the record, and the applicable law.  Being fully advised,[2] the court

GRANTS the Children's Defendants' motion to dismiss.

## II.    BACKGROUND

### A.    Factual Background

This case arises from a report of suspected child abuse made by an employee of

Seattle Public Schools ("SPS") to Child Protective Services ("CPS"), a component of the

Washington State Department of Children, Youth & Families ("DCYF"), regarding Ms.

Strange's child, A.S.[3]  (*See* Am. Compl. at 7.)  Staff at A.S.'s school, Dunlap Elementary

("Dunlap"), became concerned that A.S. had been abused after observing markings on his

face and after he told them that his step-father, Mr. Grae-El, had hit him.  (*See id.*)

Natalie Long, an SPS employee at Dunlap reported these concerns to Annaliese Ferreria

at DCYF on November 28, 2018.  (*Id.*)

Accompanied by officials from the Seattle Police Department ("SPD"), Ms.

Ferreria visited Plaintiffs' home that evening to conduct a safety assessment of Plaintiffs'

children, but did not remove any of the children at that time.  (*See id.* at 9.)  The

following morning, however, Ms. Ferreria "arrived at Dunlap and called for SPD to place

children in [protective custody], further noting that it, 'should have been done last

night.'"  (*Id.* at 11.)  SPD arrived at Dunlap later that afternoon and placed all five of

---

[2] Plaintiffs request oral argument (*see* Resp. at 1) but the court concludes that oral argument would not aid its disposition of the instant motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] Plaintiffs have five children, who are referred to using their initials.  *See* Local Rules W.D. Wash. LCR 5.2(a)(2).  Ms. Strange is the biological mother of A.G., A.S., and Z.A.G.  Mr. Grae-El is the biological father of E.A.D., E.M.D., and Z.A.G.  (*See* Am. Compl. at 2-3.)

1   Plaintiffs' children into protective custody.  (*See id.*)   Later that evening, "[a]ll 5 children

2   were transported to Seattle Children's for initial health screens," which began around

3   7:30 p.m. on November 29, 2018 and lasted until approximately 4:00 a.m. on November

4   30, 2018.  (*See id.* at 23.)  Plaintiffs were not permitted to attend the examinations,

5   although at some point while the children were at the hospital A.G. was able to speak

6   with Ms. Strange by telephone.  (*See id.* at 23-24.)  The examinations involved

7   photographing markings on the children's bodies, taking X-rays, and drawing samples of

8   their blood for testing.  (*See id.*)  This process—and the absence of their parents—

9   allegedly caused great distress for the children.  (*See id.*)

10          As part of this process, the children "were questioned in a group throughout the

11   several hours that they were at [Children's] by" at least Dr. Deming, Dr. Ackley, and Ms.

12   Aguilar.  (*See id.* at 24-25.)  Although some statements were recorded, "[s]pecific notes

13   were not taken" such that the resulting reports did not consistently show "who made each

14   statement."  (*See id.*; *see also id.* at 25 (noting that Ms. Aguilar could not recall, after the

15   fact, which child made which statement).)  Prior to interviewing and examining the

16   children, the Children's Defendants obtained some case background details—including

17   "the nature of the allegations" of abuse—from the DCYF social workers who brought the

18   children in for their initial health screening.  (*See id.* at 28.)  Plaintiffs allege that these

19   methods were "an improper way to conduct interviews with children regarding

20   allegations of abuse."  (*Id.* at 25.)

21          The examinations were conducted "[u]nder the orders of [Dr. Ackley]," an

22   attending physician at Children's, "who saw all five children."  (*Id.* at 23-24.)  Dr. Ackley

1    "was assisted . . . by several residents who were training to be either pediatricians or

2    emergency physicians," including first-year resident, Dr. Deming.  (*Id*.)  Neither Dr.

3    Ackley nor Dr. Deming are members of Children's Safe Child and Adolescent Network

4    ("SCAN") team, or had specialized training in "child abuse pediatrics."  (*Id.* at 24, 26-27

5    (emphasis omitted).)  The SCAN team was aware of the situation, however, and

6    recommended that Ms. Aguilar, a social worker on the SCAN team, meet with the

7    children to "conduct a protection assessment."  (*See id.* at 25 (quotation marks omitted).)

8    Ms. Aguilar is a social worker who is "a trained mandated reporter" and "an abuse

9    expert."  (*See id.* at 30.)

10         "Medical notes" taken during the examinations documented that the children were

11   experiencing the following:  A.G. and E.M.D. had headaches; A.S. had "a closed head

12   injury" in the form of a "black eye of left side"; E.A.D. had an "acute headache"; and

13   Z.A.G. experienced "vomiting" and had observable bruising on his trunk.  (*See id.* at 26.)

14   A.S. also allegedly disclosed that he had been "whacked and smacked on the face with

15   [Mr. Grae-El's] hand, and with a belt . . . a long time ago," and A.G. "had minor marks

16   that she attribute[d] to falling episodes."  (*Id.* at 29.)  The children also allegedly told the

17   Children's Defendants during their examination that "they love each other and their

18   parents," although this statement was not included in the reports to DCYF.  (*Id.*)  Based

19   on these observations, as well as the interviews with the children, Dr. Deming determined

20   that "all 5 children 'ha[d] physical signs or symptoms compatible with abuse or neglect'"

21   and then reported those findings on "foster care initial health screens."  (*Id.* at 24.)  Ms.

22   //

Aguilar also made a report to DCYF in which she concluded that all five children had possibly been physically abused by Plaintiffs.  (*See id.* at 28.)

Plaintiffs allege that Dr. Deming, Dr. Ackley, and Ms. Aguilar employed substandard interview techniques with the children—including by questioning the children in a group setting and poorly documenting which statements were attributable to which child—which resulted in erroneous reports of abuse being relayed to DCYF.  (*See id.* at 24.)  They conclude that "[t]he entire visit was an . . . attempt to discover evidence favorable to or manipulable by DCYF."  (*Id.* at 26 (emphasis omitted).)

After receiving the reports of suspected abuse from Dr. Deming and Ms. Aguilar, DCYF initiated a dependency action against Plaintiffs, which resulted in removal of the children from Plaintiffs' custody and their subsequent placement in foster care.  (*See id.* at 50.)  Plaintiffs were also charged with criminal offenses, and ultimately pled guilty to multiple counts of assault.  (*Id.* at 35.)

**B.    Procedural Background**

Plaintiffs initiated this action in King County Superior Court on or about November 19, 2021.  (*See* NOR (Dkt. # 1) ¶ 1; Compl. (Dkt. # 1-1).)  Plaintiffs alleged that the Children's Defendants violated their Fourteenth Amendment right to familial association; conspired to violate that right; and also committed medical negligence and malpractice.  (*See* Compl. at 25, 45-47; *see also* 3/1/22 Order (Dkt. # 57) at 5.)  Defendants the City of Seattle, SPD, Officer Ryoma Nichols, and Daina Boggs removed this matter from King County Superior Court on December 16, 2021.  (*See* NOR at 1.)  The Children's Defendants filed a motion to dismiss the complaint, which the court

ultimately granted in part.  (*See* 1st MTD (Dkt. # 10); 3/1/22 Order (Dkt. # 57).)  The

court dismissed each of Plaintiffs' claims without prejudice and with leave to amend.

(*See* 3/1/22 Order at 11, 17; 4/21 Order (Dkt. # 74) at 6-7; 4/22/22 Order (Dkt. # 75) at

5-6.)

Plaintiffs timely filed an amended complaint on May 22, 2022, which adds nearly

40 pages of allegations, attaches hundreds of pages of exhibits, and re-asserts a violation

of their Fourteenth Amendment right to familial association, as well as state law tort

claims for medical negligence, medical malpractice, gross negligence, and corporate

negligence.  (*See* Am. Compl. at 49 (capitalization omitted).)  The Children's

Defendants' motion to dismiss the amended complaint followed shortly thereafter.  (*See*

Mot.)

## III.    ANALYSIS

The Children's Defendants argue that Plaintiffs have once again failed to state

claims under federal or state law, and ask the court to dismiss the amended complaint

with prejudice under Federal Rule of Civil Procedure 12(b)(6).  (*See generally* Mot.)

After setting out the legal standard that applies to a motion to dismiss, the court turns to

consider whether Plaintiffs' amended complaint should be dismissed and, if so, whether

dismissal with prejudice is warranted.

## A.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint

"fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In

evaluating a complaint under Rule 12(b)(6), the court must construe the pleading in the

1   light most favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith*

2   *Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), and must do so liberally where the non-

3   movant is proceeding *pro se*, *see Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000).

4   "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

5   accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

6   556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

7   (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

8   allows the court to draw the reasonable inference that the defendant is liable for the

9   misconduct alleged." *Id.*

10  **B.    Children's Defendants' Motion to Dismiss Plaintiffs' Federal Claim**

11          The Children's Defendants argue that Plaintiffs' Fourteenth Amendment familial

12  association claim fails because Plaintiffs do not adequately allege that the Children's

13  Defendants are state actors amenable to suit under 42 U.S.C. § 1983 or that they engaged

14  in conduct that violates the Fourteenth Amendment—either directly or as part of a

15  conspiracy to deprive Plaintiffs of their rights.  The Children's Defendants further argue

16  that, even if Plaintiffs plausibly allege that their constitutional rights were violated, that

17  claim is nevertheless barred by the rule set forth in *Heck v. Humphrey*, 512 U.S. 477

18  (1994).  (*See* Mot. at 7-15.)  As the court explains below, the Plaintiffs do not plausibly

19  allege that the Children's Defendants conspired with DCYF to violate their rights, a

20  conclusion that is fatal to Plaintiffs' claims under § 1983 and § 1985.  Because the court

21  reaches that conclusion, it need not and does not address whether Plaintiffs allege a

22  //

plausible Fourteenth Amendment violation or, if they do, whether any such claim would be barred under *Heck*.

1.  Whether the Children's Defendants Plausibly Acted Under Color of State Law

The Children's Defendants argue that Plaintiffs' Fourteenth Amendment claims fail at the outset because Plaintiffs do not allege that Children's, Dr. Deming, Dr. Ackley, or Ms. Aguilar acted under color of state law within the meaning of 42 U.S.C. § 1983 and are thus not subject to liability for any constitutional deprivations Plaintiffs may have suffered.  (*See* Mot. at 11-13.)  In their response brief, Plaintiffs criticize the Children's Defendants for seeking dismissal of their claims "because of a technical flaw," and make the conclusory assertion that "Ms. Aguilar believed she acted under the color, authority, and the immunities of law," but do not otherwise substantively respond to the Children's Defendants' argument.  (*See* Resp. at 8 (capitalization omitted).)  Technical though the state action requirement may seem, establishing that the defendant violated federally protected rights while acting under color of state law is essential "because '§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrong.'"  *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999)).[4]

//

//

---

[4] "[I]f a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, 'that conduct [is] also action under color of state law and will support a suit under § 1983.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).

1      As an initial matter, Plaintiffs do not plausibly allege that the Children's

2  Defendants are state actors as a consequence of their employment.  (*See* Am. Compl. at 5

3  (alleging that Children's "is a nonprofit corporation"); *see also id.* at 6 (alleging that

4  "[a]ll of the health care providers who provided professional services to the Grae-El clan

5  were agents of" Children's); *id.* at 54 (alleging that Ms. Aguilar "acted under the

6  direction of SCAN when she conducted her assessment for DCYF intake 4029859").[5]

7  To hold the Children's Defendants liable as private parties under § 1983, Plaintiffs must

8  allege that they were engaged in state action—i.e., that "'the conduct allegedly causing

9  the deprivation of a federal right [was] fairly attributable to the [s]tate.'"  *Tsao v. Desert*

10  *Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (quoting *Lugar*, 457 U.S. at 937).

11  "'The Supreme Court has articulated four tests for determining whether a private

12  [party's] actions amount to state action:  (1) the public function test; (2) the joint action

13  test; (3) the state compulsion test; and (4) the governmental nexus test.'"  *Id.* (quoting

14  *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002)).

15  //

16  //

17

18      [5] Although Dr. Deming is alleged to have been an employee of the University of
Washington "at the time of th[e] complaint," she is sued "in her capacity as an agent of"
Children's for "care and . . . medical determinations" Children's "authorized."  (*See id.*)

19  Plaintiffs additionally make the conflicting allegation that Ms. Aguilar was employed by the
Washington Department of Social and Health Services ("DSHS") when "she provided services to
the children at the hospital" on November 29 and 30, 2018, but also that her tenure with DSHS

20  ended in January 2018.  (*See id.* at 24; *see also id.* at 57 (describing the State of Washington as
Ms. Aguilar's "previous employer").)  Plaintiffs do not clarify these discrepancies in their

21  response brief (*see generally* Resp.) but the court concludes that the most reasonable inference to
draw is that Dr. Deming or Ms. Aguilar were not functioning as state employees during the

22  events in question.

1    To the extent Plaintiffs make an argument about state action in their response

2  brief, they focus on their allegations that the Children's Defendants were part of "an

3  implied" and "systemic" agreement between the Children's Defendants, DCYF, and the

4  Seattle Public Schools because they viewed themselves as being on the "same team," and

5  that this unspoken understanding "deterred [the Children's Defendants] from making

6  determinations that would have led to the return of the children" and incentivized them

7  "to go along with the notion of abuse brought to them" by DCYF and SPS.  (*See* Resp. at

8  9 (noting Plaintiffs' "multiple attempts to articulate the existence of an implied agreement

9  between [the Children's Defendants'] and DCYF"); *see also* Am. Compl. at 27, 52-53

10  (alleging the Children's Defendants conspired with DCYF to deprive Plaintiffs of their

11  rights).)

12    The existence of a conspiracy suffices to establish state action for purposes of

13  § 1983 under "the joint action test."  *See Tsao*, 698 F.3d at 1140.  The conspiracy "need

14  not be overt, and may be inferred on the basis of circumstantial evidence," including from

15  allegations "that the alleged conspirators have committed acts that 'are unlikely to have

16  been undertaken without an agreement.'"  *See Mendocino Env't Ctr. v. Mendocino Cty.*,

17  192 F.3d 1283, 1301-02 (9th Cir. 1999) (quoting *Kunik v. Racine Cnty., Wis.*, 946 F.2d

18  1574, 1580 (7th Cir. 1991)).  Here, however, Plaintiffs fail to plausibly establish the

19  existence of a conspiracy because the alleged circumstances from which a conspiracy

20  might be inferred are insufficient "given more likely explanations" for the "parallel

21  conduct" on which Plaintiffs focus.  *See Twombly*, 550 U.S. at 546.

22  //

1    For instance, Plaintiffs allege that the SCAN department "strategically sent Ms.

2    Aguilar to conduct her assessment of the children" because she was "very familiar with

3    DCYF procedures and requirements for removal"—and would therefore know how to

4    fabricate findings in a manner most helpful to the state (*see* Am. Compl. at 53-54)—but

5    also that she "had no idea why she was sent to interview the children" (*id.* at 57).

6    Plaintiffs also allege that Dr. Deming and Ms. Aguilar failed to adhere to best interview

7    practices *despite* the SCAN department's "attempt to advise [them] on how to proceed."

8    (*See id.* at 55.)  And, despite their theory that Ms. Aguilar had been inserted into the

9    investigation to provide helpful evidence, Plaintiffs also describe ways in which her

10   report and findings do not fully corroborate other reports made in the course of the

11   protective custody placement.  (*See id.* at 61-62 (alleging that Ms. Aguilar reported

12   injuries to A.S. and A.G. whereas Officer Nichols reported injuries to A.S. and E.A.D.).)

13   Any suggestion that Dr. Deming's allegedly erroneous abuse determinations were

14   intentional and done in furtherance of a conspiracy is also undercut by Plaintiffs'

15   portrayal of Dr. Deming as inexperienced and vulnerable to unconscious biases (*see id.* at

16   53, 64), as well as the opinion of their own "[e]xpert medical witness," who concedes that

17   Dr. Deming's contested "references to 'lacerations' on [A.S.'s] face . . . can, at minimum,

18   be considered an unintentional mistake" (*see id.* at 64).

19   Additionally, Plaintiffs allege that Dr. Deming and Ms. Aguilar's abuse

20   determinations were the result of "procedural deficiencies" and that "the outcome would

21   have definitely been different" had the Children's Defendants more closely adhered to the

22   proper protocols.  (*See id.* at 55 (focusing on the Children's Defendants' failure to

1    supervise Dr. Deming; include Plaintiffs "in the decision making process" and

2    "acquisition of medical history"; or properly understand "what constitutes abuse in the

3    [S]tate of Washington").)  If the Children's Defendants had, in fact, formed an agreement

4    with DCYF to deprive Plaintiffs of their Fourteenth Amendment rights by concocting

5    medical evidence that would support a narrative of abuse, it is implausible that "the

6    outcome would have definitely been different" through improved compliance with

7    protocol, as Plaintiffs allege.  (*See id.*)

8           Ultimately, Plaintiffs' theory that the contested findings were the result of a

9    deficient process—including the participation of "misinformed and/or undertrained

10   professionals" (*see id.* at 45)—offers the "more likely explanation[]" and is, accordingly,

11   the inference the court must draw.  *See Iqbal*, 556 U.S. at 681 (finding allegations

12   "consistent with" unlawful conduct insufficient to state a claim "given more likely

13   explanations"); *see also Mendocino Env't Ctr.*, 192 F.3d at 1301-02 (finding allegations

14   "that the alleged conspirators have committed acts that 'are unlikely to have been

15   undertaken without an agreement'" sufficient to support an inference that a conspiracy

16   was formed).  Accordingly, Plaintiffs fail to establish that that the Children's Defendants

17   were acting under color of state law, and their Fourteenth Amendment claims fail.[6]  As

18   such, the Children's Defendants' motion is GRANTED and those claims are

19   DISMISSED.

20

21          [6] Because Plaintiffs fail to establish that the Children's Defendants were "acting under color of law," the court does not address whether the amended complaint alleges that the Children's Defendants engaged in conduct that violated their familial association rights under the

22   Fourteenth Amendment.  *See* 42 U.S.C. § 1983; *see also Sutton*, 192 F.3d at 835.

2.     Whether the Children's Defendants Conspired to Violate Plaintiffs'
        Fourteenth Amendment Rights

Plaintiffs also allege that the Children's Defendants conspired to violate Plaintiffs'

Fourteenth Amendment right to familial association.  (*See* Am. Compl. at 49, 52.)  As

before, the court construes this claim as one brought under 42 U.S.C. § 1985 (*see* 3/1/22

Order at 8), which provides a cause of action that allows private litigants to sue for

damages where "two or more persons" have conspired to deprive them of their federal

civil rights.  42 U.S.C. § 1985(3).  The first element of this cause of action requires a

plaintiff to plausibly allege that a conspiracy was formed.  *See Fazaga v. FBI*, 965 F.3d

1015, 1059 (9th Cir. 2020) (describing elements of a § 1985 claim), *cert. granted*, 141 S.

Ct. 2720 (2021).  As described above, Plaintiffs fail to do so.  Accordingly, the court

GRANTS the Children's Defendants' motion to dismiss Plaintiffs' conspiracy claim.

**C.     The Children's Defendants' Motion to Dismiss Plaintiffs' State Law Claims**

Plaintiffs re-assert state law tort claims against the Children's Defendants for

"Gross negligence, Malice, Negligence, [and] Medical Malpractice" (*see* Am. Compl. at

49-50); and against Children's, Dr. Deming, and Dr. Ackley for "corporate negligence"

(*see id.* at 51; *see also id.* at 50 (alleging Children's and Dr. Ackley failed to supervise

Dr. Deming)).  The Children's Defendants argue that the court must dismiss Plaintiffs'

state law claims because they are immune from liability for their good faith conduct in

examining the children and reporting suspected abuse to DCYF, and because Plaintiffs do

not sufficiently allege that Children's failed to supervise its employees.  (Mot. at 15-18.)

The court first addresses whether the Children's Defendants are immune from liability.

1          1.      Immunity Under RCW 26.44.060

2          The court previously dismissed Plaintiffs' state law tort claims, including their

3    medical negligence and medical malpractice claims, after finding that the Children's

4    Defendants were immune under RCW 26.44.060(1)(a), which provides immunity from

5    civil liability for those who report suspected child abuse in good faith.  (*See* 3/1/22 Order

6    at 14-17 (dismissing claims against Dr. Deming, Dr. Ackley, and Ms. Aguilar); *see also*

7    4/21/22 Order at 6 (dismissing *respondeat superior* claim against Children's).)  The

8    Children's Defendants urge the court to dismiss these claims for a second time because

9    Plaintiffs have again failed to allege that the Children's Defendants operated in less than

10   good faith, let alone with malice or gross negligence.  (*See* Mot. at 16.)

11         RCW 26.44.060 provides immunity from civil liability for those who, among other

12   things, "participat[e] in good faith in the making of a report . . . , or otherwise provid[e]

13   information or assistance, including medical evaluations or consultations, in connection

14   with a report, investigation, or legal intervention pursuant to a good faith report of child

15   abuse or neglect."  RCW 26.44.060(1)(a).  To claim this immunity, the reporter need only

16   have "acted 'with a reasonable good faith intent, judged in light of all the circumstances

17   then present.'"  *Whaley v. State, Dep't of Soc. & Health Servs.*, 956 P.2d 1100, 1106

18   (Wash. Ct. App. 1998).  "[A] traditional negligence standard—based on what the reporter

19   reasonably should have known—is not used to determine whether immunity will attach."

20   *Id.*  Accordingly, a defendant who reported suspected child abuse will enjoy immunity

21   from any resulting harm even where the "information giving rise to a suspicion of child

22   abuse" is not "investigated or verified before it is reported."  *Id.*  Rather, the reporter will

1   lose the protection of immunity only where they failed to act with "good faith."  *See id.*

2   (noting that burden of showing that report was made in good faith fall on the party

3   seeking immunity).  In this context, "good faith" means that the individual reporting

4   suspected abuse possessed "a state of mind indicating honesty and lawfulness of

5   purpose."  *See id.*; *see also Roe v. Washington*, No. C13-5927 BHS, 2014 WL 6611407,

6   at *3 (W.D. Wash. Nov. 19, 2014) (finding doctor was "immune from liability if she

7   acted in good faith and without gross negligence").  Applying this more lenient standard

8   advances the purpose of RCW 26.44.060:  "to encourage the reporting of child abuse."

9   *See Whaley*, 956 P.2d at 1106.

10          Plaintiffs try to defeat the Children's Defendants' entitlement to this good faith

11   immunity by arguing that the amended complaint alleges that the Children's Defendants

12   erroneously reported child abuse to DCYF maliciously or, at a minimum, with gross

13   negligence.  (*See* Resp. at 5-6.)  Plaintiffs' theory of intentional or malicious reporting

14   revolves around their allegations that the Children's Defendants were participating in a

15   conspiracy with DCYF to deprive Plaintiffs of their rights; motivated by improper

16   financial incentives or conflicts of interest stemming from pre-existing professional

17   relationships; or acting based on racial animus toward the Plaintiffs.  (*See id.* at 52-56.)

18   The court has already concluded that Plaintiffs failed to plausibly allege the existence of a

19   conspiracy.  *See supra* at 12.  Their other theories of intentional wrongdoing are similarly

20   unsupported by the facts alleged.

21          For instance, Plaintiffs' assertion that the Children's Defendants reported

22   suspected child abuse because of financial or professional conflicts of interest is based on

1    nothing more than a conclusory assertion.  (*See* Am. Compl. at 55-56 (concluding that

2    "[t]here existed" professional and financial conflicts of interest between Children's,

3    DCYF, and the University of Washington through its SCAN department).)  The court is

4    not "required to accept as true allegations that are merely conclusory," or which ask it to

5    draw "unreasonable inferences," and it declines to do so with respect to Plaintiff's theory

6    that the Children's Defendants acted because of financial or professional conflicts of

7    interest.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

8          In support of their argument that racial animus motivated the Children's

9    Defendants' reports to DCYF, Plaintiffs point to:  "[t]he socioeconomic status of the

10   family"; Mr. Grae-El's military background; the fact that the children were examined late

11   in the evening; and the mischaracterization by Ms. Aguilar of the Plaintiffs' method of

12   discipline as "beatings," instead of "whoopins"—a term Plaintiffs allege "is identified

13   with legal parental discipline in the black community" (Am. Compl. at 93).  (*See id.* at

14   53.)  Plaintiffs conclude that their experience "would not have happened to a prominent

15   white family, at least not in the same manner" (*see* Am. Compl. at 53), but allege no facts

16   suggesting that the Children's Defendants took Plaintiffs' race, socioeconomic status, or

17   Mr. Grae-El's veterans status into account when examining the children.  (*See generally*

18   *id.*); *see also Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1162

19   (W.D. Wash. 2016) (noting that racial discrimination may be alleged by identifying "a

20   similarly situated individual or entity outside of the plaintiff's protected group [that]

21   //

22   //

1    received more favorable treatment from the defendant").[7]  And the only inference that

2    can be drawn regarding the time of day at which the children were examined is that they

3    were examined when DCYF brought them to the hospital, which was not a decision in

4    which the Children's Defendants are alleged to have played a role.  (*See* Am. Compl. at

5    53.)  Finally, Ms. Aguilar's loose use of language to describe Plaintiffs' method of

6    discipline does not, without more, suggest she was motivated by racial animus.

7    Accordingly, the court finds that the facts alleged in the amended complaint do not

8    support a plausible inference that the Children's Defendants reached or reported their

9    suspicions of abuse because of race-based or cultural  animus toward Plaintiffs.

10           Plaintiffs are thus left with their argument that the Children's Defendants were

11   grossly negligent, which requires them to allege facts that, if proved, would "provide

12   substantial evidence of serious negligence" that takes into account "both what the

13   defendant failed to do *and* what the defendant did."  *Harper v. State*, 429 P.3d 1071,

14   1078 (Wash. 2018) (emphasis in original).  A defendant who is alleged to have exercised

15   even "slight care" cannot have acted with gross negligence.  *See id.*; *see also Pellham v.*

16   *Let's Go Tubing, Inc.*, 398 P.3d 1205, 1217 (Wash. Ct. App. 2017) ("Gross negligence

17   //

18   _____

19        [7] Plaintiffs assert that they "did not receive equal treatment," and cite as support for that
     conclusion news coverage of the resignation of "[a] highly accredited African American doctor
20   of Children's Hospital," who alleged that Children's "does not treat people of color as it should."
     (*See* Am. Compl. at 27 (citing David Kroman, *Revered Doctor Steps Down, Accusing Seattle*
21   *Children's Hospital of Racism*, Crosscut (Dec. 31, 2020), https://crosscut.com/equity/2020/12/
     revered-doctor-steps-down-accusing-seattle-childrens-hospital-racism).)  Plaintiffs do not,
22   however, allege sufficient facts for the court to infer that the systemic concerns addressed in the
     article shaped the outcome in their particular case.  *See Sprewell*, 266 F.3d at 988.

1    constitutes the failure to exercise slight care.") (citing *Nist v. Tudor*, 407 P.2d 798 (Wash.

2    Ct. App. 1965)).

3        Plaintiffs generally allege that the Children's Defendants improperly interviewed

4    the children as a group "with heavy adult presence," failed to take diligent notes or to

5    record the interview, relied on the children's account of their medical history instead of

6    contacting Plaintiffs for that information, and ultimately reached the wrong conclusion

7    about whether the children had been abused.  (*See* Am. Compl. at 55, 65-67.)  They

8    specifically fault Dr. Deming for making abuse determinations notwithstanding her

9    inexperience as a doctor and lack of specialized knowledge with child abuse cases (*see*

10   *id.* at 27, 64); failing to "clarify the origin of any mark observed on" A.S., A.G., or

11   Z.A.G. (*see id.* at 53, 62-63); erroneously thinking that "Mongolian spots" on Z.A.G.

12   were bruises indicative of abuse (*id.* at 64); and characterizing a marking on A.S.'s face

13   as a "laceration" instead of a "scratch" (*id.* at 64).

14       These criticisms are either contradicted—or at least tempered—by other facts

15   before the court or provide a legally insufficient basis for denying the Children's

16   Defendants immunity under RCW 26.44.060.  For instance, Plaintiffs acknowledge that

17   Dr. Deming—while not a child abuse specialist—was nevertheless specializing in

18   pediatric medicine.  (*See id.* at 27, 64.)  They further characterize her diagnostic errors as

19   the product of "unintentional . . . mistake."  (*See id.* at 64 (describing Dr. Deming's

20   alleged "mischaracterization" of "lacerations"); *see also id.* (alleging that this was a case

21   in which Mongolian spots were "mistaken as a sign of child abuse").)  And Dr. Deming's

22   deposition testimony, which Plaintiffs incorporate by reference into the amended

ORDER - 18

complaint, documents that Dr. Deming did an initial examination of the children but was

accompanied by Dr. Ackley when a more thorough "head-to-toe exam[ination]" of the

children was completed. (*See* Am. Compl., Ex. S ("Deming Dep. Tr.") at 6:26-7:8[8]; *see*

*also* Am. Compl. at 24 (alleging that Dr. Ackley "was the original supervising physician"

and "was assisted" by Dr. Deming and other resident physicians).)

Dr. Deming also did ask questions to determine the cause of markings she

observed, although perhaps not as thoroughly as she might have. (*See* Deming Dep. Tr.

at 13:26-27 (acknowledging that she did not press A.G. further on theory that bruising on

Z.A.G. was caused by an overly-tight diaper). She also considered alternative theories

for the markings, but rejected those she found to be implausible. (*See, e.g.*, *id.* at

12:12-13:27 (finding A.G.'s explanation that bruising on Z.A.G. was "due to his diaper

being too tight" "highly unlikely"); *id.* at 11-13 (finding explanation that healed scar was

result of old bike accident plausible, but that other markings were likely not explained by

tripping explanation).) Additionally, after inquiring how A.S. got his black eye, she was

told that "things at [Plaintiffs'] house sometimes get rough and they have been really

//

//

---

[8] The parties do not contest the authenticity of Dr. Deming's deposition transcript, which is attached to the amended complaint and expressly incorporated therein. (*See generally* Mot.; Resp.; Reply; Am. Compl. at 48.) Accordingly, the court may consider it when evaluating the complaint under Rule 12(b)(6), including where the facts contained therein contradict Plaintiffs conclusory assertions. *See United States v. Corinthian Colleges*, 655 F.3d 984, 990 (9th Cir. 2011) (considering document attached as exhibit to complaint) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)); *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) (stating that courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").

1    rough lately" (*id.* at 7:25-27), and that a "long arching scar" on E.A.D. was caused by a

2    "whooping" from Ms. Strange (*see id.* at 10:7-10).

3          Considering these facts as a whole, Plaintiffs have not plausibly alleged that Dr.

4    Deming or Dr. Ackley exhibited less than even "slight care," *Harper*, 429 P.3d at 1078,

5    or operated with something other than "a state of mind indicating honesty and lawfulness

6    of purpose," *Whaley*, 956 P.2d at 1106, when they examined the children and reported

7    their suspicions of abuse to DCYF.  At most, Plaintiffs have alleged that Dr. Deming and

8    Dr. Ackley could have conducted a better examination and misinterpreted the evidence in

9    front of them as indicative of abuse.  But that amounts to ordinary negligence, which

10   provides no basis for denying immunity.  *See id.* (rejecting argument that immunity is

11   denied where report to state "was based entirely on information [the reporter] should

12   have known was not genuine"); *see also Miles v. State, Child Protective Servs. Dep't*, 6

13   P.3d 112, 121 (Wash. Ct. App. 2000) ("Assuming without holding that Dr. Feldman

14   negligently diagnosed MSBP, he and Children's are immune from liability as a matter of

15   law.").

16         Plaintiffs fault Ms. Aguilar for duplicating existing reports of abuse; omitting

17   references to alternative explanations or exculpatory statements made by the children;

18   asserting that physicians at Children's had determined that markings on the children

19   indicated abuse; failing to adequately document the children's responses; erroneously

20   connecting the visible bruising on A.G.'s arms and legs with the "exercises" Plaintiffs

21   made the children do as punishment; and concluding that marks found on the children

22   were caused by Plaintiffs' physical abuse.  (*See* Am. Compl. 59-61.)  Accepted as true,

1   these facts do not provide a sufficient basis to deprive Ms. Aguilar of immunity under

2   RCW 26.44.060 because they do not suggest that she acted with less than even "slight

3   care," *Harper*, 429 P.3d at 1078, as opposed to with ordinary negligence.  Moreover, the

4   immunity afforded by RCW 26.44.060 is available even for a subsequent, duplicative

5   report that negligently contains incorrect information.  *See Whaley*, 956 P.2d at 1106

6   (noting that immunity is neither "limited to the initial report," nor forfeited where the

7   "information giving rise to a suspicion of child abuse" was not "investigated or verified

8   before it is reported").

9          Because Plaintiffs once again fail to establish that the Children's Defendants'

10  errors amounted to more than ordinary negligence, Plaintiffs' claims for medical

11  negligence, medical malpractice, and gross negligence are DISMISSED.  For the same

12  reason, any claim Plaintiffs intended to raise against Children's for the tortious acts of its

13  employees is likewise DISMISSED.  (*See* 4/21/22 Order at 6 (concluding "that RCW

14  26.44.060 applies to shield Children's from *respondeat superior* theory liability where its

15  employees have participated in good faith in the reporting or investigation of suspected

16  child abuse") (citing *Yuille v. State Dep't of Soc. & Health Servs.*, 45 P.3d 1107 (Wash.

17  Ct. App. 2002)).

18          2.      Plaintiffs' Corporate Negligence Claim

19          The Children's Defendants urge the court to dismiss Plaintiffs' corporate

20  negligence claim, as well, arguing that "Plaintiffs fail to identify *any* conduct by

21  Children's as an entity that suggests failure to supervise, let alone the 'obvious

22  negligence' required by Washington law."  (Mot. at 17 (citing *Alexander v. Gonser*, 711

1   P.2d 347, 351 (Wash. Ct. App. 1985).)  The doctrine of corporate negligence "plac[es] a

2   duty on the hospital to 'intervene in the treatment of its patients if there is obvious

3   negligence.'"  *Alexander*, 711 P.2d at 351 (quoting *Schoening v. Grays Harbor*

4   *Community Hosp.*, 698 P.2d 593 (Wash. Ct. App. 1985).)

5         Plaintiffs' claim fails at the outset because the amended complaint alleges that

6   Children's did provide oversight of its employees.[9]  For instance, Plaintiffs allege that Dr.

7   Deming's examination of the children "was done under the authority of the attending

8   [emergency department] physician Stanford Ackley" (Am. Compl. at 30), and that "the

9   SCAN department did attempt to advise Dr. Deming and Ms. Aguilar on how to

10  proceed," although "neither staff member listened" (*id.* at 54).  The claim still fails even

11  if a greater degree of corporate supervision were required because, as discussed above,

12  the amended complaint plausibly alleges only that Dr. Deming, Dr. Ackley, and Ms.

13  Aguilar engaged in ordinary negligence.  *See supra* at 20-21.  Thus, Children's duty to

14  intervene to prevent "obvious negligence" was never triggered.  *See Alexander*, 711 P.2d

15  //

16      [9] In their response, Plaintiffs cite to an excerpt from a report commissioned by Children's
    from the law firm Covington & Burling LLP, which summarizes findings regarding issues of
    workplace and health equity at Children's, including at the Odessa Brown Children's Clinic (the
17  "Covington Report").  (*See* Resp., Ex. A; *see also id.* at 7 (stating that the Covington Report "is
    presented as supporting evidence for the claims of corporate negligence and racial animus").)
18  The Covington Report is not discussed in the amended complaint or included in the voluminous
    materials filed as attachments to that pleading.  (*See generally* Am. Compl.; *see also id.*, Exs.
19  A-W.)  Nor do Plaintiffs ask the court to take judicial notice of it.  (*See generally* Resp.)
    Accordingly, the court may not consider the Covington Report in assessing whether the amended
20  complaint states a plausible claim for corporate negligence.  *See Orellana v. Mayorkas*, 6 F.4th
    1034, 1042-43 (9th Cir. 2021) (noting that a district court "generally may not consider material
21  outside the pleadings at the motion to dismiss stage, unless the documents have been
    incorporated into the complaint by reference, or are matters of which a court may take judicial
22  notice" (internal citation omitted)).

at 351 (quotation marks omitted).  Accordingly, Plaintiffs' claim for corporate negligence against Children's is DISMISSED.[10]

### D.   Dismissal With Prejudice

The Children's Defendants ask the court to dismiss Plaintiffs claims with prejudice, arguing that allowing Plaintiffs a further opportunity to amend their complaint would be futile.  (*See* Mot. at 18.)  "A district court may dismiss a complaint without leave to amend if 'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'"  *Sanchez v. Los Angeles Dep't of Transportation*, 39 F.4th 548 (9th Cir. 2022) (quoting *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988)).  Here, Plaintiffs have had two opportunities to allege facts that would support their federal and state claims against the Children's Defendants.  Their amended complaint is more than 100 pages long and attaches 23 exhibits, which the court has carefully reviewed.  (*See* Am. Compl., Exs. A-W.)  Notwithstanding the quantity of information Plaintiffs have put before the court, they have again failed to state a claim for relief under either their federal or state theories.  Accordingly, the court concludes that a further opportunity to amend their complaint would be futile and that Plaintiffs' claims should be DISMISSED WITH PREJUDICE.

//

//

---

[10] To the extent Plaintiffs intended to allege a corporate negligence claim against Dr. Deming and Dr. Ackley in their personal capacities (*see* Am. Compl. at 51), that claim necessarily fails for the simple reason that neither physician is a corporate employer.  *See Alexander*, 711 P.2d at 351 (placing duty to intervene on the employer, not the physician employee).

# IV.    CONCLUSION

For the foregoing reasons, the Children's Defendants' motion (Dkt. # 78) is GRANTED and Plaintiffs' claims against the Children's Defendants are DISMISSED WITH PREJUDICE.

Dated this 26th day of July, 2022.

JAMES L. ROBART
United States District Judge