UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ZION T. GRAE-EL, et al.,

Plaintiffs,

v.

CITY OF SEATTLE, et al.,

Defendants.

CASE NO. C21-1678JLR

ORDER

## I.   INTRODUCTION

Before the court is Defendants the City of Seattle, Officer Ryoma Nichols, and Sergeant Daina Boggs's (collectively, the "City Defendants") motion for summary judgment.  (Mot. (Dkt. # 82); Reply (Dkt. #87).)  *Pro se* Plaintiffs Zion T. Grae-El and Caprice Strange (collectively, "Plaintiffs") request a continuance of their obligation to respond to the City Defendants' motion (MFC (Dkt. # 84)), but have not substantively opposed the motion.  (*See* Dkt.)  The City Defendants oppose Plaintiffs' request for a continuance.  (MFC Resp. (Dkt. # 86).)  The court has considered the submissions of the

1  parties, the relevant portions of the record, and the applicable law.  Being fully advised,[1]

2  the court DENIES Plaintiffs' motion for a continuance and GRANTS the City

3  Defendants' motion for summary judgment.

## II.    BACKGROUND

5      This case arises out of a report of suspected child abuse made to Child Protective

6  Services ("CPS"), a component of the Washington State Department of Children, Youth

7  & Families ("DCYF").  (Am. Compl. (Dkt. # 77) at 7.[2])  On November 28, 2018, an

8  employee at Plaintiffs' children's school, Dunlap Elementary School ("Dunlap"),

9  contacted CPS to report that Ms. Strange's minor child, A.S.,[3] had an injury to his face

10 and had disclosed to school employees that he had been hit by his step-father, Mr.

11 Grae-El.  (Am. Compl. at 7.)  The Seattle Police Department ("SPD") was not contacted

12 at that time and the children were permitted to go home after school.  (*Id.*)

13     That evening, however, SPD Officer Timothy Jones was dispatched to Plaintiffs'

14 home "to assist CPS with possibly taking the children into protective custody."  (*See* SPD

15 General Offense Report (Dkt. # 77-24 (sealed)) at 13-15 (Officer Jones's report).)  Upon

16 arrival, Corey Grace and Annaliese Ferreria—the CPS case workers assigned to the

---

18 [1] The parties do not request oral argument (*see* Mot. at 1; MFC; MFC Resp. at 1), and the court concludes that oral argument is not necessary to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

20 [2] The court cites to the page numbers contained in the CM/ECF header when referring to the amended complaint and the exhibits attached to that pleading.

21 [3] The minor children are referred to using their initials.  Ms. Strange is the biological mother of A.G., A.S., and Z.A.G., who is also Plaintiff Zion T. Grae-El's biological son.  (Am. Compl. at 2-3.)  In addition to Z.A.G., Mr. Grae-El is the biological father of E.A.D. and E.M.D. (*Id.*)

matter—filled Officer Jones in on the general case background, including that A.S.'s

teacher at Dunlap, Leslie Meekins, had reported that A.S. arrived at school with a black

eye and that A.S. said the bruise was caused by Mr. Grae-El hitting him.  (*Id.* at 14-15;

*see also* Ferreria Dep. Tr. (Dkt. # 77-23) at 7-11.)  Mr. Grace also showed Officer Jones a

photo of A.S., taken by his teacher earlier that day, which Officer Jones agreed depicted

"what looked like a possible bruise under [A.S.'s] eye."  (SPD General Offense Report at

15.)

Mr. Grae-El declined to permit Officer Jones or the CPS officials to enter his

home, although he indicated he would allow CPS to conduct an inspection during a

scheduled visit.  (*Id.*)  He also asserted that A.S.'s injury happened during "an incident

involving his other son and possibly a dog."  (*Id.*)  After Mr. Grae-El spoke with Ms.

Strange by phone, however, he agreed to bring the children out, one at a time, so that the

CPS officials could speak with and inspect them.  (*Id.*)  Although the children "seemed a

bit nervous" to Officer Jones, they "answered all the questions asked" and exhibited no

"signs of distress."  (*Id.*)  Officer Jones was also able to see into Plaintiffs' home "a little

bit," and did not "see anything that concerned [him] at the time."  (*Id.*)  Nor was he able

to observe an injury on A.S. from where he was standing, though he was told by CPS

officials that "they could see an injury near [A.S.'s] eye."  (*Id.*)  Ultimately, although

Officer Jones "got the impression that CPS wanted [him] to grab [A.S.] when he came

out or force [his] way in" to seize the other children, he took no action that evening,

believing that doing so—based on "the way [Mr.] Grae-El was acting, especially his

expressed dislike of the police"—might have caused the situation to "escalate[] into a

1  possible fight." (*Id.*)  The parties disagree about what inferences should be drawn from

2  Mr. Grae-El's demeanor.  (*Compare id.*, *and* Ferreria Dep. Tr. at 10:18 (describing Mr.

3  Grae-El as "hostile" based on his body language and rhetoric), *with* Am. Compl. at 72

4  (describing Mr. Grae-El's behavior as "lawful, open, protective, and reasonable").)

5      The following day, November 29, 2018, Officer Nichols was "dispatched to a

6  service call at Dunlap Elementary School" at approximately 2 p.m.  (SPD General

7  Offense Report at 19 (Officer Nichols's report).)  CPS had requested SPD's assistance

8  taking the children into custody, which CPS indicated "should have been done" the prior

9  night at Plaintiffs' residence.  (*See id.* (capitalization omitted).)  Prior to arriving, Officer

10  Nichols read Officer Jones's report, from which he understood "that there was physical

11  evidence of a child having been assaulted," and that, "[w]hen CPS and SPD tried to

12  remove the children from the custody of the parents, it was unsafe to do so based on [Mr.

13  Grae-El's] aggressive and confrontational demeanor."  (*Id.*)

14      As Officer Nichols "was preparing to interview" A.S., A.G., E.M.D., and E.A.D.

15  at Dunlap, Ms. Strange arrived with Z.A.G., although she "started to leave as soon as she

16  saw police cars in the school parking lot."  (*Id.*)  Officer Nichols approached her with

17  another SPD officer, and told her that SPD was taking Z.A.G. into protective custody, at

18  which point Ms. Strange surrendered Z.A.G.  (*See id.*)  Officer Nichols tried to give Ms.

19  Strange his business card with the incident number, and to "tell her that [he] needed to

20  give her a copy of a Custody Without Court Order form [("CWO")], but she left the

21  scene before [he] could" do so.  (*Id.*)

22  //

During this interviews of the school-age children, Officer Nichols "observed some bruising underneath [A.S.'s] left eye and scratches on both sides of his neck," which he photographed. (*Id.*)  Additionally, although Officer Nichols "had difficulty understanding [A.S.] due to his level of speech," he reported that A.S. told him that after he "got into trouble at home," Mr. Grae-El "gave him a 'whooping' and made him do push-ups and assume an 'invisible chair' position," as well as a "legs in the air position." (*Id.* at 19-20.)  A.S. told Officer Nichols "that the scratches and bruising were from the 'whooping,'" which he described "as several open slaps across his face." (*Id.* at 20.)  He also told Officer Nichols "that [Ms. Strange] yelled 'I'll pop you in the mouth' during the incident." (*Id.*)  Finally, A.S. told Officer Nichols "that when he gets in trouble, which is often, he gets a 'whooping' or assumes the 'invisible chair' position." (*Id.*)

Officer Nichols proceeded to interview the other school-age children, as well, each of whom reported that they had either heard or seen A.S. get "whooped" on November 27, 2018, that such "whoopings" were common in their home, and that they had personally been "whooped" by either Mr. Grae-El or Ms. Strange within the past year. (*See id.*[4])  For instance, E.M.D. disclosed that he heard A.S. get "whooped" by Mr. Grae-El, that "assuming push up and squat positions and being 'whooped' with a belt was common at his home," and that he had last been "whooped" with a belt in May or June 2018. (*Id.*)  A.G. told Officer Nichols that she also heard A.S. get "whooped" by Mr. Grae-El, that "small whoopin[s]" and stress positions were commonly used by Mr.

---

[4] Officer Nichols did not interview Plaintiffs' youngest child, Z.A.G., because, at the time, he was "two years old" and could "barely speak." (*Id.*)

Grae-El and Ms. Strange, and that she had last been "whooped" in November, 2017,

when Mr. Grae-El held her and two of her siblings down while Ms. Strange "hit them

with a belt." (*Id.*)   Finally, although he had some trouble understanding her because of

"her speech level," Officer Nichols reported that E.A.D. disclosed that she saw A.S. get

"whooped" because she had received a "whooping" at the same time, which consisted of

Ms. Strange hitting "her face and legs with a belt." (*Id.*)   Officer Nichols did not observe

any marks on E.A.D.'s legs because she was wearing pants, but reported that he observed

and photographed "a mark on her left cheek," which she explained was caused by the

"whooping." (*Id.*)   Officer Nichols also noted in his report that he "overheard part of

[Ms.] Ferreria's interview of [E.A.D.]," in which E.A.D. stated that scratches on her neck

and a small scar near her collarbone "were cause[d] by [Ms. Strange] hitting her with a

belt and spatula in a separate incident." (*Id.* (capitalization omitted).)   Plaintiffs dispute

whether E.A.D. had any markings on her left cheek or whether Officer Nichols could

have overheard her state that scratches on her neck were caused by Ms. Strange. (*See*

Am. Compl. at 81-82 (alleging that body worn camera ("BWC") footage would show

"the absence of any observed mark on the left cheek of [E.A.D.]"); *see also id.* at 73.)

Officer Nichols also spoke with A.S.'s teacher, Ms. Meekins, who reiterated that

during the school day on November 28, 2018, A.S. "told her that he 'felt sad,' was

'scared' and that [Mr. Grae-El] was mad," and also that A.S. had an observable injury on

his face consistent with what Officer Nichols had observed. (*See* SPD General Offense

Report at 20-21.)

*//*

1    Officer Nichols concluded from this investigation that "there was probable cause

2  to believe that all five children were abused and that they would be injured or could be

3  injured if they were not taken into custody" at that time, "[b]ased on the physical

4  evidence of abuse that [he] had observed and the pattern of physical abuse reported by

5  every single child [he] had interviewed." (*Id.* at 21.)  In addition, he concluded from

6  Officer Jones's description of Mr. Grae-El's behavior during the November 28, 2018

7  safety assessment that "the children could not [have been] taken into custody if it were

8  necessary to first obtain a court order." (*Id.*)  Office Nichols recorded these findings on a

9  CWO, gave a copy of the CWO to Ms. Ferreria, and escorted Ms. Ferreria and the

10  children to the CPS office.  (*Id.* at 21; *see also id.* at 27 (indicating on the CWO that the

11  "[d]anger of further physical abuse" and "[u]nsafe or injurious living conditions"

12  warranted immediate removal).)  Officer Nichols concluded by "screen[ing] the incident

13  with [Sergeant Boggs]." (*Id.* at 21.)

14    The children were eventually taken that evening for examinations at Seattle

15  Children's Hospital ("Children's"), where an additional referral to CPS was made based

16  on indications of abuse disclosed by the children or observed by Children's employees

17  during that process.  (*See* Am. Compl. at 23-32.)

18    A follow-up case investigation was conducted by SPD Detective Jess Pitts, who

19  initially reviewed the matter on November 30, 2018.  (*See* SPD General Offense Report

20  at 22-26 (Detective Pitts's report).)  Detective Pitts tried unsuccessfully to reach Ms.

21  Strange and Mr. Grae-El on two occasions—December 6 and 7, 2018—before he decided

22  to refer the "case to the Seattle Law Department for review without [Plaintiffs'] version

1    of the situation." (*Id.* at 25.)  As Detective Pitts knew, Plaintiffs were engaged in their

2    dependency proceeding during that time.  (*See id.*)

3           At the conclusion of the dependency proceeding, the children were either sent to

4    live with their non-custodial parent or placed in a foster home.  (*See* Am. Compl. at 13.)

5    E.A.D. was sent to live with her mother in Minnesota and, shortly after arriving,

6    disclosed to her mother that Mr. Grae-El had sexually abused her.  (*Id.*)  Criminal charges

7    soon followed.  Mr. Grae-El was charged with rape of a child in the first degree (E.A.D.),

8    and assault of a child in the third degree (A.S.).  (*See id.* at 35.)  Ms. Strange was charged

9    with one count of assault of a child (E.A.D.).  (*Id.*)  Mr. Grae-El was first tried on the

10   rape charge, and found not guilty on September 4, 2019.  (*Id.*)  Following Mr. Grae-El's

11   acquittal on the rape charge, the State filed an amended information, which charged Mr.

12   Grae-El with third degree assault against A.S. and second degree assault against E.M.D.;

13   charged Ms. Strange with third degree assault against E.A.D.; and charged Plaintiffs with

14   jointly committing second degree assault against A.S. and E.M.D.  (*See id.*, Ex. E at 5

15   (Mr. Grae-El's motion for relief from his conviction); *see also id.* at 35-36.)  In lieu of

16   trial, Mr. Grae-El and Ms. Strange reached a plea agreement with the State whereby Mr.

17   Grae-El pled guilty to "one count of assault of a child in the third degree (E.M.D.) and

18   one count of assault in the fourth degree (A.S.)," and Ms. Strange "entered guilty pleas to

19   two counts of assault in the fourth degree (E.A.D. and A.S.)."  (*See id.*, Ex. E at 6; *see*

20   *also* Verification of State Records (Dkt. # 20), Ex. 3 at 158 (Mr. Grae-El's motion for

21   //

22   //

1  relief from his conviction).[5])  Mr. Grae-El subsequently sought to vacate his conviction

2  on the ground that his guilty plea was the result of ineffective assistance from his counsel.

3  *See State v. Grae-El*, No. 82306-0-I, 2022 WL 670953, at *3 (Wash. Ct. App. Mar. 7,

4  2022).  After holding an evidentiary hearing, the trial court denied Mr. Grae-El's motion

5  in a ruling that was affirmed on appeal.  *Id.* at *3, 9.

6        The City Defendants removed this matter from King County Superior Court on

7  December 16, 2021 and later filed a motion for judgment on the pleadings, which the

8  court granted.  (NOR (Dkt. # 1); MJP (Dkt. # 51); 4/19/22 Order at 30.)  Plaintiffs filed

9  an amended complaint on May 22, 2022, which re-alleges the same claims contained in

10  their initial complaint, including for violations of rights secured by the First, Fourth, and

11  Fourteenth Amendment, as well as Washington law.  (*Compare* Compl. (Dkt. # 1), *with*

12  Am. Compl.)

13              **III.    ANALYSIS**

14        The City Defendants move for summary judgment on each of Plaintiffs' claims.

15  (*See* Mot. at 8-23.)  Plaintiffs did not file a response to the City Defendants' motion for

16  summary judgment, but instead asked the court to continue this matter for 60 days to

17  allow time for further consultation with a potential declarant.  (*See* MFC at 2.)  The court

18  first addresses Plaintiffs' motion for continuance before turning to consider the City

19  Defendants' motion for summary judgment.

20  //

21

22        [5] The court previously took judicial notice over the records from Plaintiffs' state court
criminal proceeding.  (*See* 4/19/22 (Dkt. # 73) at 6 n.6 (citing Fed. R. Evid. 201).)

**A.      Plaintiffs' Motion for Continuance**

Plaintiffs request "a continuance of 60 days to allow" time to consult with Dr. Steve Wilson, a clinical social worker Plaintiffs have enlisted as a declarant and potential expert witness in this matter, regarding BWC footage and other materials Plaintiffs obtained through a public records request on June 2, 2022.  (*See* MFC at 2.)  When Plaintiffs filed their motion, Dr. Wilson was apparently unavailable to consult on this newly acquired material because he was out of the country on vacation, though he was expected to return in late July 2022—i.e., shortly before Plaintiffs' response brief would have been due.  (*See id.*); *see also* Local Rules W.D. Wash. LCR 7(d)(3).  Mr. Grae-El represents that the recently obtained records are "relevant to the arguments in this case," including his *Brady v. Maryland*, 373 U.S. 83 (1963) claim.  (MFC at 2.)

The City Defendants argue that Plaintiffs' motion should be considered under Federal Rule of Civil Procedure 6, which permits a court to extend a fixed deadline "for good cause," Fed. R. Civ. P. 6(b)(1), and that Plaintiffs do not and cannot establish that good cause exists for the 60-day extension they seek.  (*See* MFC Resp. at 1.) Specifically, the City Defendants argue that, when considering their summary judgment motion, the court will construe all available evidence—including the BWC footage—in Plaintiffs' favor, such that any testimony Dr. Wilson might provide on Plaintiffs' behalf would be inconsequential to their summary judgment opposition.  (*See id.* at 2.)

Plaintiffs do not specify which rule their motion is made under.  (*See generally id.*) In light of their *pro se* status, however, the court will consider their motion under Federal Rules of Civil Procedure 6(b)(1) and 56(d).  As noted above, Rule 6(b)(1) empowers the

1   court to extend fixed deadlines "for good cause."  Fed. R. Civ. P. 6(b)(1).  Rule 56(d)

2   allows the court to defer consideration of a summary judgment motion for a specified

3   time in order to "allow [a nonmovant] time to obtain affidavits or declarations or to take

4   discovery," provided the "nonmovant shows by affidavit or declaration that, for specified

5   reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).

6        The court concludes that Plaintiffs' requested 60-day extension is not warranted

7   under either standard because they do not request additional time to obtain evidence

8   necessary to oppose summary judgment, but rather to discuss evidence already in their

9   possession with an expert witness.  (*See* MFC at 2 (stating that Plaintiffs received BWC

10  footage and other information from SPD on June 2, 2022).)  Plaintiffs do not explain why

11  they require an expert's gloss on this evidence before they can respond to the City

12  Defendants' summary judgment motion and the court doubts that they do.  Plaintiffs have

13  previously shown themselves to be capable of attaching evidence as exhibits to their

14  filings and making arguments to the court about the favorable inferences that it should

15  draw.  (*See, e.g.*, Am. Compl. at 81-82 (alleging what the BWC footage from November

16  28, 2018 would show).)  Plaintiffs could have taken the same approach with respect to

17  the BWC footage and other newly acquired evidence.

18       Because Plaintiffs do not explain why this evidence must first be filtered through

19  expert testimony, as opposed to being presented directly to the court, the court does not

20  find that good cause exists for a 60-day extension.  *See* Fed. R. Civ. P. 6(b)(1).

21  Moreover, because Plaintiffs do not seek extra time to obtain evidence necessary to

22  oppose summary judgment, only to discuss evidence already in their possession, their

1    motion also fails under Rule 56(d).  *See* Fed. R. Civ. P. 56(d) (allowing continuances

2    where more time is needed to gather "facts essential to justify its opposition").

3           Accordingly, whether construed as a motion made under Rule 6(b) or Rule 56(d),

4    Plaintiffs' motion for a 60-day extension to their summary judgment response deadline is

5    DENIED.

6    **B.    Summary Judgment Legal Standard**

7           Summary judgment is appropriate if the evidence, when viewed in the light most

8    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

9    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

10   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine"

11   if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

12   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material"

13   if it "might affect the outcome of the suit under the governing law."  *Id.*  The moving

14   party bears the initial burden of showing that there is no genuine dispute of material fact

15   and that it is entitled to prevail as a matter of law, which it may do by "identifying those

16   portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

17   together with the affidavits, if any,' which it believes demonstrate the absence of a

18   genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P.

19   56(c)).  Thus, "regardless of whether the moving party accompanies its summary

20   judgment motion with affidavits, the motion may, and should, be granted so long as

21   whatever is before the district court demonstrates" the absence of a genuine dispute of

22   material fact and that the movant is entitled to judgment as a matter of law.  *See id.*  If the

1  moving party meets its burden of production, the burden then shifts to the nonmoving

2  party to identify specific facts from which a factfinder could reasonably find in the

3  nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

4       Where, as here, the non-moving party fails to respond to the summary judgment

5  motion, the court cannot grant the motion automatically.  *See Heinemann v. Satterberg*,

6  731 F.3d 914, 916 (9th Cir. 2016) ("[A] motion for summary judgment may not be

7  granted based on a failure to file an opposition to the motion."); Local Rules W.D. Wash.

8  LCR 7(b)(2).  Rather, the court may only "grant summary judgment if the motion and

9  supporting materials—including the facts considered undisputed—show that the movant

10 is entitled to it."  Fed. R. Civ. P. 56(e)(3); *see Heinemann*, 731 F.3d at 916.  Facts

11 asserted by the moving party in an unopposed motion may be treated as "undisputed for

12 purposes of the motion."  Fed. R. Civ. P. 56(e)(3); *see Heinemann*, 731 F.3d at 916.

13 **C.    The City Defendants' Motion for Summary Judgment**

14      The City Defendants move for summary judgment on each of Plaintiffs' claims,

15 arguing that:  (1) the Fourth and Fourteenth Amendment claims against Officer Nichols

16 and Sergeant Boggs are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) the

17 First, Fourth, and Fourteenth Amendment claims fail because Officer Nichols had

18 probable cause to take the children into custody; (3) the *Brady* claim fails because the

19 allegedly suppressed information does not cast sufficient doubt on Plaintiffs' guilt; (4) the

20 failure to supervise claim against Sergeant Boggs fails because Plaintiffs do not allege

21 that an underlying constitutional violation took place; and (5) the state law claims fail

22 //

1   because Plaintiffs did not provide adequate pre-suit notice to the City Defendants, as is

2   required by RCW 4.96.020.  (*See* Mot. at 8-23.[6])

3          Perhaps because Plaintiffs assumed the court would grant their extension request,

4   they have not opposed the City Defendants' motion for summary judgment.  (*See* Dkt.;

5   MFC at 2.)  The court's local rules caution against such an approach, warning that

6   "[p]arties should not assume that the[ir extension] motion will be granted and must

7   comply with the existing deadline unless the court orders otherwise."  Local Rules W.D.

8   Wash. LCR 7(j).  Thus, the court considers whether, on the record before the court, the

9   City Defendants are entitled to summary judgment.  *See Celotex Corp.*, 477 U.S. at 323.

10          1.      *Heck v. Humphrey* Bars Plaintiffs' Fourth and Fourteenth Amendment
                    Claims Against Officer Nichols and Sergeant Boggs

11

12          Plaintiffs allege that Officer Nichols violated their Fourth Amendment rights

13   through the preparation of a police report and CWO that contained material and deceptive

14   statements, and which served as the basis for removing their children without a warrant,

15   thereby depriving them of their Fourteenth Amendment right to familial association.  (*See*

16   Am. Compl. at 69-73.)  They also allege that Sergeant Boggs violated their Fourteenth

17   Amendment right to due process by failing to supervise Officer Nichols during his

18   investigation of suspected child abuse and by failing to "screen the incident" with SPD's

19   Sexual Assault and Child Abuse Unit ("SAU").  (*See id.* at 75, 92.)  The City Defendants

20   *//*

21   _____

22          [6] Plaintiffs also allege that the SPD policy manual violates the constitution by allowing
     SPD officers to rely on their subjective opinions.  (*See* Am. Compl. at 76-78.)  The court
     previously dismissed this claim with prejudice.  (*See* 4/19/22 Order at 28.)

1   assert that these claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  (*See* Mot.

2   at 8-10.)

3   The court previously dismissed Plaintiffs' Fourth and Fourteenth Amendment

4   claims after finding that, at bottom, they challenged whether Officer Nichols had

5   probable cause to place the children in protective custody and were thus not "distinct

6   temporally or spatially from the factual basis for [their] conviction[s]," *Beets v. Cnty. of*

7   *Los Angeles*, 669 F.3d 1038, 1042 (9th Cir. 2012), and that success on those claims

8   would "implicitly question the validity" of their convictions, in violation of *Heck*, *see*

9   *Muhammad v. Close*, 540 U.S. 749, 751 (2004); *Heck*, 512 U.S. at 487.  (*See* 4/19/22

10  Order at 20-22; *id.* at 20 n.11 (taking judicial notice of records from Plaintiffs' state court

11  proceedings to determine whether *Heck* applied).)  The amended complaint continues to

12  challenge the legality of Officer Nichols's probable cause determination, despite the fact

13  that it is clear from the record that Plaintiffs' convictions remain intact.  (*See generally*

14  Am. Compl.); *see also Grae-El*, 2022 WL 670953, at *9 (affirming the trial court's

15  decision denying Mr. Grae-El's effort to vacate his guilty plea on the grounds that he was

16  provided ineffective assistance from his counsel).  Accordingly, Plaintiffs' Fourth and

17  Fourteenth Amendment claims against Officer Nichols continue to be barred under *Heck*.

18  (*See* 4/19/22 Order at 20-22.)

19  Likewise, because *Heck* prohibits Plaintiffs from establishing a Fourth or

20  Fourteenth Amendment constitutional violation against Officer Nichols, they cannot

21  maintain a § 1983 claim against Sergeant Boggs, based on her failure to supervise Officer

22  Nichols with respect to those claims, or the City of Seattle.  (*See* 4/19/22 Order at 29);

1    *see also Jones v. Williams*, 297 F.3d 930, 937 (9th Cir. 2002) (describing elements of a

2    supervisory liability claim under § 1983 to include the establishment of an underlying

3    constitutional violation); *Larin v. Cnty. of Santa Barbara*, No. CV 15-2734-GW (SP),

4    2016 WL 9244021, at *7 (C.D. Cal. Dec. 13, 2016) (finding that the supervisory liability

5    claim failed because *Heck* prevented plaintiff from establishing an underlying

6    constitutional violation), *report and recommendation adopted*, No. CV 15-2734-GW(SP),

7    2017 WL 2836209 (C.D. Cal. June 27, 2017).

8         Plaintiffs also assert that Sergeant Boggs violated their due process rights by

9    failing to "screen the incident" with SAU, which SPD Policy requires when a "child has a

10   serious injury and child abuse or neglect is suspected."  *See* SPD Policy Manual 15.220-

11   POL-5, Seattle Police Dep't (May 7, 2019), https://www.seattle.gov/police-manual/title-

12   15---primary-investigation/15220---child-welfare; (Am. Compl. at 92).  They contend

13   that Sergeant Boggs's failure to do so either violated their due process rights or provides

14   evidence that SPD did not, in fact, believe the children's injuries were serious.  (*See* Am.

15   Compl. at 92.)  The court need not decide whether Sergeant Boggs violated SPD policy,

16   however, because her alleged policy infraction either fails as a standalone claim under

17   § 1983, *see Canell v. Bradshaw*, 840 F. Supp. 1382, 1387 (D. Or. 1993) ("Violations of

18   state law or regulations are not cognizable under § 1983."), *aff'd*, 97 F.3d 1458 (9th Cir.

19   1996), or merely provides evidence relevant to Plaintiffs' *Heck*-barred familial

20   association claim.

21        Accordingly, the City Defendants are entitled to summary judgment on Plaintiffs'

22   Fourth and Fourteenth Amendment claims against Officer Nichols, Sergeant Boggs, and

the City of Seattle, regardless of whether those claims are asserted under theories of direct, supervisory, or municipal liability.

   2.   The Existence of Probable Cause Bars Plaintiffs' First, Fourth, and Fourteenth Amendment Claims

   In addition to the Fourth and Fourteenth Amendment claims, described above, Plaintiffs also allege that Officer Nichols's determination that exigent circumstances warranted taking the children into protective custody without a warrant was made in retaliation for Mr. Grae-El's conduct during the November 28, 2018 safety assessment, where he "asserted his rights, questioned the existence of a warrant, voiced his dislike for police officers," and "criticized the cultural sensitivity of state agents." (*See* Am. Compl. at 71.)  The City Defendants argue that Plaintiffs' First, Fourth, and Fourteenth Amendment claims all fail for the common reason that Officer Nichols had probable cause to conclude that abuse had taken place, and that the risk of further abuse if the children remained in Plaintiffs' custody was sufficiently likely to permit placing the children into protective custody without a warrant.  (Mot. at 10-16.)

   To prevail on a First Amendment retaliation claim, a plaintiff must show "'that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.'"  *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).  A plaintiff must also show that the challenged conduct "was objectively unreasonable because it was not

supported by probable cause." *Nieves v. Bartlett*, ⸺ U.S. ⸺, 139 S. Ct. 1715, 1722 (2019).  A Fourth Amendment claim for judicial deception, likewise, turns on whether the challenged affidavit "on its face establishes probable cause."  *See Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009).  Finally, a claim that the Fourteenth Amendment right to familial association has been violated requires the plaintiff to show that the officer lacked "reasonable cause to believe that" the children were "'likely to experience serious bodily harm in the time that would [have been] required to obtain a warrant.'"  *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016) (emphasis omitted) (quoting *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007)).[7]

Plaintiffs' claims all fail because, as the record before the court illustrates, Officer Nichols had a reasonable basis for believing that the children had been abused and were likely to experience further abuse in the time it would have taken to obtain a warrant. Indeed, as Officer Nichols documented in his report, he observed "some bruising underneath [A.S.'s] left eye and scratches on both sides of his neck," which A.S. attributed to Mr. Grae-El hitting him with "several open slaps across his face."  (*See* SPD General Offense Report at 20.)  That observation and explanation aligned with the initial report from Dunlap staff and with observations documented in Officer Jones's report from the November 28, 2018 safety assessment.  (*See* Am. Compl. at 7 (alleging that Dunlap employee Natalie Long reported to Ms. Ferreria on November 28, 2018 "that it looked like someone grabbed [A.S.'s] face really hard"); *see also* SPD General Offense

---

[7] "[P]robable cause" and "reasonable grounds" are "substantial equivalents of the same meaning."  *Draper v. United States*, 358 U.S. 307, 311 n.3 (1959).

Report at 15 (noting that CPS officials observed "an injury near [A.S.'s] eye" during

November 28, 2018 safety assessment).[8])  It was also corroborated by A.S.'s siblings,

who told Officer Nichols that they either saw Mr. Grae-El "whoop" A.S. (E.A.D.) or

heard it (E.M.D. and A.G.).  (*See* SPD General Offense Report at 20.)  Finally, each of

the school-age children told Officer Nichols that "whoopings" were a common method of

punishment used by Mr. Grae-El and Ms. Strange, and that they had each been hit with a

belt or other object in the prior year during a "whooping."  (*See id.* at 20-21.[9])  That

compilation of evidence is sufficient to establish probable cause.  *See Stoot v. City of*

*Everett*, 582 F.3d 910, 920 (9th Cir. 2009) (allowing that statements from child victims

may be used to establish probable cause where they are corroborated by additional

evidence); *see also Rodis v. City, Cnty. of San Francisco*, 558 F.3d 964, 969 (9th Cir.

2009) (noting that probable cause "exists when officers have knowledge or reasonably

trustworthy information sufficient to lead a person of reasonable caution to believe that

//

//

---

[8] Officer Nichols's account was later corroborated by doctors at Children's, who diagnosed A.S. as having a black eye.  (*See* Am. Compl. at 26.)

[9] Plaintiffs allege that Officer Nichols could not have overheard E.A.D. tell Ms. Ferreria that she had been hit with a belt because Ms. Ferreria testified in a deposition that she "did not ask any questions" when the children were interviewed on November 29, 2018 at Dunlap.  (*See* Am. Compl. at 73.)  They conclude, therefore, that Officer Nichols must have "lied about the origin of his observed child abuse allegation involving [E.A.D.]"  (*See id.* (quoting Ferreria Dep. Tr. at 11:4).)  That argument is not before the court but, even if it were, the record still contains undisputed evidence that E.A.D. directly told Officer Nichols that Ms. Strange hit her with a belt, which is consistent with the "whoopings" that each of the school-age children disclosed to Officer Nichols.  (*See* SPD General Offense Report at 19-20.)  Thus, even without evidence that Officer Nichols heard E.A.D. reaffirm her story of abuse to Ms. Ferreria, the record contains sufficient evidence to establish probable cause that Plaintiffs abused their children.

1    an offense has been or is being committed"  (quoting *United States v. Lopez,* 482 F.3d

2    1067, 1072 (9th Cir. 2007)).

3          In addition to probable cause to believe that the children had been abused, the

4    court also concludes that Officer Nichols had reasonable cause to justify placing the

5    children into protective custody without a warrant.  In the CWO, Officer Nichols relied

6    only on the evidence of abuse he gathered through his interviews and observations to

7    conclude "that all five children are in danger of physical harm if returned home."  (SPD

8    General Offense Report at 27.)  He repeats this finding in his report and states that it is

9    additionally supported by Mr. Grae-El's "reported behavior" during the safety

10   assessment, as described in Officer Jones's report.  (*See id.* at 21.)  It is this additional

11   conclusion that Plaintiffs take as evidence that Officer Nichols was retaliating against Mr.

12   Grae-El for asserting his rights during the November 28, 2018 safety assessment.  (*See*

13   Am. Compl. at 71 (noting Officer Nichols's reference to Mr. Grae-El's "reported

14   behavior").)

15         As described by Officer Jones, Mr. Grae-El's conduct during the safety

16   assessment, including his "expressed dislike of the police" (SPD General Offense Report

17   at 15), likely included constitutionally protected speech.  *See, e.g.*, *United States v.*

18   *Poocha*, 259 F.3d 1077, 1081-82 (9th Cir. 2001) (finding that profane expression of

19   police disapproval was protected by the First Amendment).  Considering protected

20   speech in the course of evaluating whether reasonable cause exists is not necessarily

21   improper, however.  *See Capp*, 940 F.3d at 1056 ("[P]rotected speech is often a 'wholly

22   legitimate consideration' for officers when deciding whether to make an arrest."  (quoting

1  *Nieves*, 139 S. Ct. at 1724)).  Moreover, even if Officer Nichols did intend to retaliate

2  against Mr. Grae-El for expressing his dislike of the police, that "state of mind is simply

3  'irrelevant'" if, viewed objectively, Officer Nichols had reasonable cause to remove the

4  children without a warrant.  *See Nieves*, 139 S. Ct. at 1725 (quoting *Devenpeck v. Alford*,

5  543 U.S. 146, 153 (2004)) (counseling courts to focus on the objective inquiry of whether

6  there was probable cause for the challenged conduct).  The record before the court shows

7  that he did.

8       Officer Nichols's primary basis for determining that there was no time to obtain a

9  warrant before placing the children into protective custody was "the physical evidence of

10 abuse that [he] had observed and the pattern of physical abuse reported by every single

11 child [he] had interviewed."  (SPD General Offense Report at 21 (concluding, on that

12 basis, that the children "would be injured or could be injured if they were not taken into

13 custody" immediately).)  The court agrees that the nature of the abuse allegations were

14 serious enough to "give rise to a reasonable inference of imminent danger sufficient to

15 justify taking children into temporary custody" and to conclude that the children were

16 likely to suffer further harm before a warrant could have been obtained.  *See Kirkpatrick*,

17 843 F.3d at 790.  Indeed, Officer Nichols was only able to establish probable cause when

18 he completed his interviews of the children sometime after 2 p.m. on November 29, 2018,

19 leaving him with insufficient time to obtain a warrant before the children would have

20 been released to Mr. Grae-El and Ms. Strange at the end of the school day.  (*See* SPD

21 General Offense Report at 19-21; *see also* 4/19/22 Order at 14-15 (noting that the time to

22 obtain a warrant should be calculated from the point at which probable cause of abuse is

1   established (citing *Rogers*, 487 F.3d at 1294-95)).)  Moreover, the "whoopings" were

2   described to Officer Nichols as occurring unpredictably and whenever Mr. Grae-El or

3   Ms. Strange believed the children deserved punishment (*see* SPD General Offense Report

4   at 19-21), meaning a "whooping" could have occurred as soon as the children returned

5   home that afternoon.  *Cf. Rogers*, 487 F.3d at 1295 (noting that "information that the

6   abuse occurs only on certain dates or at certain times of day" counsels against a finding

7   of exigency).[10]  Thus, there is a sufficient basis to conclude that exigent circumstances

8   warranted placing the children into protective custody without waiting for a warrant.  *See*

9   *Barnes v. Cnty. of Placer*, 654 F. Supp. 2d 1066, 1071-72 (E.D. Cal. 2009) (analyzing

10  exigency based on the time between confirmation of suspected abuse and the close of the

11  school day), *aff'd*, 386 F. App'x 633 (9th Cir. 2010).

12          Accordingly, the City Defendants have met their summary judgment burden by

13  identifying portions of Plaintiffs' amended complaint and supporting exhibits

14  demonstrating that Officer Nichols's decision to place the children in protective custody

15  without a warrant was justified by probable and reasonable cause.  That is fatal to

16  Plaintiffs' claims under the First, Fourth, and Fourteenth Amendments.

17  //

18  //

19

20          [10] Although the fact that the children were permitted to remain in Plaintiffs' custody after
    the November 28, 2018 safety assessment could suggest a lack of exigency, *see Rogers*, 487 F.3d
21  at 1295 ("[A]n official's prior willingness to leave the children in their home militates against a
    finding of exigency."), it does not do so here.  As the record makes clear, CPS believed the
    children should have been removed on November 28, 2018, but Officer Jones believed that doing
22  so—even if it had been supported by reasonable cause—"might have escalated into a possible
    fight" with Mr. Grae-El, which he "wanted to avoid."  (*See* SPD General Offense Report at 15.)

1

2

      3.     The Allegedly Suppressed *Brady* Material Does Not Undermine
            Confidence in Plaintiffs' Convictions

3

     Plaintiffs allege that certain pieces of exculpatory or impeachment evidence were

4

withheld from them in the discovery phase of their dependency and criminal proceedings

5

in violation of the due process rights secured by *Brady v. Maryland*, 373 U.S. 83 (1963).

6

(*See* Am. Compl. at 76, 81-82.)  Specifically, Plaintiffs contend that the following pieces

7

of evidence were withheld:  (1) Officer Jones's November 28, 2018 report, which

8

documents the safety assessment; (2) Officer Nichols's BWC footage from his visit to

9

Dunlap on November 29, 2018; and (3) a follow-up report created by Detective Pitts.

10

(*See id.*[11])

11

     To establish a *Brady* violation for suppression of evidence by an investigating

12

officer, plaintiffs must allege that "(1) the officer suppressed evidence that was favorable

13

to the accused from the prosecutor and the defense, (2) the suppression harmed the

14

accused, and (3) the officer 'acted with deliberate indifference to or reckless disregard for

15

an accused's rights or for the truth in withholding evidence from prosecutors.'"  *Mellen v.

16

Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (quoting *Tennison v. City & Cnty. of San

17

Francisco*, 570 F.3d 1078, 1087, 1089 (9th Cir. 2009)).  Only suppressed evidence that

18

"could reasonably be taken to put the whole case in such a different light as to undermine

19

//

20

//

21

           [11] Plaintiffs also vaguely allege that a recording of Ms. Ferreria's "conduct" may exist.
(*Id.* at 81.)  They do not specify what that recording might show or how it might call into

22

question Plaintiffs' convictions; thus, that allegedly missing evidence cannot support a *Brady*
claim.  *See Mellen*, 900 F.3d at 1096.

1    confidence in the verdict" will suffice to establish such a due process violation.  *See id.*

2    (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

3          The court agrees with the City Defendants that Plaintiffs' claim fails on the first

4    element because Plaintiffs do not allege that Officer Nichols or Sergeant Boggs

5    "suppressed evidence that was favorable to the accused from the prosecutor and the

6    defense," *Mellen*, 900 F.3d at 1096, only that such evidence was not included in the

7    discovery they received during their dependency and criminal proceedings (*see* Am.

8    Compl. at 76).  Even if Plaintiffs had alleged that Officer Nichols or Sergeant Boggs

9    were responsible for discovery errors in their dependency and criminal cases, the claim

10   would still fail because the allegedly withheld evidence would not have "put the whole

11   case in such a different light as to undermine confidence in the verdict."  *See Mellen*, 900

12   F.3d at 1096.

13         For instance, if Plaintiffs could have used Officer Jones's report to show that Mr.

14   Grae-El behaved "reasonably and lawfully" during the November 28, 2018 safety

15   assessment, that might have called into question the reasonableness of Officer Nichols's

16   decision to proceed without a warrant, but would not undermine Plaintiffs' assault

17   convictions.  (*See* Am. Compl. at 81.)  Plaintiffs also speculate that Officer Nichols's

18   BWC footage from November 29, 2018 would show that Officer Nichols failed to

19   properly interview the children or to record their statements "verbatim," and that E.A.D.

20   did not have an observable mark on her left cheek, contradicting Officer Nichols's report.

21   (*See id.* at 81-82.)  Plaintiffs do not allege what harm they suffered from Officer

22   Nichols's substandard interview tactics or how a "verbatim" transcript would differ from

1   Officer Nichols' report.  (*See id.*)  And, even if the allegedly suppressed BWC footage

2   would rebut Officer Nichols's assertion that E.A.D. had visible bruising on her cheek,

3   Ms. Strange's conviction for assaulting E.A.D. is supported by other evidence of abuse

4   that might have come out at trial, including testimony from a physician at Children's that

5   E.A.D. had bruising on her leg, and scarring near her neck that E.A.D. attributed to being

6   "whooped" by Ms. Strange (*see* Am. Compl., Ex. S at 10:7-10 (deposition transcript of

7   Dr. Hannah Deming)).

8        Finally, Plaintiffs allege that Detective Pitts's follow-up report would have

9   contradicted the conclusion that Plaintiffs abused their children and supported their

10  theory of lawful parental discipline.  (Am. Compl. at 82.)  They specifically focus on

11  Detective Pitts's summary of findings made during the examination at Children's, which

12  concluded that only A.S. and A.G. had observable injuries, which were characterized as

13  "superficial bruising."  (*Id.* (quoting SPD General Offense Report at 24).)  Although that

14  contradicts Officer Nichols's assertion that E.A.D. had an observable mark on her left

15  cheek, Detective Pitts's report otherwise supports Officer Nichols's understanding that

16  Mr. Grae-El gave A.S. a black eye and that Mr. Grae-El and Ms. Strange disciplined their

17  children by hitting them "with hands, belts, spoons, and spatulas."  (*See* SPD General

18  Offense Report at 19-20, 24.)

19       Because Plaintiffs fail to allege that the City Defendants suppressed evidence and

20  the record shows that the allegedly withheld evidence would not have "put the whole case

21  in such a different light as to undermine confidence in" Plaintiffs' convictions, the City

22  //

1    Defendants are entitled to summary judgment on this claim. *See Mellen*, 900 F.3d at

2    1096.

3        4.     Plaintiffs Failed to Provide the City Defendants with Pre-Suit Notice

4        Plaintiffs allege state law claims against Officer Nichols for intentional infliction

5    of emotional distress and gross negligence. (*See* Am. Compl. at 80-81, 91.) The City

6    Defendants argue that these claims fail as a matter of law because Plaintiffs did not

7    provide the pre-suit notice required by RCW 4.96.020(4). (*See* Mot. at 20-23.)

8        Pursuant to RCW 4.96.020, "[n]o action . . . shall be commenced against any local

9    governmental entity, or against any local governmental entity's officers, employees, or

10   volunteers, acting in such capacity, for damages arising out of tortious conduct until sixty

11   calendar days have elapsed after the claim has first been presented to the agent of the

12   governing body thereof." RCW 4.96.020; *see also Troxell v. Rainier Pub. Sch. Dist. No.*

13   *307*, 111 P.3d 1173, 1174 (Wash. 2005) (noting that RCW 4.96.020(4) "forbids the

14   commencement of a tort action against a local government defendant 'until sixty days

15   have elapsed after' the plaintiff files a claim notice with the local government entity").

16   "The purpose of RCW 4.96.020(4) is to establish a period of time for government

17   defendants to investigate claims and settle those claims where possible." *Troxell*, 111

18   P.3d at 1175-76 (alteration omitted) (quoting *Medina v. Pub. Util. Dist. No. 1 of Benton*

19   *Cnty.*, 53 P.3d 993, 1000 (Wash. 2002)).

20        The City Defendants assert that "[i]n the City of Seattle, the Department of

21   Finance and Administrative Services [("FAS")] administers the tort claim process," and

22   that "FAS has not received any such filing from either Plaintiff in this action." (Reply at

4.)  As evidence, they provide the declaration of Sara Kern, a claims manager within FAS

who testifies that she has "searched the records of [her] office and ha[s] found no record

of a tort claim submitted by Plaintiffs Zion Grae-El or Caprice Strange."  (*See* Kern Decl.

(Dkt. # 83) ¶ 3; *see also id.* ¶ 2 ("FAS maintains the Standard Tort Claim Form available

online.").)  Although Plaintiffs did not submit a brief in response, they assert in their

motion for a continuance that Mr. Grae-El filed a "tort complaint . . . 60 days prior to the

filing of this complaint" and "was contacted by an investigator for SPD" to discuss the

tort complaint.  (MFC at 2-3.)  Plaintiffs' motion for a continuance is made "[i]n good

faith and the pursuit of justice" (*see id.* at 3), but not under "under penalty of perjury," 28

U.S.C. § 1746, as is necessary for the court to accept as evidence facts that are based on

personal knowledge but set forth in a motion "when deciding a motion for summary

judgment," *see Johnson v. Meltzer*, 134 F.3d 1393, 1400 (9th Cir. 1998); *see also Jones

v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (considering "as evidence in . . . opposition

to summary judgment" a *pro se* litigant's "contentions offered in motions and pleadings,

where such contentions are based on personal knowledge," admissible, and made under

penalty of perjury).

  Even if the court could consider assertions in Plaintiffs' unverified motion for a

continuance as evidence, the claim would still fail.  Plaintiffs have consistently alleged

that they provided pre-suit notice to the State of Washington, not to the City of Seattle.

(*See* MFC at 3 (asserting that "[t]he tort form was completed and submitted online with

the office of risk management"); *see also* Am. Compl. at 2 (alleging that "Plaintiffs filed

a Standard Tort Claim Form with the State of Washington, Office of Risk Management"

1    and complied with RCW 4.92.110 *et seq.*).[12])  As the court has previously explained, that

2    does not suffice to pursue a tort claim against a municipal entity and its employees, like

3    the City Defendants.  (*See* 3/10/22 Order (Dkt. # 62) at 18-19 (dismissing Ms. Strange's

4    tort-based claim for damages against Seattle Public Schools and Ms. Long based on Ms.

5    Strange's failure to allege compliance with RCW 4.96.020).)

6        Accordingly, the City Defendants are entitled to summary judgment on Plaintiffs'

7    claims for intentional infliction of emotional distress and gross negligence.

8                            **IV.    CONCLUSION**

9        For the foregoing reasons, the court DENIES Plaintiffs' motion for a continuance

10   (Dkt. # 84) and GRANTS the City Defendants' motion for summary judgment (Dkt.

11   # 82).

12       Dated this 23rd day of August, 2022.

13

14

15                            JAMES L. ROBART
                             United States District Judge

16

17

18

19

20

21   _____
     [12] RCW 4.92.110 pertains to actions "commenced against the state, or against any state
22   officer, employee, or volunteer, acting in such capacity, for damages arising out of tortious
     conduct."