1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

10    ZION T. GRAE-EL, et al.,                     CASE NO. C21-1678JLR

11                         Plaintiffs,             ORDER

            v.
12
      CITY OF SEATTLE, et al.,
13
                         Defendants.
14

15                    **I.    INTRODUCTION**

16         Before the court is a motion by Defendants the Washington State Department of

17  Children Youth and Families ("DCYF"), Annaliese Ferreria, Greg McCormack, Christine

18  Spencer, Rosalynda Carlton, Derrick Reinhardt, Schawna Jones, Rebecca Webster,

19  Rachel Zakopyko, Corey Grace, Stephanie Allison-Noon, and Tabitha Pomeroy

20
21
22

1   (collectively, the "State Defendants"[1]) for summary judgment.  (Mot. (Dkt. # 92); Reply

2   (Dkt. # 98).)  *Pro se* Plaintiffs Zion T. Grae-El and Caprice Strange ("Plaintiffs") oppose

3   the State Defendants' motion.  (*See* Resp. (Dkt. # 94).)

4          The court has considered the parties' submissions, the applicable law, and the

5   relevant portions of the record.  Being fully advised,[2] the court (1) GRANTS the State

6   Defendants' motion for summary judgment with respect to Plaintiffs' Fourteenth

7   Amendment and state law negligence claims and (2) ORDERS Plaintiffs to SHOW

8   CAUSE why the court should not also dismiss their First and Fourth Amendment claims.

9                                    **II.    BACKGROUND**

10         Plaintiffs accuse DCYF and several of its employees of violating their

11  constitutional rights and of negligence in connection with the removal of Plaintiffs'

12  children from their care and the subsequent placement of the children in foster care.  (*See*

13  *generally* Am. Compl.)  The court set forth much of the factual background of this case in

14  detail in its August 23, 2022 order granting summary judgment to the City of Seattle,

15  Seattle Police Department ("SPD") Officer Ryoma Nichols, and SPD Sergeant Daina

16  Boggs.  (*See* 8/23/22 Order (Dkt. # 88) at 2-9.)  The court recounts here only the

17  background relevant to the instant motion.

18

19         [1] The individual named Defendants are all employees of DCYF who investigated initial
    reports of suspected child abuse, placed Plaintiffs' children in foster care, and interfaced with
20  Plaintiffs throughout the process.  (*See* Am. Compl. (Dkt. # 77) at 3-4.)

21         [2] Plaintiffs requested oral argument (Resp. at 1), while the State Defendants did not (Mot.
    at 1).  The court finds that oral argument would not be helpful to its disposition of the motion.
22  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1    **A.     Removal of Plaintiffs' Children**

2          This case arises out of a report of suspected child abuse made to Child Protective

3    Services ("CPS"), a component of DCYF.  (Am. Compl. at 7.)  On November 28, 2018,

4    Leslie Meekins, a teacher at Dunlap Elementary School ("Dunlap") contacted DCYF

5    with concerns that her student, A.S., one of Plaintiffs' five children, may have suffered

6    child abuse.  (SPD General Offense Report (sealed) (Dkt. # 77-24) at 14-15.[3])  That

7    evening, SPD Officer Timothy Jones accompanied two CPS case workers, Defendants

8    Annaliese Ferreria and Corey Grace, to Plaintiffs' house to investigate the allegations of

9    child abuse.  (*Id.*)  According to Officer Jones, Mr. Grace and Ms. Ferreria informed him

10   that Ms. Meekins had reported that A.S. arrived at school with a black eye and that A.S.

11   said the bruise was caused by Mr. Grae-El hitting him.  (*Id.*)  Mr. Grace also showed

12   Officer Jones a photo of A.S., taken by his teacher earlier that day, which Officer Jones

13   agreed depicted "what looked like a possible bruise under [A.S.'s] eye."  (*Id.* at 15.)

14          Mr. Grae-El declined to permit Officer Jones or the CPS case workers to enter his

15   home, although he indicated he would allow CPS to conduct an inspection during a

16   scheduled visit.  (*Id.*)  He also asserted that A.S.'s injury happened during "an incident

17   involving his other son and possibly a dog."  (*Id.*)  After Mr. Grae-El spoke with Ms.

18   Strange by phone, however, he agreed to bring their children out, one at a time, so that

19   the CPS case workers could speak with and inspect them.  (*Id.*)  Although the children

20   "seemed a bit nervous" to Officer Jones, they "answered all the questions asked" and

21   _____

22   [3] Unless otherwise specified, the court cites to the page numbers in the ECF header when citing Plaintiffs' exhibits.

1  exhibited no "signs of distress." (*Id.*)  Officer Jones was also able to see into Plaintiffs'

2  home "a little bit," and did not "see anything that concerned [him] at the time." (*Id.*)  Nor

3  was he able to observe an injury on A.S. from where he was standing, though he was told

4  by CPS case workers that "they could see an injury near [A.S.'s] eye." (*Id.*)  Ultimately,

5  although Officer Jones "got the impression that CPS wanted [him] to grab [A.S.] when he

6  came out or force [his] way in" to seize the other children, he took no action that evening,

7  believing that doing so—based on "the way [Mr.] Grae-El was acting, especially his

8  expressed dislike of the police"—might have caused the situation to "escalate[] into a

9  possible fight." (*Id.*)  According to Plaintiffs, neither Ms. Ferreria nor Mr. Grace

10  recorded case notes from this interaction.  (Am. Compl. at 10.)

11       The following day, SPD officers and Ms. Ferreria went to Dunlap and interviewed

12  Plaintiffs' four school-aged children about their parents' punishment techniques.  (SPD

13  General Offense Report at 19-21.)  Each of the children reported being subjected to

14  "whoopins," which entailed being slapped, hit with a belt or spatula, or forced to assume

15  stress positions.  (*Id.*)  SPD officers also interviewed Ms. Meekins, who reported that

16  A.S. had expressed fear of Mr. Grae-El's anger.  (*Id.* at 20-21.)  Finding reasonable cause

17  to remove the children from Plaintiffs' care, SPD placed the children in DCYF custody.

18  (*Id.* at 21.)  While an SPD officer prepared to interview the children, Ms. Strange

19  appeared at the school with her youngest child, Z.A.G.  (*Id.* at 19.)  She surrendered

20  Z.A.G. to SPD custody before leaving Dunlap.  (*Id.*)  That same evening, employees at

21  Seattle Children's Hospital conducted additional examinations of Plaintiffs' children,

22

1    independently concluded that the children had experienced unlawful abuse by Plaintiffs,

2    and made additional referrals to CPS.  (*See* Am. Compl. at 23-32.)

3    **B.    Dependency Proceedings and Criminal Charges**

4            After assuming protective custody over Plaintiffs' five children, DCYF

5    commenced dependency proceedings.  (*See* Am. Compl. at 14; Mot. at 6.)  At the Shelter

6    Care hearing, DCYF found reasonable cause to remove the children from Plaintiffs' care

7    to avoid imminent risk of harm.  (Mot. at 6; Am. Compl. at 14).  Following the

8    dependency proceedings, Plaintiffs were both charged with and ultimately pleaded guilty

9    to assaulting their children.  (*See* 8/23/2022 Order at 8-9; Am. Compl. at 35-36; Grae-El

10   Guilty Plea (Dkt. # 94-2) (sealed).)  According to Plaintiffs, Defendant Rebecca Webster,

11   whom Plaintiffs describe as an agent of DCYF, submitted a statement concluding that

12   Plaintiffs had physically abused their children by "caus[ing] bodily harm greater than

13   transient pain."  (Am. Compl. at 4, 93-94.)  Plaintiffs note that Ms. Webster's statement

14   was offered in support of both the criminal charges and dependency proceedings against

15   Plaintiffs.  (*See id.*)  Mr. Grae-El appealed the judgment against him in his criminal case,

16   arguing that his guilty plea was invalid because his defense attorney was constitutionally

17   ineffective.  *See State v. Grae-El*, No. 82306-0-I, 2022 WL 670953 (Wash. Ct. App.

18   March 7, 2022), *rev. denied*, 512 P.3d 892 (Wash. 2022).  The Washington Court of

19   Appeals denied his appeal, and the Washington State Supreme Court subsequently denied

20   review.  *Id.*

21

22

1    **C.    Foster Care Placements**

2          DCYF placed two of Plaintiffs' children, Z.A.G. and A.S., in foster care with Scott

3    and Heather Hadfield, a foster family living in Bellingham, Washington.  (Am. Compl. at

4    21, 39.)  Plaintiffs, who are African American, practice "Afrocentric spirituality,

5    Confucism [sic] and Islamism [sic]," and live in Tacoma, state that they would have

6    preferred a foster care placement for their children that was located closer to them and

7    better reflected their race, ethnicity, and cultural and religious practices.  (*Id*. at 95.)  The

8    children were ultimately removed from the Hadfields' care.  (*See id.* at 17.)

9          DCYF then placed Z.A.G. in foster care with Ms. Meekins.  (*See id.* at 17.)  While

10   under Ms. Meekins' care, Z.A.G. suffered head injuries and developed a skin condition

11   on his scalp.  (*Id*. at 97; Resp. at 11.)  Plaintiffs state that they conveyed their concerns

12   about Z.A.G.'s injuries, his skin condition, and fear that he was not receiving medications

13   to Defendant Derrick Reinhardt.  (*See* Am. Compl. at 15-16; Resp. at 12.)  Plaintiffs state

14   that they expressed the same complaints regarding Z.A.G.'s health to Defendants

15   Rosalynda Carlton, Rachel Zakopyko, Shawna Jones, Tabitha Pomeroy, and Stephanie

16   Allison-Noone, but were dissatisfied with the State Defendants' response to their

17   complaints.  (Am. Compl. at 15-16; Resp. at 12.)

18                              **III.    ANALYSIS**

19         The court first reviews the legal standard for summary judgment before turning to

20   the State Defendants' motion.

21

22

**A.      Summary Judgment Legal Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*.  The moving party bears the initial burden of showing that there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law, which it may do by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  Thus, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates" the absence of a genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. *Id*.

If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Id*. at 324; *Anderson*, 477 U.S. at 250.  Although the court must construe pleadings by *pro se* litigants liberally, *see Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020), it will not identify specific evidentiary support for the factual

1    assertions underlying their legal claims for them, *see Indep. Towers of Wash. v.*

2    *Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for

3    truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

4    1991)).  Conclusory, self-serving statements are insufficient to create a genuine dispute of

5    material fact.  *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.

6    1997), *as amended* (Apr. 11, 1997).

7    **B.    Plaintiffs' Evidence**

8            At the outset, the court notes that Plaintiffs have again failed to follow the Federal

9    Rules of Civil Procedure and the court's local rules in filing their response to the State

10   Defendants' motion for summary judgment, despite the court's repeated admonitions that

11   the court's rules are not optional and that they must comply with them.  (*See, e.g.*,

12   9/30/2022 Minute Order (Dkt. # 97) at 2 (informing Plaintiffs that they must comply with

13   the court's rules); 1/10/2022 (Dkt. # 23) (same).)  Although the court has cited to

14   Plaintiffs' amended complaint for factual background, the complaint is not evidence and

15   allegations made therein are not competent evidence to oppose a motion for summary

16   judgment.  *See* Fed. R. Civ. P. 56(c); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997

17   (9th Cir. 2001) (stating that "the non-moving party must go beyond the pleadings and by

18   its own evidence set forth specific facts showing that there is a genuine issue for trial").

19   Plaintiffs have not filed any affidavits or declarations that comply with the Federal Rules

20   or the court's local rules, nor have they directed the court to the specific portions of the

21   record that they rely on in opposing the motion for summary judgment.  *See* Fed. R. Civ.

22   P. 56(c) (requiring that affidavits or declarations filed to oppose a motion "must be made

1    on personal knowledge, set out facts that would be admissible in evidence, and show that

2    the affiant or declarant is competent to testify on the matters stated"); *see also* Local

3    Rules W.D. Wash. LCR 10(c)(10) (requiring litigants to attach and clearly mark exhibits

4    in support of their arguments, and providing, "References in the parties' filings to such

5    exhibits should be as specific as possible.").

6         Nevertheless, the court affords a certain amount of leeway to pro se litigants and

7    construes their pleadings liberally.  *See, e.g.*, *Richards v. Harper*, 864 F.2d 85, 88 (9th

8    Cir. 1988).  Accordingly, out of an abundance of caution, the court considers the exhibits

9    attached to Plaintiffs' amended complaint and responsive brief to the extent Plaintiffs cite

10   them in opposing Defendants' motion for summary judgment.

11   **C.    The State Defendants' Motion for Summary Judgment**

12        The State Defendants move for summary judgment on each of Plaintiffs' claims.

13   They assert that:  (1) Plaintiffs' constitutional claims are barred by qualified immunity,

14   or, in the alternative, by judicial estoppel and *Heck v. Humphrey*, 512 U.S. 477 (1994);

15   (2) Plaintiffs do not show violations of their Fourteenth Amendment rights; and

16   (3) Plaintiffs' negligence claims are legally deficient.  (*See* Mot. at 2-3.)

17        1.  <u>*Heck v. Humphrey*</u> bars Plaintiffs' Fourteenth Amendment familial association
             and *Brady* claims.

18        Plaintiffs allege that the State Defendants violated their Fourteenth Amendment

19   right to familial association by removing their children from their care based on

20   misrepresentations of Plaintiffs' disciplinary practices and without following DCYF

21   procedures.  (Am. Compl. at 12, 93-94.)  Plaintiffs further allege that the State

22

1  Defendants withheld exculpatory evidence in violation of their Fourteenth Amendment

2  rights as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963).  (*See* Am. Compl. at 93;

3  Resp. at 4-5.)  The State Defendants argue that both claims are barred by *Heck*.  (Mot. at

4  17.)  The court agrees.

5         Under *Heck*, a plaintiff cannot maintain a § 1983 action where it will "necessarily

6  imply the invalidity of" an existing conviction or sentence, "unless the plaintiff can

7  demonstrate that the conviction or sentence has already been invalidated."  *Heck*, 512

8  U.S. at 487.  Thus, where a conviction stands, *Heck* instructs that "if a criminal

9  conviction arising out of the same facts stands and is fundamentally inconsistent with the

10  unlawful behavior for which section 1983 damages are sought the 1983 action must be

11  dismissed."  *Lemos v. Cnty. of Sonoma*, 5 F.4th 979, 983 (9th Cir. 2021) (en banc)

12  (quoting *Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir. 1996) (per curiam)).  When the

13  underlying conviction is the result of a guilty plea, and not a verdict following trial, the

14  court must similarly determine whether success in the § 1983 action would undermine the

15  validity of the plea agreement.  *See Smith v. City of Hemet*, 394 F.3d 689, 699 (9th Cir.

16  2005) (en banc), *disapproved of on state law grounds in Lemos*, 5 F.4th at 983-84; *see

17  also Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1133 (9th Cir. 2011).  It is the

18  defendants' burden to establish that *Heck* applies by showing that "success in the action

19  would necessarily imply the invalidity of a criminal conviction."  *Washington v. Los

20  Angeles Cnty. Sheriff's Dep't*, 833 F.3d 1048, 1056 n.5 (9th Cir. 2016).

21         Here, there is no dispute that Plaintiffs' guilty pleas remain in effect, and Mr.

22  Grael-El has exhausted his appeals.  *See State v. Grae-El*, No. 82306-0-I, 2022 WL

670953 (Wash. Ct. App. March 7, 2022), *rev. denied*, 512 P.3d 892 (Wash. 2022).  As a result, the only question before the court is whether success on Plaintiffs' Fourteenth Amendment § 1983 claims would imply the invalidity of their guilty pleas.  *See City of Hemet*, 394 F.3d at 699.  The court finds that it would.

> a. *Plaintiffs' Fourteenth Amendment familial association claims are barred by* Heck.

As discussed in greater depth below, a violation of the right to familial association arises where a state actor unlawfully interferes with the parent-child relationship.  *Keates v. Koile*, 883 F.3d 1228, 1238 (9th Cir. 2018).  State actors may only separate children from their parents if they had "reasonable cause to believe [the children were] in imminent danger of serious bodily injury," and if "the scope of the intrusion was reasonably necessary to prevent serious bodily injury."  *Id.*  Thus, Plaintiffs can only prevail on their § 1983 claim by showing that DCYF lacked reasonable cause to believe the children were in imminent danger of serious bodily injury.  *See id.*

The State Defendants contend that because the court previously determined that Plaintiffs' Fourteenth Amendment claims that SPD officers relied on false or inadequate information in removing their children were barred by *Heck*, it must also determine that Plaintiffs' similar claims against the State Defendants are barred.  (*See* Mot. at 11, 16, 18; *see also* 4/19/2022 Order (Dkt. # 73) at 20-22 (dismissing Plaintiffs' Fourteenth Amendment claims against SPD officers); 8/23/2022 Order at 14-16 (granting summary judgment to remaining SPD officers on Plaintiffs' Fourteenth Amendment claims).  The State Defendants also note that Mr. Grae-El acknowledged when he pleaded guilty to

1    assault in the third and fourth degrees against his children that he "'overstepped his

2    boundaries as a parent, according to Washington law.'"  (Reply at 5 (quoting *State v.*

3    *Grae-El*, 2022 WL 670953, at *3); *see also* Grae-El Guilty Plea at 9 (admitting to "the

4    crime of assault" and "offensive or unwanted touching")).)  Ms. Strange also pleaded

5    guilty to two counts of assault in the fourth degree against one of her children.  (*See* Am.

6    Compl. at 35-36.)

7             Plaintiffs counter that because they pleaded guilty to lesser forms of child abuse

8    than the conduct on which DCYF and its agents based their decision to remove Plaintiffs'

9    children, their § 1983 claims do not imply the invalidity of their guilty pleas.  (*See* Resp.

10   at 5-6.)  Specifically, Mr. Grae-El states that he pleaded guilty to "an offensive or

11   unwanted touching" while physically disciplining A.S., to "hit[ting] [A.S.'s] hand," and

12   to striking E.M.D. "with a belt, using moderate force, on top of his clothing," which

13   Plaintiffs contend could not have left a marking.  (*Id.*; Grae-El Guilty Plea at 9.)

14   Plaintiffs assert that DCYF's decision to remove the children from their care, by contrast,

15   was predicated on allegations of more serious physical abuse—allegations Plaintiffs

16   dispute—including that Mr. Grae-El punched A.S. in the face, causing a black eye, and

17   left markings on E.M.D.'s body following a beating with a belt.  (*See* Resp. at 5.)  But

18   Plaintiffs admitted to assaulting their children in their guilty pleas; success in their § 1983

19   claim will necessarily imply that these guilty pleas were invalid.  (*See* 4/19/22 Order at

20   17-19; Grae-El Guilty Plea at 9).[4]  Therefore, for the same reasons articulated in the

21

22             [4] Plaintiffs do not dispute that much of the same evidence was used to support both
     DCYF's decision to remove Plaintiffs' children and Plaintiffs' criminal charges (which led to

1  court's prior orders, the court determines that Plaintiffs' Fourteenth Amendment familial

2  association claims against the State Defendants are barred by *Heck*.  (*See* 4/19/2022

3  Order at 16-22; 8/23/2022 Order at 14-16.)

4         *b.  Plaintiffs'* Brady *claim is barred by* Heck.

5        The State Defendants also argue that Plaintiffs' claim that the State Defendants

6  withheld exculpatory evidence in the form of "Ms. Ferreria's verbatim child interview,"

7  in violation of their Fourteenth Amendment rights is barred by *Heck*.  (*See* Mot. at 18; *see*

8  *also* Am. Compl. at 93; Resp. at 4-5.)  The court agrees.

9        Suppression of evidence violates the accused's due process rights where the

10  evidence "is material either to guilt or to punishment." *Brady*, 373 U.S. at 87.  Evidence

11  is "material" if "there is a reasonable probability that, had the evidence been disclosed to

12  the defense, the result of the proceeding would have been different." *U.S. v. Bagley*, 473

13  U.S. 667, 682 (1985).  A plaintiff establishes a "reasonable probability" of a different

14  result by showing that the "government's evidentiary suppression 'undermines

15  confidence in the outcome of the trial.'" *Kyles v. Whitely*, 514 U.S. 419, 434 (1995)

16  (quoting *Bagley*, 473 U.S. at 678).  Thus, a successful *Brady* claim would necessarily

17  imply the invalidity of an underlying criminal conviction and is therefore barred by *Heck*

18  where the conviction has not been overturned. *See, e.g.*, *Skinner v. Switzer*, 562 U.S.

19  521, 536-37 (2011) (suggesting *Brady* claims are barred by *Heck*); *Amaker v. Weiner*,

20  179 F.3d 48, 51 (2d Cir. 1999) (determining plaintiff's *Brady* claim was barred by *Heck*).

21

22  their guilty pleas), including Ms. Webster's assessment that the physical discipline caused more
  than transient pain.  (*See* Am. Compl. at 93-94.)

ORDER - 13

1    Here, if Plaintiffs could establish a reasonable probability that the disclosure of

2    Ms. Ferreria's "verbatim child interview" would have resulted in a different outcome in

3    their criminal proceedings, it would necessarily imply that their guilty pleas were invalid.

4    Therefore, Plaintiffs' *Brady* claim is barred by *Heck* and the State Defendants are also

5    entitled to summary judgment with respect to Plaintiffs' *Brady* claim.

6        2.   The individually named State Defendants are entitled to qualified immunity
             with respect to Plaintiffs' Fourteenth Amendment familial association claims.

7    Even if Plaintiffs' Fourteenth Amendment claims were not barred by *Heck*, the

8    court finds that qualified immunity bars these claims against the individually named State

9    Defendants.

10       In determining whether a government employee is entitled to summary judgment

11   on qualified immunity, the court must decide whether:  (1) viewing the facts in the light

12   most favorable to plaintiff, the government employee violated the plaintiff's

13   constitutional right; and (2) the right at issue was "clearly established" at the time the

14   defendant engaged in the misconduct.  *Crowe v. Cty. of San Diego*, 608 F.3d 406, 427

15   (9th Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  A court may consider

16   the two questions in any order and need not decide both questions to resolve the case.

17   *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

18       The Fourteenth Amendment's Due Process Clause recognizes a liberty interest in

19   familial association, which is independently held by both parent and child.  *Keates*, 883

20   F.3d at 1235-36; *Smith v. City of Fontana*, 818 F.2 1411, 1418 (9th Cir. 1987).  The right

21   protects parents' custodial interests in their minor children, *City of Fontana*, 818 F.2d at

22

ORDER - 14

1   1419, such that parents who raise such claims allege deprivation of their own liberty

2   interests as opposed to those of their children, *Kelson v. City of Springfield*, 767 F.2d 651,

3   653 n.2 (9th Cir. 1985).  The right to familial association has "both a substantive and a

4   procedural component." *Keates*, 883 F.3d at 1236.  The court evaluates the State

5   Defendants' motion with respect to Plaintiffs' substantive and procedural due process

6   claims in turn.

7              *a.  Plaintiffs do not show a violation of substantive due process.*

8          The substantive due process right to familial association right is fundamental but

9   not limitless:  parents' liberty interest in familial association is "limited by the compelling

10  government interest in protecting minor children." *Woodrum v. Woodward City, Okl.*,

11  866 F.3d 1121, 1125 (9th Cir. 1989).  A state violates a parent's substantive due process

12  right to familial association by interfering with the parent-child relationship through

13  conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.

14  2008).  A state official's conduct may shock the conscience if the official acted with

15  "deliberate indifference" to the victim.  *Id.*; *see also Calonge v. City of San Jose*,

16  523 F. Supp. 3d 1101, 1105-16 (N.D. Cal. 2021) (finding plaintiff sufficiently alleged

17  deliberate indifference where police officer killed plaintiff's family member who was

18  unarmed and walking away despite the officer having sufficient time to make repeated

19  verbal commands).[5]  For a defendant to act with deliberate indifference, he or she must

20

21  _____

22  [5] A substantive due process violation may also arise where an officer acts with a "purpose
    to harm." *Porter*, 546 F.3d at 1137.  The "purpose to harm" test only applies where an encounter
    escalates quickly, forcing the officer to make a snap judgment.  *See id.*  Because Plaintiffs'

1   "recognize the unreasonable risk and actually intend to expose the [victim] to such risks

2   without regard to the consequences to the [victim]." *Herrera v. Los Angeles Unified Sch.*

3   *Dist.*, 18 F.4th 1156, 1158 (9th Cir. 2021) (internal quotation marks and brackets

4   omitted).

5         Here, although Plaintiffs repeatedly use the phrase "substantive due process" in

6   their amended complaint, they do not direct the court to specific facts that would support

7   a claim that any of the State Defendants engaged in conduct that would "shock the

8   conscience." (*See, e.g.*, Am. Compl. at 97-98.)  To the contrary, the facts in the record

9   reveal that the State Defendants removed the children from Plaintiffs' custody after the

10  children described physical abuse and the State Defendants observed physical injuries on

11  the children.  Therefore, because Plaintiffs fail to identify evidence that would allow a

12  factfinder to find establish a violation of their substantive due process rights to familial

13  association, their substantive due process claim is barred by qualified immunity.  Because

14  Plaintiffs fail to show a violation of this right, the court need not evaluate whether the

15  right was "clearly established."  *See Pearson*, 555 U.S. at 232 (asserting that the court

16  may consider the questions in either order and need not address both).

17              *b.  Plaintiffs do not show a violation of procedural due process.*

18        A procedural due process violation of the right to familial association arises when

19  an official fails to provide the parents with fundamentally fair procedures.  *See Keates*,

20  833 F.3d at 1236 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).  State actors

21

22  interactions with the State Defendants took place over a series of days, they do not fit this
    description.  Accordingly, the court focuses only on the "deliberate indifference" test.

ORDER - 16

do not violate this right by separating children from their parents if (1) at the time of the separation, the state actors had sufficient information gleaned from a "reasonable investigation" that gave them "reasonable cause to believe [the children were] in imminent danger of serious bodily injury," and (2) "the scope of the intrusion was reasonably necessary to prevent serious bodily injury." *Keats*, 883 F.3d at 1238.

In support of their procedural due process claim, Plaintiffs allege defects in the investigation and dependency proceedings.  Specifically, Plaintiffs point to the individually named State Defendants' (1) failure to comply with DCYF policy with respect to recording notes (*See* Am. Compl. at 93-95; Resp. at 3-4, 11); (2) decision to interview their children individually as opposed to collectively (*see* Am. Compl. at 94; Resp. at 7 (describing this as "child taint")); and (3) Ms. Webster's characterization of Plaintiffs' disciplinary tactics as "beatings" instead of "whoopins" (*see* Am. Compl. at 12-13, 93).  In support of their allegations that DCYF misrepresented and mishandled reports of suspected child abuse, Plaintiffs cite an expert report by social worker Sonja Ulrich.[6]  (*See* Resp. at 9-10; *see also* Ulrich Report (Dkt. # 77-4).[7])  Plaintiffs further assert that Ms. Ferreria orchestrated SPD's November 29, 2018 removal of the children "out of bitterness and spite," even though "[t]here was no documented reasonable

---

[6] Ms. Ulrich appeared as an expert witness for the Defendant Mr. Grae-El's appeal of his criminal convictions in state court.  *See State v. Grae-El*, 2022 WL 670953, at *6 (repeating trial court's conclusion that Ms. Ulrich's "assessment of CPS's practices would have been largely irrelevant in the criminal case").

[7] The State Defendants ask the court to disregard Ms. Ulrich's report because Plaintiffs did not attach it to their response and because it is unauthenticated and hearsay.  (*See* Reply at 3.) The court does not address the State Defendants' request because it would not impact the outcome of this ruling.

1    articulable suspicion identified November 28th[,] 2018 by SPD that indicated any crime

2    had been committed."  (Resp. at 2-3.)  In further support of their claims that individually

3    named State Defendants lacked reasonable cause to remove their children, Plaintiffs rely

4    on Mr. Reinhardt's report declining to conclude Mr. Grae-El had caused A.S.'s black eye.

5    (*see id.* at 3-4.)  Plaintiffs additionally reiterate their own assertion that Ms. Webster's

6    assessment was an "inflammatory and unprofessional opinion" to support this claim.

7    (*See* Am. Compl. at 12, 92-93.)

8            None of the alleged misconduct Plaintiffs identify persuades the court to walk

9    back its prior determination that SPD had "'reasonable cause to believe' that the children

10   were 'likely to experience imminent bodily harm.'"  (8/23/2022 Order at 18 (quoting

11   *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016), 20-22.  Because

12   SPD's decision to remove the children was based on substantially the same information

13   as the State Defendants' decision, the court reaches the same conclusion here.  In

14   addition, while the court must view the facts in Plaintiffs' favor, it need not accept a

15   version of events that is wholly unsupported by the record.  *See Villiarimo v. Aloha*

16   *Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2022) (noting that courts refuse to find a

17   genuine issue of fact where the only evidence presented is uncorroborated and

18   self-serving).  Plaintiffs cannot create a genuine dispute of fact by simply asserting, for

19   example, that Ms. Ferreria acted "out of bitterness and spite."  *See Publishing Clearing*

20   *House, Inc.*, 104 F.3d at 1171 (determining that conclusory and self-serving statements

21   are insufficient to raise a genuine dispute of material fact).  Ms. Ulrich's report also fails

22   to raise a genuine dispute of fact:  Plaintiffs cite portions of her report that are redundant

1    of Plaintiffs' own conclusory allegations regarding irregularities in the State Defendants'

2    investigative procedures.  (*See* Resp. at 9-10.)  The irregularities Ms. Ulrich identifies

3    would not lead a factfinder to reasonably find in Plaintiffs' favor when SPD officers—

4    whose investigations did not share these alleged flaws—had reasonable cause to believe

5    Plaintiffs' children were likely to experience imminent bodily harm.

6        Therefore, because Plaintiffs cannot demonstrate that the State Defendants lacked

7    reasonable cause to remove their children, Plaintiffs cannot establish a violation of their

8    procedural due process right to familial association.[8]  Plaintiffs' procedural due process

9    claim is barred by qualified immunity.[9]

10        3.  Plaintiffs' *Brady* claim against State Defendants fails as a matter of law.

11        The State Defendants urge that even if Plaintiffs' *Brady* claim were not barred by

12    *Heck*, the claim is legally deficient and should be dismissed.  (*See* Mot. at 18-19.)  In

13    response, Plaintiffs reiterate that Ms. Ferreria's "verbatim child interview" was never

14    submitted in the Shelter Care hearing or to any other court, assert that she "deliberately

15    lied" about the November 29, 2018 interview, and pose the rhetorical question, "How is

16    this not withholding exculpatory evidence, facts or statements?"  (Resp. at 4.)  The court

17    agrees that Plaintiffs have failed to carry their burden to show that the alleged

18

19        [8] Construing Plaintiffs' briefing liberally, the court cannot identify any arguments that the
     scope of the State Defendants' intrusion into the parent-child relationship was greater than

20    "reasonably necessary to prevent serious bodily injury."  *Keates*, 883 F.3d at 1238.

21        [9] As with Plaintiffs' substantive due process claim, *see supra* Section III.C.2.a, the court
     need not address whether the procedural due process right to familial association was "clearly
     established" in order to find that the individually named State Defendants are entitled to qualified

22    immunity.  *See Pearson*, 555 U.S. at 232.

1    withholding of Ms. Ferreria's verbatim child interview undermines confidence in the

2    outcome of their criminal proceedings and therefore have not established the necessary

3    elements of a *Brady* claim.  (*See supra* Section III.C.1.b); *see also Kyles*, 514 U.S. at 434.

4         4.   Plaintiffs' familial association claim against DCYF fails as a matter of law.

5         The State Defendants argue that even if Plaintiffs' Fourteenth Amendment familial

6    association claim against DCYF were not barred by *Heck*, their claim fails as a matter of

7    law because Plaintiffs fail to show that the removal decision was based on insufficient

8    evidence that Plaintiffs' children were in imminent danger of serious bodily harm, and

9    therefore cannot prove a constitutional violation.  (*See* Mot. at 15-17.)  Plaintiffs respond

10   that "DCYF improperly requested removal" and "incorrectly escalated" the investigation

11   based on "incorrect, defamatory, and inflammatory information."  (Resp. at 2-3, 6-7.)

12   The court agrees with the State Defendants.

13        The court previously determined that the "compilation of evidence" on which SPD

14   relied in removing Plaintiffs' children from their care was "sufficient to establish

15   probable cause" that the children were likely to experience serious bodily harm.

16   (8/23/2022 Order at 18-20.)  That "compilation of evidence" included Dunlap staff's

17   reports, SPD officers' documented observations, reports by individually named State

18   Defendants, and statements by Plaintiffs' children regarding Plaintiffs' disciplinary

19   tactics.  (*See id.*)  The court further noted that the SPD officers' observations were

20   corroborated by doctors at Seattle Children's Hospital after the children were removed.

21

22

(*Id.* at 19 n. 8.)[10]  Here, Plaintiffs assert that even if DCYF and its case workers observed bruises and scratches on their children, they lacked a basis for attributing the bruises and scratches to Plaintiffs.  (*See* Resp. at 6-7.)  But as this court already noted, the children told SPD officers and Ms. Ferreria that Plaintiffs had caused these and other physical manifestations of assault through their "whoopins."  (*See* 8/23/2022 Order at 18 (citing SPD General Offense Report at 20).)

Even when viewing these facts in Plaintiffs' favor, the court concludes that no reasonable factfinder could find that DCYF's involvement in removing Plaintiffs' children was based on insufficient evidence that the children were likely to face serious bodily injury.  Nor do Plaintiffs' unsupported, conclusory assertions that DCYF relied on "incorrect, defamatory, and inflammatory information" create a dispute of material fact with respect to the sufficiency of the evidence before the agency.  *See Publishing Clearing House, Inc.*, 104 F.3d at 1171 (determining that conclusory and self-serving statements are insufficient to raise a genuine dispute of material fact).

Finally, Plaintiffs cite an expert report by Dr. Steven Gabaeff finding that Plaintiffs' children were not abused, but the report does not create a dispute of material fact with respect to whether DCYF had sufficient cause to remove Plaintiffs' children. (*See* Resp. at 9 (referencing Gabaeff Report (sealed) (Dkt. # 77-3)).)  Dr. Gabaeff originally prepared this report in support of Mr. Grae-El's motion seeking to vacate his criminal convictions in state court.  *See State v. Grae-El*, 2022 WL 670953, at *3.  After

---

[10] Plaintiffs' guilty pleas also undermine their argument that the State Defendants lacked authority to remove their children.

1   an evidentiary hearing, the trial court determined that Dr. Gabaeff's opinion would have

2   been of limited value because Dr. Gabaeff did not review the children's forensic

3   interviews, the defense interviews, or the prior trial testimony. *Id*. at *5. The trial court

4   concluded that Dr. Gabaeff's testimony "would not have been helpful at the criminal trial

5   or likely affected its outcome," and the reviewing court agreed. *Id*.  The court agrees

6   with the state courts' assessment of Dr. Gabaeff's report.  Therefore, the court is not

7   persuaded that Dr. Gabaeff's opinion would constitute admissible evidence that Plaintiffs

8   children were in imminent danger of serious bodily harm. *See United States v.*

9   *Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) ("Before admitting expert

10  testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring

11  that the testimony is both 'relevant' and 'reliable' under Federal Rule of Evidence 702.")

12  (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)); *see*

13  *also* Fed. R. Evid. 702(a).[11]

14        Accordingly, the State Defendants are entitled to summary judgment with respect

15  to Plaintiffs' familial association claim against DCYF, even if that claim is not barred by

16  *Heck*.

17

18

19

20

21

22

---

[11] The State Defendants ask the court to disregard Dr. Gabaeff's report because Plaintiffs did not attach it to their response and because it is unauthenticated and hearsay.  (*See* Reply at 3.) The court does not address the State Defendants' request because it would not impact the outcome of this ruling.

1

     5.  <u>Plaintiffs do not identify violations of their Fifth Amendment rights.</u>

2

     Plaintiffs assert that the State Defendants violated their Fifth Amendment Rights.

3

(*See* Am. Compl. at 93.)  The State Defendants characterize this claim as alleging a

4

violation of Plaintiffs' right against self-incrimination.  (*See* Mot. at 7, n.4.)  Plaintiffs

5

neither dispute this characterization nor direct the court to any facts which would lead a

6

factfinder to reasonably find in their favor on this claim.  (*See* Resp.); *see also Celotex*

7

*Corp.*, 477 U.S. at 324.  Accordingly, the State Defendants are entitled to summary

8

judgment with respect to Plaintiffs' Fifth Amendment claim.

9

     6.  <u>Plaintiffs' state law negligence claims fail.</u>

10

     The State Defendants argue that (1) Plaintiffs' negligent investigation claim fails

11

because Plaintiffs cannot establish the requisite elements of their claim and (2) Plaintiffs

12

lack standing to assert their state law negligence claims because Plaintiffs sue on their

13

own behalf, rather than on behalf of their children who allegedly suffered the injuries.

14

(*See* Mot. at 19-21; Reply at 6.)  Liberally construed, Plaintiffs' amended complaint

15

asserts two state law negligence claims against the State Defendants.  First, Plaintiffs

16

allege DCYF was negligent in investigating reports of suspected child abuse by Plaintiffs,

17

resulting in the removal of Plaintiffs' children from a nonabusive home.  (*See* Am.

18

Compl. at 93-94; Resp. at 10-11.)  Second, Plaintiffs allege DCYF was negligent in (1)

19

investigating reports that their children suffered mistreatment in foster care and (2)

20

removing the children from unsuitable foster homes quickly enough.  (*See* Am. Compl. at

21

94-98; Resp. at 11-12.)  The court agrees with the State Defendants that both claims fail

22

and addresses each claim in turn.

a.  *Plaintiffs fail to establish that DCYF removed their children from a nonabusive home.*

Washington courts recognize an implied cause of action under RCW 26.44.050, the statute requiring DCYF to investigate child abuse.  *M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 957 (Wash. 2003).  "A negligent investigation claim is available only when law enforcement or DSHS conducts an incomplete or biased investigation that 'resulted in a harmful placement decision.'"  *McCarthy v. Cty. of Clark*, 376 P.3d 1127, 1134 (Wash. Ct. App. 2016) (quoting *M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 955 (Wash. 2003)).[12]  "A harmful placement decision includes 'removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.'"  *Id.* (quoting *M.W.*, 70 P.3d at 960).  The Washington Supreme Court has "rejected the proposition that an actionable breach of duty occurs every time the state conducts an investigation that falls below a reasonable standard of care by, for example, failing to follow proper investigative procedures."  *Petcu v. State*, 86 P.3d 1234, 1246 (Wash. Ct. App. 2004) (citing *M.W.*, 70 P.3d at 960).  To prevail on a negligent investigation claim, "the claimant must prove that the allegedly faulty investigation was a proximate cause of the harmful placement."  *Id.* at 1244.  Plaintiffs must establish both a "harmful placement" and a "proximate cause" element.  *See id.*  This type of negligent investigation claim is available to the parent as well as to the child.  *M.W.*, 70 P.3d at 958.

---

[12] DSHS, or the Department of Social and Health Services, previously administered Washington State's foster care program.  In July 2018, DCYF became responsible for administering the program.  *See* Norah West, "On July 1, change is coming to child welfare, behavioral health in Washington state," Washington State Department of Social and Health Services (June 12, 2018), http://www.dshs.wa.gov/sesa/office-communications/media-release/july-1-change-coming-child-welfare-behaviorl-health-washington-state.

1    Plaintiffs allege that the State Defendants failed to follow DCYF procedures in

2    investigating and processing reports of suspected child abuse and intentionally

3    misrepresented the "whoopins" Plaintiffs inflicted as discipline on their children as

4    "beatings." (*See* Am. Compl. at 93-94; Resp. at 9-11.)  Plaintiffs argue that because their

5    disciplinary tactics were mere "whoopins," the children were removed from a nonabusive

6    home. (*See* Am. Compl. at 93-94.)  The State Defendants argue this is insufficient to

7    establish a negligent investigation claim because (1) the State Defendants and other

8    officials based the decision to remove the children on extensive evidence gathered by

9    multiple parties, and (2) Plaintiffs agreed, through their guilty pleas, that their

10   disciplinary tactics amounted to unlawful assaults on their children.  (*See* Mot. at 20.)

11   The court agrees with the State Defendants that Plaintiffs have failed to establish their

12   negligent investigation claim and have failed to identify any facts that would lead a

13   factfinder to reasonably find in their favor.

14       Here, even casting the facts in Plaintiffs' favor, Plaintiffs cannot succeed in their

15   claim that DCYF was negligent in its investigation and that this negligence proximately

16   caused Plaintiffs' children to be removed from a nonabusive home.  First, Plaintiffs

17   admitted to assaulting their children in their guilty pleas. (*See* Grae-El Guilty Plea at 9;

18   Am. Compl. at 35-36.)  Plaintiffs do not discharge their burden of identifying specific

19   facts that would lead a reasonable factfinder to conclude their children were removed

20   from a nonabusive home by downplaying the assaults as "whoopins" or denying they

21   caused their children's injuries despite ample evidence to the contrary. (*See, e.g., supra*

22   Section III.C.3.)  Therefore, Plaintiffs cannot establish the "harmful placement decision"

1    element of their claim.  *McCarthy*, 376 P.3d at 1134.  Second, even if DCYF failed to

2    follow the investigation procedures Plaintiffs identify, the removal decision was based on

3    extensive additional, corroborating evidence presented by other witnesses, including

4    Plaintiffs' children.  (*See, e.g.*, 8/23/2022 Order at 18-19.)  Failure to follow internal

5    procedures is not a basis for a negligent investigation action.  *Petcu*, 86 P.3d at 1246.

6    Therefore, Plaintiffs also fail to identify specific facts that would lead a factfinder to

7    reasonably find that they established the causation element of their negligence claim.

8    The State Defendants are therefore entitled to judgment as a matter of law with respect to

9    this claim.

10                  *b.  Plaintiffs' claim that DCYF negligently failed to protect their children*
                          *from abuse in foster homes fails.*

11          Plaintiffs allege that DCYF was negligent in caring for some of their children

12   while they were placed in foster care.  (*See* Am. Compl. at 21, 42, 96; Resp. at 11.)

13   Specifically, Plaintiffs allege that in placing Z.A.G. and A.S. with the Hadfields, foster

14   parents with a documented history of infractions, DCYF failed to discharge its duty to

15   protect the children from abuse.  (Am. Compl. at 96; Resp. at 11.)  Plaintiffs further

16   allege that DCYF failed to promptly remove their children from the Hadfields' care after

17   concerns of abuse surfaced.  (Am. Compl. at 96-97; Resp. at 11-12.)  Finally, Plaintiffs

18   allege DCYF failed to promptly investigate Plaintiffs' own complaints that Z.A.G. had

19

20

21

22

1    suffered injuries and was not receiving adequate medical care while in the care of Ms.

2    Meekins.[13]  (Am. Compl. at 97-98; Resp. at 11-12.)

3            An action for negligence is available to a plaintiff to whom a defendant owed but

4    failed to discharge a duty of care.  *H.B.H. v. State*, 429 P.3d 484, 491-92 (Wash. 2018)

5    (citing *Peterson v. State*, 671 P.2d 230, 425-26 (Wash. 1983)).  Although there is

6    generally no duty to protect a person from harm by a third party, a duty nonetheless arises

7    where there is a "special relationship" between the defendant and the third party or

8    defendant and the foreseeable victim of the third party's conduct.  *Peterson*, 671 P.2d at

9    426 (quoting *Niece v. Elmview Grp. Home*, 929 P.2d 420, 423 (Wash. 1997)).  Thus, "a

10   special relationship, and the accompanying duty to protect, arises where . . . the defendant

11   has a special relationship with the victim that gives the victim a right to protection."  *Id*.

12   (citing *Niece*, 929 P.2d at 423).  DCYF stands in a special relationship to foster children

13   and thus owes a duty to protect those children from foreseeable harm at the hands of

14   foster parents.  *H.B.H.*, 429 P.3d at 496 (citing Restatement (Second) of Torts § 315(b)

15   (1965)).

16           However, Washington courts narrowly construe this special duty to protect only

17   those in DCYF's custody and care.  The agency's special duty to foster children derives

18

19           _____

20   [13] Plaintiffs also allege that "DCYF acted unreasonably in the placing of AS into the
     home of Leslie Meekins."  (Resp. at 11.)  Ms. Meekins, a Dunlap teacher, made the first report of
     suspected abuse; Plaintiffs allege that placing A.S. in her care was a "direct violation" of the

21   Washington statute prohibiting DCYF from placing foster children with adults who have
     investigated allegations of abuse in connection with their employment.  (*See id.* (citing RCW
     74.13.530).)  However, this statute does not expressly contain a private right of action, nor have

22   Washington courts interpreted it to contain one.  Therefore, the court disregards this allegation.

1    from its organic statute, the purpose of which "is to safeguard, protect, and contribute to

2    the welfare of the *children* of the state." *Id*. at 495-96 (quoting RCW 74.13.010)

3    (emphasis added) (recognizing special relationship and duty owed to foster children

4    where children sued on their own behalf).  Plaintiffs do not identify any authority

5    recognizing a special duty owed to the biological parents of children placed in foster care

6    that would give Plaintiffs standing to recover from DCYF for harm suffered by their

7    children in foster care.  (*See generally* Resp.)  The court has not identified any such

8    authority in its own research.

9        Plaintiffs' negligence claim alleging DCYF failed to protect their children from

10   harm by various foster parents fails because DCYF did not owe Plaintiffs, the parents of

11   the children in its care, any special duty.  *See id*.  If DCYF failed to protect Plaintiffs'

12   children from foreseeable harm in the care of their foster parents, the right to recover for

13   those harms belongs to Plaintiffs' children, and not to Plaintiffs.  *See id*.  Because

14   Plaintiffs have brought this claim on their own behalf, rather than on behalf of their

15   children, their claim is legally deficient.  The State Defendants are entitled to summary

16   judgment as a matter of law on this claim.

17   **D.    Plaintiffs must show cause why the court should not dismiss Plaintiffs' First
        and Fourth Amendment claims on summary judgment.**

18
         Plaintiffs assert that the State Defendants violated their First and Fourth
19
     Amendment rights.  (Am. Compl. at 93.)  The court construes Plaintiffs' First and Fourth
20
     Amendment claims against the State Defendants as alleging that the State Defendants
21
     violated their familial associational rights protected by those amendments.  (*See* Am.
22

1   Compl. at 93-95 (alleging State Defendants removed Plaintiffs' children based on

2   inadequate showing and without following procedures and placed children with foster

3   families without accounting for "family constellation, sibling relationships, ethnicity,

4   culture, and religion")); *see also Keates*, 888 F.3d at 1236 (noting that the First

5   Amendment protects family relationships); *Kirkpatrick*, 843 F.3d at 791 (discussing the

6   "settled premise that social workers violate the Fourth Amendment by removing children

7   absent a warrant or exigent circumstances.").

8          Although the State Defendants seek summary judgment on all of Plaintiffs' claims

9   against them (Mot. at 8), they do not present substantive arguments for summary

10  judgment on Plaintiffs' First or Fourth Amendment claims (*see generally id.*).[14]

11  Nevertheless, Federal Rule of Civil Procedure 56(f)(2) provides that a court may grant a

12  motion for summary judgment on grounds not raised by a party after giving notice and a

13  reasonable time to respond.  Fed. R. Civ. P. 56(f)(2).  Here, the court has already

14  determined that Plaintiffs' familial association claims under the Fourteenth Amendment

15  fail because (1) they are barred by *Heck* or by qualified immunity, or (2) Plaintiffs fail to

16  meet their burden to identify facts from which a factfinder could reasonably find that the

17  _____

18  [14] The State Defendants attempt to dispose of Plaintiffs' First Amendment claim in a
    footnote, arguing "It appears the allegations of First Amendment violation is directed to SPD.
19  Notwithstanding, any First Amendment claim against DCYF would fail for the same reason that
    it failed against the City of Seattle."  (Mot. at 7, n.4 (citing 8/23/22 Order at 17-21).)  The court
20  disagrees with State Defendants' construction.  The court previously dismissed Plaintiffs' claim
    that an SPD officer assumed protective custody over Plaintiffs' children without a warrant in
    retaliation for Mr. Grae-El's statements and conduct during the November 28, 2018 visit.  (*See*
21  8/23/2022 Order at 17; *see also* Am. Compl. at 71.)  The court interprets Plaintiffs' Amended
    Complaint to accuse the State Defendants not of retaliation but of violating their familial
22  association rights.

State Defendants violated their rights.  (*See supra* Sections III.C.1; III.C.2, III.C.4.)  In

light of this reasoning, the court is doubtful that Plaintiffs' familial association claims

under the First and Fourth Amendments remain viable.  Therefore, pursuant to Rule

56(f)(2), the court ORDERS Plaintiffs to show cause why it should not grant summary

judgment on Plaintiffs' First and Fourth Amendment claims in light of the court's

reasoning regarding Plaintiffs' Fourteenth Amendment claims.[15]

## IV.   CONCLUSION

For the forgoing reasons, the court GRANTS the State Defendants' motion for

summary judgment (Dkt. # 92) with respect to Plaintiffs' Fourteenth Amendment familial

association claim, Plaintiffs' Fourteenth Amendment *Brady* claim, Plaintiffs' Fifth

Amendment claim, and Plaintiffs' state law negligence claims.  The court ORDERS

Plaintiffs to SHOW CAUSE why State Defendants are not entitled to summary judgment

with respect to Plaintiffs' First and Fourth Amendment claims.  Plaintiffs shall file a

response to this order, limited to six pages and in full compliance with the Federal Rules

of Civil Procedure and the Local Rules for the Western District of Washington, no later

---

[15] The court again reminds Plaintiffs to comply with the Federal Rules of Civil Procedure and the Local Rules in their response, if any, to this order.

1    than November 14, 2022.  The State Defendants may, but are not required to, file a

2    response, also limited to six pages, no later than November 16, 2022.

3           Dated this 8th day of November, 2022.

4

5

6           JAMES L. ROBART
            United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22